So Ordered.

Dated: April 1, 2025



Katherine Maloney Perhach
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: | Case No. 23-21117-kmp |
| Harris Energy Group, Inc., *et al.*,[1] | Chapter 11 |
|       Debtors. | (Jointly Administered) |

| | |
|---|---|
| Harris Energy Group, Inc. et al., | |
|       Plaintiffs, | |
| v. | Adv. No. 23-2078 |
| Thomas A. Berutti et al., | |
|       Defendants. | |

| | |
|---|---|
| Renewable World Energies, LLC, | |
|       Plaintiff, | |
| v. | Adv. No. 23-2080 |
| William D. Harris et al., | |
|       Defendants. | |

## DECISION, ORDER, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

      Over the course of ten days, the Court held a bench trial on the claims asserted in the adversary proceedings and the claim objections filed in the underlying bankruptcy case. The claims asserted in the adversary proceedings included fraudulent transfers, preferential transfers, breaches of fiduciary duty, diversion of corporate opportunities, and equitable subordination. The claim objections asserted that the Debtors' former Chief Executive Officer had been terminated for cause and that his claim should be reduced accordingly. This opinion states the Court's findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a)(1) (applicable here by operation of Fed. R. Bankr. P. 7052).

---

[1] The Debtors in these Chapter 11 cases, the last four digits of their federal employee identification number, and their case numbers are: Harris Energy Group, Inc. (5473, Case No. 23-21117-kmp), Renewable World Energies, LLC (8805, Case No. 23-21118-kmp), RWE Operations, LLC (9088, Case No. 23-21120-kmp), Flambeau Hydro, LLC (7202, Case No. 23-21121-kmp), Iowa Hydro, LLC (7137, Case No. 23-21123-kmp), Grande Pointe Power Corporation (4106, Case No. 23-21124-kmp), Eau Galle Hydro, LLC (3071, Case No. 23-21127-kmp), UP Hydro, LLC (7389, Case No. 23-21128-kmp), and LCO Hydro, LLC (4089, Case No. 23-21129-kmp).

A bankruptcy court exercises jurisdiction derivative of and dependent upon a district court's jurisdiction. The district courts have original and exclusive jurisdiction of "all cases under title 11." 28 U.S.C. § 1334(a). The district courts also have "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). The district courts are permitted by statute to refer bankruptcy cases and proceedings to the bankruptcy judges for the district. 28 U.S.C. § 157(a). The United States District Court for the Eastern District of Wisconsin has made such a reference. *See* Order of Reference (E.D. Wis. July 10, 1984) (available at www.wied.uscourts.gov/general-orders/order-reference).

All of the matters before the Court are "civil proceedings arising under title 11, or arising in or related to cases under title 11." The fraudulent transfer claims, the preferential transfer claims, and the equitable subordination claim pled in Adv. No. 23-2078, the fraudulent transfer and avoidance claims pled in Adv. No. 23-2080, and the objections to Mr. Thomas Berutti's proof of claim filed by Harris Energy Group, Inc. ("HEG") and Mr. William Harris in the underlying bankruptcy case (the "Claim Objections") arise under title 11 or arise in a case under title 11. The breach of fiduciary duty claims pled in Adv. No. 23-2078 arise under title 11, arise in a case under title 11, or are "related to" HEG's bankruptcy case because resolution of the dispute "affects the amount of property for distribution [i.e., the debtor's estate] or the allocation of property among creditors." *In re FedPak Sys.*, 80 F.3d 207, 213-14 (7th Cir. 1996) (addition in original); *see also Bush v. United States*, 100 F.4th 807, 813 (7th Cir. 2024) (stating that "related to jurisdiction" "is satisfied when the resolution has a potential effect on other creditors").

The Court can enter a final order in all of the pending matters. All of the claims are either (1) core proceedings statutorily designated for final adjudication in the bankruptcy court that the Court is also constitutionally authorized to adjudicate on a final basis or (2) non-core proceedings where the parties have consented to the entry of final judgment by this Court. The first category includes the Claim Objections, which are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(B). It also includes the fraudulent transfer claims and the preferential transfer claims pled in Adv. No. 23-2078 and the fraudulent transfer and avoidance claims pled in Adv. No. 23-2080, which are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(F) and (H). It also includes the equitable subordination claim pled in Adv. No. 23-2078, which is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) and (O). Some of the breach of fiduciary duty claims pled in Adv. No. 23-2078 are arguably also core proceedings pursuant to 28 U.S.C. § 157(b)(2)(B). *See Giuliano v. Fleming (In re Nobilis Health Corp.)*, 661 B.R. 891, 901 (Bankr. D. Del. 2024).

To the extent the breach of fiduciary duty claims are non-core proceedings, the Court may hear and determine them with the parties' consent. *See* 28 U.S.C. § 157(c)(2). The parties have consented to the Court's entry of final orders in both adversary proceedings. Both complaints contain a statement consenting to the Court's jurisdiction. Adv. No. 23-2078, Docket No. 1 ¶ 14; Adv. No. 23-2080, Docket No. 1 ¶ 11. Neither of the answers contains a statement addressing consent to this Court's entry of final orders, so the Defendants have forfeited any

2

right to withhold that consent. Fed. R. Bankr. P. 7012; Bankr. E.D. Wis. Local Rule 7012;[2] *see Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683-85 (2015).

## STATEMENT OF FACTS[3]

In 1977, Bill Harris graduated from the University of Illinois with a degree in electrical engineering. Trial. Tr. 111 (May 7, 2024). The following year, Wisconsin Power and Light ("WP&L") hired Mr. Harris as an electrical field engineer stationed out of Fond du Lac, Wisconsin. *Id*. at 111-12. WP&L also hired Chuck Alsberg around that same time and the two soon became friends. *Id*. at 112. As Mr. Harris observed, "both of us were kind of wired the same in the sense that we liked entrepreneurship." *Id*.

At the start of their employment, WP&L was associated with several decommissioned hydroelectric plants, including a plant in Wautoma, Wisconsin. *Id*. at 112-13. Mr. Alsberg and Mr. Harris became interested in the Wautoma plant and determined that it "might be quite repairable." *Id*. at 113. They promptly entered into a purchase agreement with the plant's owner and made a down payment of $250. *Id*. Mr. Alsberg and Mr. Harris subsequently resigned from their positions with WP&L and went into the hydro business. *Id*. at 114. They formed a company called North American Hydro in which they were equal partners. *Id*. at 117, 123.

Mr. Alsberg and Mr. Harris moved near Wautoma and lived at the hydro plant's dam house on the White River. *Id*. at 114-15. Mr. Harris worked to get the plant running and they managed to survive for about a year. *Id*. at 115. Over the next ten years, North American Hydro acquired approximately a dozen dams. *Id*. at 120. Mr. Harris's dad gave them seed money which they used as collateral to obtain bank loans to support their operations. *Id*. at 116. Mr. Alsberg and Mr. Harris had different roles at North American Hydro: "[Mr. Alsberg] did the money management end of it and [Mr. Harris] did the technical end of it." *Id*.

Eventually, North American Hydro acquired approximately forty-five hydro plants throughout the Upper Midwest in Wisconsin, Minnesota, Iowa, and Illinois. *Id*. at 121-22. Mr. Harris continued to manage the operations, and Mr. Alsberg continued to manage the office. *Id*. However, they needed more assistance and hired additional employees to assist with finances, payroll, bookkeeping, and maintenance. *Id*. At its peak, North American Hydro employed approximately fifty individuals. *Id*. at 122.

In approximately 2012, U.S. Bank called North American Hydro's loan. *Id*. at 124. Mr. Alsberg knew some people who were interested in buying the company. Mr. Harris asked Mr.

---

[2] Local Rule 7012 provides, "A party's failure to include in a responsive pleading a statement addressing consent to the bankruptcy court's entry of final orders or judgments as required by Fed. R. Bankr. P. 7012(b) constitutes a forfeiture of that party's right to withhold that consent. A party who fails to file a responsive pleading after being served as required by Fed. R. Bankr. P. 7004 also forfeits any right to withhold consent to the bankruptcy court's entry of a final order or judgment."

[3] Additional findings of fact related to Sugarloaf Hydro, LLC are included in Sections I.E, III.A, and III.B., *infra*. Additional findings of fact related to RWE Data, LLC are included in Section I.D., *infra*.

3

Thomas Berutti to assist with valuations and projections related to the sale.[4] Trial Tr. at 30-31 (April 17, 2024). Mr. Harris and Mr. Alsberg eventually sold North American Hydro's plants to Eagle Creek Renewable Energy ("Eagle Creek") for $55 million and paid off the company's remaining debt of $14 million. *Id*. at 124-27. Mr. Alsberg and Mr. Harris split the proceeds and Mr. Alsberg moved to Montana. *Id*. at 125.

After North American Hydro sold its collection of dams, Mr. Harris sought to repurchase certain dams from Eagle Creek so that he could remain in the hydroelectric business. Trial Tr. 126 (May 7, 2024). He ultimately purchased seventeen hydro plants and formed Renewable World Energies, LLC ("RWE"), one of the Debtors in these jointly administered bankruptcy cases. Trial Tr. 31-32 (April 17, 2024). Mr. Harris testified that he used about $14 million of his own money to invest into RWE to repurchase the plants. Trial Tr. 174, 211 (May 9, 2024).

Mr. Harris then looked to find someone in Mr. Alsberg's mold: someone who could manage RWE's finances while Mr. Harris oversaw the technical operations. Trial Tr. 165 (May 8, 2024). Mr. Harris approached Mr. Berutti and asked him "to come on board and do financial work for him." *Id*. at 32. Mr. Harris hired Attorney Sverre Roang of Whyte Hirschboeck Dudek, S.C. to form Renewable World Energies, and Attorney Roang drafted an employment agreement for Mr. Berutti. Trial Tr. 202 (April 18, 2024); Trial Tr. 133-35 (May 7, 2024).

### Mr. Berutti enters into his first employment agreement with RWE and RWEO in 2012.

In March of 2012, Mr. Berutti entered into an employment agreement with RWE Operations, LLC ("RWEO") "to serve as Executive Vice President and Chief Financial Officer of RWEO and RWEO's parent company RWE" for a period of three years. Trial Ex. 5, § 1. *See also* Trial Tr. 34 (April 17, 2024). RWEO agreed to pay Mr. Berutti $200,000 per year, with annual increases and bonuses provided at the sole discretion of RWE's board. *Id*. §§ 4.1, 4.3. Mr. Berutti also received reimbursement for ordinary and necessary business expenses incurred in carrying out his duties, the option to participate in the employee benefit plans generally available to RWEO employees, and twenty days of personal time off that would not accrue year-to-year. *Id*. §§ 4.4, 5.1, 5.2. RWE agreed to be jointly and severally liable for payment of all amounts due to Mr. Berutti under the 2012 Employment Agreement. *Id*. § 25.

In his 2012 Employment Agreement, Mr. Berutti agreed that he would "be supportive of the business and best interests of RWE and its affiliated companies and shall not, directly or indirectly, take any action which could reasonably be expected to have an adverse effect upon the business or best interests of RWEO." Trial Ex. 5, § 2. Mr. Berutti also agreed that he "covenants, represents, and warrants that he will at all times honestly and fairly conduct his duties as described herein, or as otherwise directed by the CEO or the Board, and will at all times

---

[4] Mr. Harris testified that he first learned of Mr. Berutti through a recommendation from Mr. Jeff Kiser. Trial Tr. 127 (May 7, 2024). Mr. Kiser owned Kiser Hydro, which was a "hydroelectric fabricator" that worked mainly on the mechanical parts of a hydro plant. Trial Tr. 27 (April 17, 2024). Mr. Berutti testified during trial that he originally met Mr. Harris in 2004, when Mr. Berutti assisted Mr. Kiser with selling Kiser Hydro and a building in Norway, Michigan to Mr. Harris. *Id*. at 27-28. Mr. Harris (and potentially Mr. Alsberg) eventually acquired Kiser Hydro. *Id*. at 28.

maintain the highest of professional standards in representing the interests of RWE and its affiliated companies." *Id.*

The 2012 Employment Agreement required Mr. Berutti to "devote his time, attention, and energies on a full-time basis to RWE and its affiliated companies" and restricted Mr. Berutti from engaging "in any other business activity which, in the reasonable judgment of RWEO, conflicts with the duties of [Mr. Berutti] under this Agreement, whether or not such activity is pursued for gain, profit, or other pecuniary advantage." Trial Ex. 5, § 3.

The 2012 Employment Agreement also contained a non-solicitation provision and a non-competition provision. Under the agreement, Mr. Berutti agreed that he would not "solicit, encourage or induce any employee of RWEO for any employment," or "aid or assist any other person, firm, corporation or other business entity to do any of the aforesaid acts." *Id.* § 8.3. In addition, he agreed that "during the Employment Period and for a further period of six (6) months" after his termination, he would not "provide assistance or service to, engage in, or have a material financial interest in that aspect of any firm, entity, activity or enterprise which (i) engages in business substantially similar to that RWEO and (ii) competes with the Company anywhere within the Restricted Territory, which was defined in the Agreement as "any and all areas within a 150-mile radius of a location at which RWEO or its subsidiaries has material business operations." *Id.* § 9.

The 2012 Employment Agreement provided that Mr. Berutti could be terminated "for cause" or "without cause." *Id.* §§ 6.4, 6.5. It enumerated nine "circumstances" that would constitute "cause" and provided that if one of the circumstances occurred, RWEO would provide Mr. Berutti with written notice of the circumstance and afford him three days to review and respond. *Id.* § 6.4. After the expiration of that period, RWEO could terminate Mr. Berutti's employment immediately. *Id.*

In the provision addressing termination "without cause," the 2012 Employment Agreement provided that if Mr. Berutti were terminated "for any reason other than pursuant to Sections 6.1 through 6.4 [i.e., upon death, total disability, mutual termination, or termination for cause] hereof, RWEO will continue to pay [Mr. Berutti] his unpaid Base Salary for the remainder of the Employment Period in accordance with RWEO's regular payroll cycle." *Id.* § 6.5.

## Mr. Berutti enters into two new employment agreements with RWEO and Kiser Hydro in 2013.

The following year, 2013, Mr. Berutti entered into two new employment agreements. Trial Exs. 6, 7. According to Mr. Berutti, Mr. Harris "asked [him] to get involved with Kiser Hydro, as well as RW[E] Operations." Trial Tr. 34 (April 17, 2024). Kiser Hydro was a "union millwright, fabricating company" that "worked on hydro plants, mainly the mechanical parts of the hydro plants." Trial Tr. 27, 166 (April 17, 2024). Mr. Berutti testified that "Kiser was, at that point, cratering," Mr. Harris had personally guaranteed approximately $4 million in debt, and Kiser Hydro "had major projects underway where they were losing - - hemorrhaging money." *Id.* at 39. Mr. Berutti's 2013 Employment Agreements provided that he would serve as Executive Vice President and Chief Financial Officer of Kiser, RWEO, and RWEO's parent

5

company, RWE, for a three-year term. Trial Ex. 6, 7, §§ 1-2. The agreements also contained "evergreen" provisions such that the three-year terms would renew at each anniversary of the agreements' commencement date subject to the renewal and termination provisions stated in the agreements. Trial Exs. 6, 7, §§ 1.

Mr. Berutti's total base salary was $202,000, similar to his base salary under the 2012 Employment Agreement, but with a fixed annual increase of 3% instead of an increase at the Board's discretion. Trial Exs. 6, 7, §§ 4.1. Mr. Berutti was also eligible for bonuses at the Board's discretion, reimbursement of ordinary business expenses, other generally available employee benefit plans, and twenty days of personal time off that did not carry over from year-to-year. *Id*. §§ 4.3, 4.4, 5.1, 5.2. The 2013 Employment Agreement with RWEO also required the company to pay Mr. Berutti a monthly $800 vehicle allowance "to offset ordinary wear and tear, as well as reimbursement for all repairs, tire replacements and oil changes." *Id.* § 4.5.

The 2013 Employment Agreements contained similar provisions addressing termination "for cause" or "without cause" as the 2012 Employment Agreement, though they required the employing company to provide thirty days' written notice of the event or circumstance supporting termination for cause instead of three days. *Id*. §§ 6.4, 6.5. The agreements also contained similar non-solicitation and non-competition provisions as the 2012 Employment Agreement. *Id*. §§ 8.3, 9.

## **Mr. Berutti enters into another employment agreement with RWE and RWEO in 2015.**

In 2015, Mr. Berutti had a severe heart attack in Milwaukee. Trial Tr. 40 (April 17, 2024). He subsequently entered into a new employment agreement with RWEO where he received an ownership interest in the company. He testified that he received "rights to ownership - - a part ownership interest in - - in RWE as an incentive for me to stay working with the company." *Id*. at 40. Mr. Berutti worked with RWE's new attorney, Paul Karch, to negotiate this new employment agreement. Trial Tr. 47 (April 17, 2024). He consulted with Julie LaCost as a personal attorney. *Id*.

Under the 2015 Employment Agreement, Mr. Berutti was employed as the "Chief Executive Officer of RWEO, RWEO's parent company, RWE, and its subsidiary companies" for a period of three years. Trial Ex. 8, §§ 1-2. The 2015 Employment Agreement continued to have an "evergreen" provision such that the three-year term would renew at each anniversary of the agreement's April 1, 2015 commencement date. *Id*. § 1. For his services, RWEO agreed to pay Mr. Berutti $211,181 per year, subject to an annual increase of 3%. *Id*. § 4.1. Consistent with his previous agreements, he remained eligible for discretionary bonuses, reimbursement of ordinary and necessary business expenses, other generally available employee benefit plans, twenty days of personal time off, and a monthly vehicle allowance. *Id*. §§ 4.3, 4.4, 4.5, 5.1, 5.2.

The 2015 Employment Agreement contained similar provisions addressing termination "for cause" or "without cause" as the 2012 Employment Agreement and the 2013 Employment Agreements, though it required RWEO to provide fifteen days' written notice of the circumstance supporting termination for cause (instead of the three days provided in the 2012 Employment Agreement or the thirty days provided in the 2013 Employment Agreements). *Id*.

6

§§ 6.4, 6.5. It also contained similar non-solicitation and non-competition provisions as the 2012 Employment Agreement and the 2013 Employment Agreements. *Id.* §§ 8.3, 9.

To grant the ownership interest to Mr. Berutti, the 2015 Employment Agreement provided that upon satisfaction of certain loan agreements, Mr. Berutti "shall automatically be granted a six (6) percent interest in RWE or other parent company to the RWE affiliated and subsidiary entities, as applicable, provided that [Mr. Berutti] is employed on such date. The grant of the minority interest shall be made within thirty (30) days following the date of the Loan Satisfaction." *Id.* § 11.1. In addition, as of each January 1, Mr. Berutti was entitled to receive an additional one percent "interest in RWE or other parent company to the RWE … affiliated and subsidiary entities, as applicable, until [Mr. Berutti] has been granted a total interest of ten (10) percent." *Id.* § 11.2.1. The agreement also provided that each time Mr. Berutti received an interest in the company, the company would pay him an additional "amount equal to the sum of income taxes payable by [Mr. Berutti], plus the amount necessary to put [Mr. Berutti] in the same after-tax position (taking into account any and all applicable federal, state, local income, employment and excise taxes) that he would have been in if [Mr. Berutti] had not incurred any tax liability upon receiving an interest grant." *Id.* § 11.3.

### RWE becomes a subsidiary of Harris Energy Group, Inc. in 2015.

In 2015, RWE became a subsidiary of Harris Energy Group, Inc. ("HEG"), also one of the Debtors in these bankruptcy cases. Trial Tr. 46 (April 17, 2024). Given the number of Debtors and hydro plants involved in this bankruptcy case, this helpful chart prepared by Debtors' counsel assists with visualizing the organizational structure of HEG at the time these bankruptcy cases were filed on March 16, 2023:



*In re Harris Energy Group, Inc.*, No. 23-21117-kmp, Docket No. 11, Exhibit A.[5]

**Mr. Berutti begins to pursue a new employment agreement in 2016.**

In February 2016, Mr. Berutti retained Attorney Ed Hammond to represent him in connection with a new employment agreement. He executed an engagement agreement which provided that the law firm would "bill Harris Energy Group, attn: Mr. Robert Gerhard" instead of billing Mr. Berutti. Trial Ex. 9(b). Mr. Gerhard was an employee of RWEO. According to Mr. Berutti, he was in charge of HR, oversaw the bookkeeping, accounts payable and accounts receivable, and worked under Mr. Berutti's direction. Trial Tr. at 52 (April 17, 2024). Mr. Gerhard had been previously employed by Mr. Berutti in his payday lending business and had worked for him since 2000. Trial Tr. at 28-29 (April 17, 2024).

Mr. Berutti's outstanding stock was at least part of the reason he sought the new employment agreement. Trial Ex. 9(a). In a February 2016 email to Mr. Berutti, Attorney Hammond stated that "the initial issues we need to address for you involve (i) a new employment agreement (since your current one is expiring soon) and (ii) addressing strategies to assist the company in fulfilling its promises of stock ownership to you." *Id.* Mr. Berutti's 2015 Employment Agreement was not "expiring soon." Trial Ex. 8, § 1. It was effective on April 1, 2015, and had a three-year term that would renew at each anniversary of that commencement date unless or until a party elected not to renew it. *Id.* On November 1, 2016, Attorney Hammond, Mr. Berutti's personal attorney, emailed Attorney Jonathan Walton, outside corporate counsel for Harris Energy Group, a draft of a new employment agreement and a summary of Mr. Berutti's proposed changes. Trial Ex. 10. Attorney Hammond's cover email noted that, for the first time, Mr. Berutti would be asking Mr. Harris to personally guarantee the company's employment obligations. *Id.* at 1.

After he received that email, and on that same date, Attorney Walton asked Mr. Berutti, "[w]ho should I contact at the company to discuss some initial questions and ultimately to get in touch with Bill Harris?" Trial Ex. 11 at 1. *See also* Trial Tr. 67-68 (April 17, 2024). Mr. Berutti responded that "Bob Gerhard and I will present the cont[r]act to Bill with Bob [Gerhard] present". *Id. See also* Trial Tr. 67 (April 17, 2024). Mr. Berutti testified that "Mr. Harris received drafts back in" 2016, Trial Tr. 72 (April 17, 2024), but there were no documents showing that Mr. Harris received or reviewed the draft agreements until February 2017.

**Mr. Berutti enters into his final employment agreement with HEG in February 2017.**

On February 15, 2017, Mr. Berutti, Mr. Harris, and Mr. Gerhard went over the draft Employment Agreement and a new Shareholders Agreement. Trial Exs. 15, 20. Mr. Gerhard wrote a letter to Attorney Walton summarizing the meeting:

> On Wednesday, February 15, 2017, Bill Harris, Tom Berutti and I
> went over all the documents associated with Tom Berutti's
> Employment Agreement and Shareholder's Agreement, along with
> the Unconditional Guaranty, The Action of the Shareholder and the

---

[5] Marseilles Hydro Power, LLC, Grenfell Inc., and Neshkoro Hydro, LLC are not debtors in this bankruptcy case.

letter from Tom Berutti to Bill Harris regarding the Rental
Properties. We went over the Summary of Changes for both the
Employment Agreement and the Shareholders agreement. We
pointed out and explained the documents to Bill.

I then gave an entire set of the above documents to Bill to keep and
review before our formal meeting Thursday night with Jonathan
Walton, HEG's Corporate Attorney.

Trial Ex. 20.

On February 16, 2017, Attorney Walton traveled to Iron Mountain, Michigan and met
with Mr. Harris.  Trial Tr. 70 (April 17, 2024); Trial Exs. 13, 19; Walton Dep. Tr. 17-18, 43, 47-
50 (Docket No. 51-49, 80).  Attorney Walton did not recall having any discussions with Mr.
Harris about the agreement prior to meeting with Mr. Harris.  Walton Dep. Tr. 17-18 (Docket
No. 51-49, 80).  However, Attorney Walton had a lengthy discussion with Mr. Harris at the
February 16, 2017 meeting.  Walton Dep. Tr. 17-18, 43, 47-50 (Docket No. 51-49, 80); Trial Ex.
19.  Attorney Walton summarized this meeting in a letter that he wrote to Attorney Hammond,
Mr. Berutti's personal attorney, as follows:

On Thursday, February 16, 2017 I met with Bill Harris and Bob
Gerhard to go over Tom Berutti's proposed Amended and Restated
Employment Agreement and Shareholders Agreement, Bill's
Guaranty, the Shareholder Consent and the letter from Tom to Bill
concerning rental payments.  We discussed the general structure as
well as the specific aspects of the documents.

As to the Employment Agreement, the points covered included:
increasing the duration of the contract from the three-year term
currently under Tom's 2015 employment contract to a five-year
evergreen term; the salary to be paid, including a lump-sum
payment during the second quarter of each year; the provisions for
a 3% annual increase in the lump sum payment and the base salary;
reimbursement to Tom of premiums for the life insurance policies
covering Bill that Tom holds; and the benefit package. We also
discussed the provisions in the Employment Agreement that fulfill
and protect Bill's agreement that Tom would receive a 10%
ownership share in HEG, including the time table for issuing
shares to Tom. We reviewed the provision to pay Tom the
equivalent of an annual S corporation shareholder distribution
based on the difference between the amount payable to a 10%
holder and the amount of stock actually issued to him. We also
reviewed the requirement that upon termination of employment
Tom receive payment for the value of the portion of a 10% holding
not yet issued to him (in addition to a buy back of his issued shares
under the Shareholders Agreement). We also covered Bill's

9

Guaranty of the Employment Agreement, that also extends to RWEO.

One provision of the Employment Agreement that was extensively discussed was Section 14, which requires that if Tom or his trust/heirs wind up in litigation against HEG relating to the Employment Agreement, then during the pendency of the case the company must reimburse the legal costs of Tom or his trust/heirs on a monthly basis. It was decided in discussions with Tom to limit the duration of this provision. To do so, language was added so that Section 14 will expire upon the earlier of establishing a governance and succession plan relating to Bill's ownership in HEG, or two years from the signing of the agreement-February 16, 2019.

Trial Ex. 19.

Attorney Walton then addressed the new Shareholders Agreement:

We also reviewed all of the major provisions of the Shareholders Agreement. The basic structure was explained, in which Tom is not permitted to sell his shares outside the company, but HEG must buy back his shares when his employment is terminated for any reason, and in other scenarios such as divorce or insolvency. We reviewed how the buyback price is determined based on current appraisals and appraisals of future hydros acquired. We also discussed how the Agreement includes language that may extend the buyback payment over time if required by the company's contractual obligations, legal constraints and/or financial condition. Finally, we reviewed the portions of the Agreement providing for unanimous voting on important issues and establishing a three person board of directors comprised of Bill, Tom and Bob. We also went over the Shareholder Consent proposed to add the new board structure and the provisions of the Shareholders Agreement to HEG's Bylaws.

*Id.*

Attorney Walton concluded the summary of the meeting by stating, "Bill indicated that all of his questions had been answered, and that he agreed with terms presented. He and Tom shook hands on the deal. At the conclusion of our meeting all documents were signed, initialed and witnessed." *Id.*

10

Mr. Gerhard's letter to Attorney Walton offers the same account:

> On Thursday, February 16, 2017, Jonathan Walton and Bill Harris went over all of the above documents at greater length [Tom Berutti's Employment Agreement and Shareholder's Agreement, along with the Unconditional Guaranty, The Action of the Shareholder and the letter from Tom Berutti to Bill Harris regarding the Rental Properties]. I, Bob Gerhard, was also in the room the entire time.

> The only alteration to any of the documents came at Bill Harris' request. Bill Harris requested that in the Employment Agreement, Section 14: Legal Expenses, the line: "This Section 14 will expire upon the earlier of: (i) the completion of a succession and governance plan with respect to William D. Harris's ownership share in HEG or(ii) February 16, 2019", be added to the section.

> This change was agreed to by all parties and the entire set of documents were then signed by all parties involved and witnessed.

Trial Ex. 20.

### Compensation and benefits under Mr. Berutti's 2017 Employment Agreement.

Under the 2017 Employment Agreement, Mr. Berutti was employed to serve as the Chief Executive Officer of HEG and its subsidiary companies. The agreement extended the term of Mr. Berutti's employment from a three-year rolling term to a five-year rolling term. Trial Ex. 16, § 1; Trial Tr. 74 (April 17, 2024). The 2017 Employment Agreement continued to have an "evergreen" provision, like the 2013 Employment Agreements and the 2015 Employment Agreement, such that the five-year term would renew at each anniversary of the agreement's February 16, 2017 commencement date. Trial Ex. 16, § 1. Mr. Berutti's base salary under the 2017 Employment Agreement increased from $211,181 to $224,042 and was subject to the same annual increase of 3% as in the past. Trial Ex. 16, § 4.1; Trial Tr. 76 (April 17, 2024).

For the first time, the 2017 Employment Agreement provided for set bonuses. Instead of receiving a bonus only at the discretion of the Board like in the previous agreements, Mr. Berutti would receive a fixed bonus of $52,451, subject to an annual increase of 3%. Trial Ex. 16, § 4.4; Trial Tr. 79 (April 17, 2024). He would also receive a bonus "in an amount equal to the amount of ordinary income that would be reportable on a Schedule K-1 for the prior calendar year with respect to a HEG shareholder at all times during the previous calendar year owning a number of HEG shares equal to the excess of (a) the number of shares of HEG a ten percent (10%) owner of HEG would own over (b) the number of HEG shares [Mr. Berutti] owns as of the last day of the prior calendar year." Trial Ex. 16, § 4.2; Trial Tr. 76-77 (April 17, 2024).

Mr. Berutti remained eligible for discretionary bonuses and, like in the previous agreements, would receive reimbursement for ordinary and necessary business expenses and an

$800 monthly vehicle allowance. Trial Ex. 16, §§ 4.4, 4.5, 4.6. For the first time, the 2017 Employment Agreement also provided that HEG would reimburse Mr. Berutti for the monthly premiums on a $3,000,000 life insurance policy on Mr. Harris and a $2,000,000 accidental death and disability insurance policy on Mr. Harris. *Id.* §§ 4.8, 4.9.

Like in the previous agreements, Mr. Berutti received twenty days of personal time off. However, unlike the previous agreements, the 2017 Employment Agreement explicitly provided that the time would accrue and "not be subject to any limit." *Id.* §§ 5.1, 5.2. The agreement provided that if Mr. Berutti "emails or texts for any business purpose during any day, that day (whether or not scheduled as personal time off) will not be considered as a personal time off day." *Id.* § 5.2.

RWEO, RWE, and Kiser Hydro "agree[d] to be jointly and severally liable for all obligations due to [Mr. Berutti] under the terms" of the 2017 Employment Agreement. *Id.* § 27. In addition, Mr. Harris and RWEO executed an "Unconditional Guaranty" of HEG's obligations under the 2017 Employment Agreement. Trial Ex. 78. This was the first time Mr. Harris had personally guaranteed HEG's obligations to Mr. Berutti.

**General provisions in Mr. Berutti's 2017 Employment Agreement.**

In the 2017 Employment Agreement, Mr. Berutti agreed to "work cooperatively with the Board and other members of management of HEG and provide input on the future direction of HEG and its subsidiary companies." Trial Ex. 16, § 2. The agreement provided that Mr. Berutti "covenants, represents, and warrants that he will at all times honestly and fairly conduct his duties as described herein, or as otherwise directed by the Board, and will at all times maintain the highest of professional standards in representing the interests of HEG and its subsidiary companies." *Id.* It also required Mr. Berutti to "devote his work time, attention, and energies on a full-time basis to HEG and its subsidiary and/or affiliated companies" and restricted Mr. Berutti from engaging "in any other business activity which, in the reasonable judgment of the Board, conflicts with the duties of [Mr. Berutti] under this Agreement, whether or not such activity is pursued for gain, profit, or other pecuniary advantage." *Id.* § 3.

The 2017 Employment Agreement contained non-solicitation and non-competition provisions. Mr. Berutti agreed that he would not "solicit, encourage or induce any employee of HEG, or its subsidiary companies for any employment," or "aid or assist any other person, firm, corporation or other business entity to do any of the aforesaid acts." *Id.* § 8.3. In addition, he agreed that "while employed pursuant to this Agreement, and for a further period" after his termination, he would not "provide assistance or service to, engage in, or have a material financial interest in that aspect of any firm, entity, activity or enterprise which (i) engages in business substantially similar to the hydroelectric business of HEG and its subsidiaries, and (ii) competes with HEG and its subsidiaries" "within a 150-mile radius of a location at which HEG and its subsidiaries own or operate a hydroelectric dam." *Id.* § 9.

**Termination provisions in Mr. Berutti's 2017 Employment Agreement.**

Like the previous agreements, the 2017 Employment Agreement contemplated "termination for cause" and "termination without cause." *Id*. §§ 6.3, 6.4. The agreement listed six potential events which would constitute a "for cause" termination:

6.3.1    Any intentional act of dishonesty of [Mr. Berutti] that involves a substantial and material aspect of his employment and causes material harm to HEG;

6.3.2    The occurrence of any event or circumstance caused by [Mr. Berutti's] intentional, reckless or grossly negligent act or omission which would constitute just cause for termination at common law or in equity;

6.3.3    [Mr. Berutti's] conviction of a felony involving dishonesty or any other crime involving dishonesty by any court of competent jurisdiction;

6.3.4    [Mr. Berutti's] conviction for embezzlement or misappropriation of funds or other resources of RWEO, RWE, or HEG;

6.3.5    Abandonment by [Mr. Berutti] of, or chronic, habitual or continuous failure by [Mr. Berutti] to perform, his job duties for any reason that is unrelated to his death or disability;

6.3.6    Material violation, default or breach of any of [Mr. Berutti's] duties under this Agreement.

*Id*. §§ 6.3.1-6.3.6.

If one of the "for cause" events occurred, the 2017 Employment Agreement required HEG's Board of Directors to provide Mr. Berutti, prior to his termination, with written notice of the "cause" for his termination and afford him thirty days to review and respond unless his "continued employment would expose [HEG] to substantial, material harm." *Id*. § 6.3. In the event that Mr. Berutti's "continued employment would expose [HEG] to substantial, material harm," HEG could terminate Mr. Berutti "immediately" and "without notice." *Id.* The 2017 Employment Agreement stated as follows:

> In the event any one or more of the foregoing circumstances should occur, prior to Executive's termination, the Board must provide written notice of the applicable event or circumstance and further afford Executive a period of at least thirty (30) calendar days to review and respond to said event or circumstance (unless continued employment would expose the Company to substantial, material harm, in which event HEG may terminate Executive immediately without notice). After the expiration of the thirty-calendar-day review and response period provided for above, the Board may, at its option, terminate Executive's employment

13

immediately with HEG and its subsidiaries if no response has been
provided by Executive. In the event a response is provided by
Executive, Executive's employment shall not be terminated unless
the Board, at a duly scheduled meeting, gives full and fair
consideration to the response provided by Executive and affords
Executive the opportunity, at his option, to appear at said meeting
and address the issues raised in the written notice. Should the
Board thereafter determine to proceed with the termination, it
shall, within fifteen (15) calendar days of the Board meeting,
provide Executive a written explanation setting forth its reasons for
so proceeding.

*Id.*

If Mr. Berutti were terminated "for cause," the 2017 Employment Agreement provided
that he would receive "pro-rated compensation earned through the date of his separation from
service." *Id.* It also contained a provision related to his ownership interest in the company. He
would receive (1) an "amount equal to the excess of the Purchase Price of ten percent (10%) of
the issued and outstanding stock of HEG over the Purchase Price of the shares of HEG actually
transferred to and owned by Executive pursuant to Section 11 as of the date of Executive's
separation;" (2) "an additional amount equal to the income taxes payable by Executive on such
payment;" and (3) an amount necessary to put him in the same after-tax position that he would
have been in if he had not incurred any tax liability upon receiving such payments. *Id.*

If Mr. Berutti were terminated "without cause," the 2017 Employment Agreement
provided that he would receive payment of "his unpaid Base Salary for the remainder of the
Employment Period in accordance with RWEO's regular payroll cycle." *Id.* § 6.4. It also
provided that he would receive the same payments related to his ownership interest in the
company as if he were terminated for cause.

**Stock grant provision of the 2017 Employment Agreement.**

To address the stock grant to Mr. Berutti, the 2017 Employment Agreement stated that
"[a]lthough Loan Satisfaction has occurred, such grant has not yet occurred as of the date of this
Agreement pursuant to Section 11.13 and Section 409A of the Code. Accordingly, at the time
Section 11.4 allows such grants, Executive shall be granted an interest in HEG equivalent in
value to a six percent (6%) interest in RWE." Trial Ex. 16, § 11.1. Section 11.4 stated,

[n]otwithstanding anything to the contrary herein, if the provisions
of this Section 11 jeopardize the ability of HEG or its subsidiaries
to continue as a going concern, or would violate a loan covenant,
agreement, or similar obligation of HEG or its subsidiaries then the
transfers and payments provided for in this Section 11 shall occur
during the first taxable year in which such transfers and payments
would not have such effect.

14

*Id*. § 11.4. Like the 2015 Employment Agreement, the 2017 Employment Agreement also provided that Mr. Berutti would receive an additional grant of a 1% interest each year, starting with January 2016, until he had been granted a total interest of 10% of HEG. *Id*. § 11.2. It stated, "[s]ubject to Section 11.4, the grants for 2016 and 2017 will be made upon the execution of this Agreement by Executive and HEG." *Id*.

## Mr. Harris and Mr. Berutti also enter into a Shareholders Agreement in February 2017.

Mr. Harris was the sole shareholder of HEG at the time of the 2017 Employment Agreement. Mr. Berutti and Mr. Gerhard were added as directors of HEG in February 2017. Trial Ex. 17. In anticipation of the grant of the ownership interest contemplated in the 2017 Employment Agreement, HEG, Mr. Berutti, and Mr. Harris also entered into a Shareholders Agreement on February 16, 2017. *Id*. The Shareholders Agreement contained a requirement that HEG repurchase Mr. Berutti's stock at a certain price if certain "Triggering Events" occurred, which included (1) if Mr. Berutti's employment were terminated; (2) if Mr. Berutti's assets were divided in a divorce proceeding; (3) if Mr. Berutti entered into an assignment for the benefit of creditors; (4) if Mr. Berutti filed or was forced into bankruptcy; (5) if a receiver were appointed for Mr. Berutti's assets; (6) if a majority of HEG's stock were sold, or if HEG sold a majority of its assets; or (7) if Mr. Berutti were to alienate or encumber his shares. Trial Ex. 17, § 3.2.

If a "Triggering Event" did occur, the Shareholders Agreement provided that the "Purchase Price" would equal: (1) the agreed-upon or appraised value of HEG as of the "Determination Date" as determined by the provisions of the Shareholders Agreement, divided by (2) the total number of shares issued and outstanding on the "Determination Date," multiplied by (3) the number of shares being purchased. *Id*. § 4.1.

The Shareholders Agreement further provided that the "Value" of the shares would "not be less than the combined appraised value of HEG and each of its subsidiary entities" less "the debts of the combined companies," and that no subsidiary would have a value less than $1.00. *Id*. § 4.2. The agreement contained a list of appraised values for the hydroelectric projects reflecting an aggregate value of $27,505,000.00. *Id*. at 13. The aggregate value included the following hydro plants and appraised values:

| | |
|---|---|
| Cataract | $6,630,000 |
| Eau Galle | $710,000 |
| Grande Pointe Power | $1,750,000 |

*Id*.

## RWE borrows $7 million from Zero6 in December 2017.

On or about December 20, 2017, RWE obtained a $7 million loan from Juhl Clean Energy Assets, Inc. n/k/a Zero6 Energy, Inc. ("Juhl" or "Zero6"). Trial Ex. 27; Trial Tr. 100-01 (April 17, 2024); Trial Tr. 89-90 (April 22, 2024); Trial Tr. 41-43 (May 8, 2024). Zero6 loaned $2.5 million directly to Flambeau Hydro, LLC and paid $4.5 million to Stephenson National

15

Bank and Trust ("SNBT") to reduce its indebtedness with the bank. *Id.* After the paydown, RWE owed SNBT $6,610,000. Trial Ex. 428 at 1; Trial Tr. 12 (May 7, 2024).

## HEG issues stock to Mr. Berutti in December 2017.

About a week after the Zero6 loan, on or about December 28, 2017, HEG issued 40 shares of stock valued at $651,029.65 to Mr. Berutti pursuant to an Action of the Directors by Consent. Trial Ex. 144. HEG also paid $567,442.46 to satisfy the requirement in the 2017 Employment Agreement that HEG pay Mr. Berutti an additional amount necessary to put him in the same position after taxes that he would have been in without the stock issuance. *Id.*

The December 2017 Action of the Directors by Consent recognized that as of January 1, 2018, under his 2017 Employment Agreement, "Mr. Berutti will have earned the right to insurance [sic] of a 9% interest in the Corporation, including the interest issued hereunder, which constitutes 4.08%." Trial Ex. 144 at 1. It stated that, "issuance of further share to Mr. Berutti in fulfillment of the [2017 Employment] Agreement is recognized as an obligation of the Corporation in accordance of [sic] the Agreement, and shall be completed at a future date based on the requirements of the Agreement and the financial need of the Corporation." *Id.*

## Mr. Berutti arranges the Eau Galle/Grande Pointe "sale-and-buyback" transaction in October 2020.

Several years passed without any further issuance of an ownership interest to Mr. Berutti. Mr. Berutti testified that in 2020, the company was not in a position to grant him the remaining ownership interest he was entitled to under the 2017 Employment Agreement. He testified that if the company had issued him a stock certificate, "the company would've had to pay $550,000 to the IRS, which it could not do." Trial Tr. 121 (April 17, 2024). Nonetheless, Mr. Berutti arranged a transaction in 2020 where, instead of receiving stock, he ultimately received $1 million in cash, after first taking ownership of two RWE subsidiaries, Eau Galle Hydro, LLC and Grande Pointe Power Corporation, to ensure that he would receive payment.

In 2020, one of RWE's subsidiaries, Iowa Hydro, LLC, needed $500,000 for a hydro plant upgrade. Iowa Hydro owned a hydro plant in Maquoketa, Iowa (the "Maquoketa Plant"). The company sold the electricity the plant produced into a utility system, the Midcontinent Independent System Operator ("MISO"), that is, the "grid." Trial Tr. 59 (May 8, 2024). MISO was updating its voltage, and this meant that the Maquoketa Plant had to upgrade its transformer to continue to sell power into MISO. *Id.* MISO had informed Iowa Hydro of the upgrade two plus years in advance. *Id.* at 60-61. Mr. Harris estimated that the upgrade would cost around $450,000 to $500,000 in the late summer of 2020. *Id.* at 61, 63.

Mr. Berutti was in charge of finding the money for the upgrade. Mr. Harris "trusted that Tom would do whatever mechanism - - financial mechanism would be the most cost-effective, most efficient for the company." *Id.* at 65. SNBT was Iowa Hydro's primary secured lender. Timothy Stauss, SNBT's loan officer, testified at trial that he did not recall SNBT receiving a request for money to pay for the upgrade. Trial Tr. 30-31 (May 7, 2024). The fact that a request for money does not appear in his write-ups led him to the conclusion that such a request was

16

likely never made. *Id.* at 31; Trial Ex. 432. Mr. Berutti testified that because SNBT was the primary secured creditor, he did not seek a loan from a different commercial lending institution. Trial Tr. 107 (April 17, 2024). He also testified that he did not ask to borrow the money from Zero6, the entity that loaned $7 million to RWE in 2017, because he understood that a $500,000 loan was "too small for them." *Id*. at 107, 112.

Mr. Berutti ultimately funded the $500,000 upgrade himself and he structured a transaction that would result in Mr. Berutti recovering the "value" of his unissued stock, which he claimed was roughly $700,000, as well as an amount that would cover any tax consequences associated with his receipt of that value. He proposed a transaction in which RWE would sell two of its subsidiaries, Eau Galle Hydro and Grande Pointe Power Corporation, to Berutti Energy, Mr. Berutti's company, in exchange for $500,000 in cash and "$700K of his earned unpaid deferred comp." Trial Ex. 59. RWE would lease the hydro plants back from Berutti Energy for $8,000 per month. *Id.* The proposal also contemplated that RWE would eventually buy back Eau Galle Hydro and Grande Pointe Power Corporation for $1.2 million plus the amount required to cover the transaction's adverse tax consequences to Mr. Berutti. *Id.* If RWE was unable to buy back the subsidiaries, Mr. Berutti could sell them to anyone and RWE and Mr. Harris, personally, would be liable for any deficiency between the sale price and $1.2 million plus Mr. Berutti's tax consequences. *Id.*

On September 15, 2020, Mr. Berutti emailed Attorney Walton asking that he prepare a purchase agreement, lease, operation and maintenance agreement, an "RWE Repurchase Option," and a "TAB Put Option." *Id.* Mr. Berutti proposed that RWE would sell Eau Galle Hydro, LLC and Grande Pointe Power Corporation to him for $600,000 each. *Id*. Mr. Berutti would "use $700K of his earned unpaid deferred comp towards the purchase of these LLC's [sic]." *Id*. He asserted that the balance of his deferred compensation "after this transaction will be $300K. ($1.7 million minimum per my employment contract less $700K paid in December 2018, less the $700K used here)." *Id*. The proposed transaction required that Dan Ehr, the Debtors' accountant, complete an analysis "that should show no[ ] taxes due by TAB on deferred com[p] due to depreciation on assets purchased." *Id*. It also required that RWE "lease and operate and maintain both hydro plants on a 10-year lease term with a monthly lease payment of $8K per month plus dam lease and property tax escrow." *Id*. RWE would also keep "all revenue and pay[] all operating and maintenance expenses and must return the assets in working order at end of lease." *Id*.

Mr. Berutti's proposal gave RWE "the option to repurchase both LLC's (all or none) for $1.2 million (PLUS Capital gain taxes liability that would be owed by TAB) at any time during lease term." *Id*. In addition, Mr. Berutti would have "the right to put said LLC's back on RWE should TAB no longer be employed or if the lessor [RWE] fails to proper[ly] maintain and operate the hydro plants." *Id*. The strike price would be "$1.2 million PLUS Capital gain taxes liability that would be owed by TAB." *Id*. (emphasis in original). If RWE did not accept the put option, then Mr. Berutti would be able to sell the assets to anyone, with RWE and Mr. Harris liable for any amounts necessary to make Mr. Berutti whole. *Id*. Attorney Walton responded that same day: "Ok, I'll get to work." Walton Dep. Ex. 19 (Docket No. 51-49, 80).

On September 21, 2020, Mr. Berutti sent the proposed transaction to Mr. Stauss, RWE's loan officer at SNBT. Trial Ex. 443. Mr. Berutti wrote that he would like to personally "finance $600K, of the purchase ($500K to Seller and $100K other debt) over 10 years but I would like the monthly payment sent [sic] at $8,000 P&I (in effect a[n] 8 year amort) plus property tax and dam less escrow." *Id*.

A few weeks later, on October 6, 2020, Mr. Berutti presented a summary of the "Lease Buy Back" option to Mr. Harris by email:

> Bill,
>
> Jonathan is drafting the necessary documents for the sale lease back of Eau Galle and Three Rivers to raise capital for RWE. In summary here is what it will look like:
>
> I will buy the Eau Galle Hydro LLC for $600K and Grande Point [sic] Power Corp LLC (GPPC) for $600K for a total of $1.2 million.
>
> I will use $700K of my unpaid ownership in HEG (to be confirmed by Dan Ehr) towards the purchase and pay RWE $500K in cash at closing.
>
> RWE will then lease the LLCs back from me for 10 years at rent of $8K/month, RWE will operate and maintain the plants during the lease and keep whatever revenue the plants generate.
>
> RWE will have the right to repurchase the two LLC's at any time for the purchase price plus tax my adverse tax effect [sic] caused by this transaction.
>
> I will have the right to sell the two LLC's back to RWE on the same terms if there is a breach of the leases, when the leases expire, and if my employment terminates for any reason. If RWE does not buy back then I will have the right to sell the LLC's to any third party buyer, and RWE will have to make up any shortfall in the purchase price. I will need you and HEG to guaranty this part of the transaction.

Trial Ex. 135; *see* Walton Dep. Ex. 21 (Docket No. 51-49, 80). His email concluded, "If you want more details Jonathan [Walton] can provide." *Id*.

Although Mr. Berutti stated in the email that "$700K of my unpaid ownership in HEG" was "to be confirmed by Dan Ehr," Mr. Ehr, the companies' accountant with Baker Tilly, testified that he did not have any independent knowledge of the value of shares in October 2020. Trial Tr. at 28 (April 19, 2024). Mr. Berutti sent Mr. Ehr an email on October 28, 2020 that

referred to the valuation as of the time of his 2017 stock award and stated, "Based on the valuation I should be awarded 44 more shares of stock valued at $702,090.80. Bringing my total awarded shares to 84 shares (40 previous and 44 here), leaving the company to owe me 6 shares valued at $95,739.65." Trial Ex. 137. Mr. Ehr did not recall whether Mr. Berutti explained how he came up with these figures. Trial Tr. at 29 (April 19, 2024).

At trial, Mr. Berutti explained that the Eau Galle/Grande Pointe transaction did not use the 2020 value of the stock, but rather used the December 28, 2017 value of the stock, as shown on Exhibit A to the Action of the Directors by Consent. Trial Tr. 91 (April 19, 2024); Trial Ex. 144. Mr. Berutti believed this was appropriate because as he described it, stock "was issued in 2017 when it was - - the value when it was vested and awarded to [him] in 2017, [he] deferred receipt of it until the company could find a way to make the transaction work. The value was established in 2017 and vested in 2017." Trial Tr. 114 (April 17, 2024).

Mr. Berutti testified that he came up with the transaction because "HEG needs $500,000 and HEG has a commitment to [him] to issue [him] the stock." *Id*. at 106. Mr. Berutti explained:

> This plan also allowed HEG to issue me similar stock that I've invested in since 2017 in a tax efficient manner. Whereas $700,000 issued to me would have a tax consequence of $550,000 per my employment agreement. Doing it this way, we were able to defer that $550,000 tax expense by purchasing the assets, depreciating them. I had no income tax liability due at that time when the plan[t]s were repurchased for $750,000 each, HEG paid the gross up of 300,000. So in effect, HEG saved $250,000 in tax liability.

*Id*. at 108.

On October 28, 2020, Attorney Walton, outside corporate counsel for the companies, sent both Mr. Harris and Mr. Berutti a copy of the proposed lease, equity purchase agreement, and unconditional guaranty for the Eau Galle/Grande Pointe transaction. Trial Ex. 136. Two days later, Attorney Walton sent the "documents for the closing." Trial Ex. 138. He summarized the transaction as follows:

> As discussed in our telephone conferences on October 28 and 29, 2020 this is a transaction that Bill and Tom have decided to enter into as a reasonable way of providing cash to RWE without the necessity of RWE going to outside funding sources. I believe everyone is in agreement that this arrangement is not meant to be long-term, RWE will eventually buy back the Eau Galle and Grande Pointe, and that the intent is that at the end of the day Tom will not wind up with tax liability or losing money as a result [of] purchasing the 2 hydros. Please let me know if the[r]e is any disagreement with how I am describing the transaction.

19

Trial Ex. 138.

Attorney Walton testified that as to transactions, including the Eau Galle/Grande Pointe transaction, he had "the belief that Mr. Berutti and Mr. Harris were working together and had had discussions and had agreed between the two of them to move forward with those transactions. And I drafted the documents to carry out what I had been led to believe was their agreement." Walton Dep. Tr. 143 (Docket No. 51-49, 80).

In the final Eau Galle/Grande Pointe transaction documents, instead of issuing stock to Mr. Berutti, HEG executed a Promissory Note in the amount of $702,078.84, payable to Mr. Berutti. Trial Ex. 61 at 1. Mr. Berutti wrote "paid in full" on the Promissory Note. *Id.* Berutti Energy took ownership of Eau Galle and Grande Pointe through assignments of RWE's membership interest in Eau Galle Hydro and stock interest in Grande Pointe, in exchange for "consideration in the amount of" $1,202,078.84. *Id.* at 2-3, 6. This amount was comprised of (1) $500,000 cash; and (2) Mr. Berutti's release of the $702,078.84 Promissory Note. *Id.* at 7. The Equity Purchase Agreement signed by Mr. Harris and Mr. Berutti explained the dollar amount of the Promissory Note:

> The Note amount is the after tax value of compensation that HEG conveyed to TAB [Mr. Berutti] in the amount of Seven Hundred Eighteen Thousand Nine Hundred Seventy Four and 75/100 Dollars ($718,974.75). That compensation was conveyed to TAB in lieu of the issuance to TAB of 42.109 shares of the common stock HEG pursuant to a certain Amended and Restated Executive Employment Agreement dated February 16, 2017 (the "Employment Agreement"). By agreement of TAB and HEG, the compensation was granted simultaneously with the transaction hereunder. HEG and TAB acknowledge that 40 shares in HEG previously issued to TAB pursuant to the Employment Agreement shall not be affected by this transaction, and that an [sic] 15.891 additional shares of HEG shall remain payable to TAB under the Employment Agreement. RWE shall indemnify TAB for any liability relating to nonwithholding or under-withholding of employment taxes due as a result of the issuance of the note to TAB and the release of that note toward payment of the Purchase Price hereunder.

*Id.* The Equity Purchase Agreement contained a statement that the "parties hereto acknowledge that . . . [e]ach of the parties has had all information necessary to make an informed and voluntary decision regarding this Agreement and the Leases and the Unconditional Guaranty." *Id.* at 15.

RWE leased the hydro plants back from Berutti Energy pursuant to commercial property leases under which RWE agreed to pay $4,000 each month for each plant, for a total of $8,000 per month. *Id.* at 17-38.

RWE had an option to repurchase the equity interests at any time. Berutti Energy had the option to cause RWE to repurchase the equity interests under certain circumstances. If either party exercised its option, the purchase price would be $1,202,078.84 for the equity in both entities, or $601,039.42 for the equity in one of the entities (the "Option Price"), plus "an additional amount equal to the amount necessary to put [Mr. Berutti] and/or [Berutti Energy] in the same after-tax position . . . that they would have been in if they had not incurred any tax liability as a result of the sale." *Id.* at 10. If Berutti Energy exercised its option and RWE failed to confirm or close the transaction, then Berutti Energy was permitted to sell the equity interests to third parties on such terms as it determined was acceptable. *Id.* In that case, RWE would remain liable for the Option Price less the net proceeds of a third-party sale after deducting all the reasonable expenses of the third-party sale. *Id.* Mr. Harris personally guaranteed RWE's obligation. *Id.* at 39-40. HEG also guaranteed the obligation. *Id.*

### A drought starts in the summer of 2021.

After the sale portion of the Eau Galle/Grande Pointe transaction, RWE continued to operate the Eau Galle/Grande Pointe hydro plants. In the summer of 2021, HEG and its subsidiaries began suffering the consequences of a drought. Mr. Berutti testified that since the drought started, "Harris Energy Group has been struggling immensely, and they continue to this day because energy production is roughly two-thirds of historic levels." Trial Tr. 152 (April 17, 2024). *See also id.* at 184 ("The drought started in 2021, as we formerly said. Right now, our revenue in 2021 - - production dropped from 90,000 megawatt hours to around 60,000 megawatt hours."); *id.* at 194 ("The drought is coming into play very severely [as of June 1, 2021]."); *id.* at 194 ("2021, the drought starts in 2021. This is where Harris Energy Group falls apart, starting in 2021.").

In June 2021, Mr. Berutti put together a plan to reduce wages and expenses. Trial Ex. 24; Trial Tr. 193-94 (April 17, 2024). Along with the wage and expense reductions, HEG and Mr. Berutti entered into an Addendum to the 2017 Employment Agreement. Trial Ex. 25. Among other things, it increased Mr. Berutti's personal time off effective June 1, 2021, and provided that "[a]ll PTO awarded (past and/or future) to [Mr. Berutti] will have no accumulation cap, and all accumulated and unused PTO shall be paid out to [Mr. Berutti] (or his estate) upon separation or reduction to part-time employment status." *Id.*

Mr. Harris also began loaning money to the company in June 2021. Trial Ex. 48; Trial Tr. 181-82 (April 22, 2024).

### Flambeau Hydro, LLC repurchases Eau Galle Hydro, LLC in August 2021.

In August 2021, Berutti Energy exercised its option to cause RWE to repurchase the Eau Galle Hydro equity interests. Flambeau Hydro, LLC, an RWE subsidiary and a debtor in one of the bankruptcy cases before the Court, repurchased the membership interests in Eau Galle Hydro for $750,000. Berutti Energy, Eau Galle Hydro, Flambeau Hydro, RWE, HEG, and Mr. Harris entered into an Equity Purchase Agreement under which Flambeau Hydro purchased the Eau Galle Hydro equity from Berutti Energy. Trial Ex. 62 at 1, § 1.1.

The funds for the Eau Galle Hydro buyback came from a $1.8 million loan agreement entered into by RWE and Flambeau Hydro with Zero6 in August 2021, a portion of which was used to allow Flambeau Hydro to repurchase Eau Galle Hydro. Trial Ex. 404 at 4 (describing the use of 2021 proceeds "for costs associated with the transformer purchase and interconnection upgrade at [Flambeau Hydro's] Maquoketa hydroelectric facility in Maquoketa, Iowa, the acquisition of Eau Galle …, and for general corporate purposes[.]"); *see also* Trial Tr. 120 (April 17, 2024). Flambeau Hydro paid $565,085.13 to satisfy Berutti Energy's loan with SNBT and remitted the remaining $184,914.87 to Berutti Energy. Trial Ex. 62 at 22.

**Iowa Hydro, LLC repurchases Grande Pointe Power Corporation in May 2022.**

In May 2022, Berutti Energy exercised its option to cause RWE to repurchase the stock interest in Grande Pointe. Iowa Hydro, LLC, an RWE subsidiary and a debtor in one of the bankruptcy cases before the Court, repurchased the stock interests in Grande Pointe for $750,000. Berutti Energy, Grande Pointe, Iowa Hydro, RWE, HEG, and Mr. Harris entered into a Stock Purchase Agreement under which Iowa Hydro purchased the stock interests in Grande Pointe. Trial Ex. 63. Like the repurchase of Eau Galle Hydro, the repurchase was funded by an additional loan from Zero6 in the amount of $6.5 million.[6] Trial Ex. 404 at 4-5; Trial Tr. 29.

**Mr. Berutti begins negotiating a sale of the companies to Zero6 in the fall of 2022.**

In late September 2022 and into October 2022, Mr. Berutti began negotiating the sale of substantially all of HEG's assets to Zero6. Trial Tr. 61-62 (April 18, 2024); Trial Ex. 413. Mr. Berutti told Mr. Harris that they had to sell because they were never going to get out of the tailspin caused by the worsening drought. *Id.* By this point in time, RWE had a substantial amount of debt. Trial Tr. 53 (April 18, 2024). RWE had incurred long-term debt of $13.5 million with Zero6. Ex. 29; Trial Tr. 53 (April 18, 2024). RWE had also incurred long-term debt of $2 million with SNBT. Trial Exs. 450, 453; Trial Tr. 53 (April 18, 2024); Trial Tr. 80 (May 7, 2024); Trial Tr. 135 (May 8, 2024); Claim No. 7 filed by SNBT. There were stale payables in the amount of $500,000 to $800,000. Trial Tr. 53 (April 18, 2024). As of September 1, 2022, Mr. Harris had loaned approximately $1.5 million to the company (and the amount of that loan would increase to $2.17 million by December 19, 2022). Trial Ex. 48, Trial Tr. 183 (April 22, 2024); Trial Tr. 135 (May 8, 2024). Additionally, Mr. Berutti was going to seek a substantial severance payment under the terms of his 2017 Employment Agreement.

According to Mr. Berutti, there was an original memorandum of understanding between RWE and Zero6 that contemplated a sale of substantially all RWE's assets for $20 million. Trial Tr. 50 (April 18, 2024). However, Mr. Harris sent an email to Mr. Berutti on October 13, 2022 stating that he was "concerned about losing control of the vast majority of the hydro plants that [he had] worked his lifetime to acquire, renovate, and successfully operate." Trial Ex. 209. Mr. Harris asked Mr. Berutti to pass onto Zero6 that he wanted to "keep the Iowa plants as part of

---

[6] The repurchase and recapitalization of Grande Pointe was just one of the purposes of the additional $6.5 million loan with Zero6. Trial Ex. 404 at 4. As stated in the Second Amended and Restated Loan Agreement between Flambeau Hydro and RWE and Zero6, additional financing was also being sought (1) to refinance existing debt with SNBT; (2) to refinance the $1.8 million note related to the Eau Galle buyback; (3) to fund capital improvements for the Iowa Falls project; and (4) for general corporate purposes. *Id.*

this transaction." *Id.* Mr. Harris understood that "this change will affect the value of the transaction with [Zero6]." *Id.* Mr. Harris further testified that he was not in favor of selling the company, though he could not identify any lenders to avoid the sale. Trial Tr. 136-37 (May 8, 2024).

**The October 28, 2022 Draft Memorandum of Understanding.**

On October 28, 2022, Clay Norrbom, the president of Zero6, emailed Mr. Berutti a "draft term sheet for us to continue to discuss and agree [to] terms for the creation of Main Street Hydro." Trial Ex. 414. The term sheet assumed that Mr. Harris would retain Iowa Hydro and Grande Pointe. *Id.*

Mr. Norrbom also attached a draft Memorandum of Understanding to his October 28, 2022 email to Mr. Berutti. *Id.* It contemplated that Zero6 would acquire Flambeau Hydro, Eau Galle Hydro, LCO Hydro, and Grenfell and the hydroelectric projects that those entities owned. *Id.* Zero6 intended to create a special purpose entity called Main Street Hydro that would directly purchase and own the assets. *Id.* The draft MOU contemplated that the parties would complete the closing by December 31, 2022. *Id.*

The October 28 draft MOU provided that Zero6 would pay $15.15 million to purchase Flambeau Hydro, Eau Galle Hydro, LCO Hydro, and Grenfell, and the hydroelectric projects that those entities owned. Trial Ex. 414. The purchase price would be allocated as follows:

- Zero6 would convert $12 million of its current $13.5 million outstanding loan to Flambeau Hydro into equity in Main Street Hydro.

- The remaining $1.5 million loan to Iowa Hydro would remain in place and continue to be secured by the assets of Iowa Hydro, including Grande Pointe and its Three Rivers plant.

- Zero6 would fund $2.65 million in cash to the current shareholders of RWE.

- RWE would be granted a $500,000 common equity ownership in Main Street Hydro representing an initial ownership share of 3.28% of Main Street Hydro.

*Id.* at 3-4.

The following HEG/RWE properties were not included in the proposed October 28 MOU and would be retained by HEG/RWE: UP Hydro and the Au Train hydro plant; Neshkoro Hydro and the Neshkoro hydro plant; Marseilles Hydro and the Marseilles building and property; Iowa Hydro and the Maquoketa, Anamosa, and Iowa Falls hydro plants (as requested by Mr. Harris in his October 13, 2022 email); and the operating agreement with Neenah Paper to operate the Appleton middle dam. Trial Ex. 414; Trial Tr. 95-96 (May 10, 2024).

The October 28 draft MOU provided that Main Street Hydro would have "the right to hire all existing employees of RWE Operations that currently manage and operate the hydro

23

projects" and that all hired employees would "become full time employees of [Main Street Hydro]" and "cease to be employed by RWE Operations or any of its subsidiaries being retained by RWE." *Id.*

The October 28 draft MOU also included a section regarding Mr. Berutti's employment with Main Street Hydro:

> Tom Berutti, current shareholder of RWE agrees to sign a [5] year employment agreement to serve as President and have primary executive responsibility of [Main Street Hydro]. Berutti's responsibilities will include oversight of the Assets and the hydro projects including lead responsibility for the operation and maintenance of the hydro projects, monitoring compliance with all contracts where [Main Street Hydro] and its subsidiaries are party to, ensuring compliance with all regulatory authorities, managing the employees of the Assets and [Main Street Hydro], and providing operating and financial reports to the shareholders of [Main Street Hydro]. There will also be incentives for Berutti to grow the [Main Street Hydro] business through acquisition of additional hydroelectric assets and/or the development of additional clean energy resources.

*Id.* at 4.

The October 28 draft MOU contemplated that there would need to be "satisfactory due diligence" completed before Zero6 would acquire the assets and pay the purchase price. *Id.* Everyone seemed to think that after the completion of the due diligence, the final sale price would be less than what was contemplated in the MOU. Mr. Berutti acknowledged that Zero6 was "in the due diligence" and that Zero6 was a "[v]ery sophisticated" group of people. Trial Tr. 55 (April 18, 2024). Attorney Rossmeissl, an attorney who had been hired by Mr. Harris, testified that, "He said when the - - he said when they get into due diligence, the value of the deal will go down. He expected that." Trial Tr. 254 (April 19, 2024). Mr. Berutti further noted that the proposed closing date of December 31, 2022 was "a very aggressive target" but "we're in the middle of a drought" and "I'm trying to get this thing closed before they realize how bad the drought is." Trial Tr. 55 (April 18, 2024).

### The October 31, 2022 Redlined Draft Memorandum of Understanding suggests that Mr. Berutti must be terminated as an employee of RWEO.

On October 31, 2022, Mr. Berutti circulated a redline of the MOU to Mr. Ehr, the companies' accountant at Baker Tilly, and to several individuals at Zero6, including Mr. Norrbom. Mr. Berutti did not know if he prepared this redline or if Attorney Walton, the companies' outside corporate counsel, prepared this redline, but he acknowledged that "I'm definitely involved in doing the redlines, so I'll take responsibility for it for sure." Trial Tr. 71 (April 18, 2024). The October 28 draft MOU had contemplated Mr. Berutti agreeing to a five-year employment agreement to serve as President and to have the primary executive

responsibility for Main Street Hydro, Zero6's acquiring entity. Trial Ex. 414. Mr. Berutti added to the October 28 draft MOU that "RWE and Harris Energy Group, Inc. must terminate Berutti as an employee of RWEO." Trial Ex. 416 at 3. The paragraph addressing Mr. Berutti's contemplated employment with Main Street Hydro now read:

> **Employment Agreement**. Thomas A. Berutti, current shareholder of RWE agrees to sign a [5] year employment agreement to serve as President and have primary executive responsibility of MSH. **RWE and Harris Energy Group, Inc. must terminate Berutti as an employee of RWEO**. Berutti's responsibilities will include oversight of the Assets and the hydro projects including lead responsibility for the operation and maintenance of the hydro projects, monitoring compliance with all contracts where MSH and its subsidiaries are party to, ensuring compliance with all regulatory authorities, managing the employees of the Assets and MSH, and providing operating and financial reports to the shareholders of MSH. There will also be incentives for Berutti to grow the MSH business through acquisition of additional hydroelectric assets and/or the development of additional clean energy resources.

*Id.* (emphasis added).

### Attorney Walton becomes concerned and suggests that Mr. Harris retain his own counsel.

At some point during this process, Attorney Walton recommended that Mr. Harris retain personal counsel. Walton Dep. Tr. 120 (Docket No. 51-49, 80). Attorney Walton made this recommendation because (1) he formed the opinion that Mr. Harris "was reluctant, if not actively opposed, to doing a deal" with Zero6; and (2) he was concerned about the economics of the deal with Zero6. *Id.* at 120-21. He believed that:

> [A]fter all was said and done, Harris Energy, I think, would have only consisted of the Iowa plants - - three plants in Iowa, the AuTrain plant, and maybe one or two other small properties. And it just didn't seem - - my concern was that that might not be a very viable operation going forward.

*Id.* at 121.

### Mr. and Mrs. Harris continue to make personal loans to HEG to support operations.

On November 1, 2022, Mr. and Mrs. Harris made a personal loan to HEG in the amount of $200,000 due to the company's "cashflow problems," which was in addition to the personal loan made by the Harrises on September 19, 2022 in the amount of $250,000 for "cash problems" and the additional personal loan made by the Harrises on October 5, 2022 in the amount of $150,000 due to "cash problems." Trial Ex. 48; Trial Tr. 238-39 (April 17, 2024). As

of November 1, 2022, Mr. and Mrs. Harris were owed $2,157,886.22 by HEG and RWE.  Trial Ex. 48.

**Mr. Harris retains Attorney Andrew Rossmeissl.**

On November 8, 2022, Mr. Harris wrote to Mr. Berutti, informing him that RWE had retained an attorney, Attorney Andrew Rossmeissl at Herrling Clark, based on Attorney Walton's "suggestion several weeks ago."  Trial Ex. 207.  Although Mr. Harris indicated that RWE retained Attorney Rossmeissl, he represented Mr. Harris individually.  Trial Tr. 194 (April 19, 2024) (Attorney Rossmeissl testifying that "By that point, it was very clear that I was looking out for Bill's interest in these transactions.").  That said, at the time, Mr. Berutti was unsure who Attorney Rossmeissl represented.  Trial Tr. 77, 97 (April 18, 2024).  He just knew that Attorney Walton had told Mr. Harris and Mr. Berutti that they should each seek their own counsel, so Mr. Berutti contacted his own attorney, Attorney Hammond, and Mr. Harris contacted his own attorney, Attorney Rossmeissl.  *Id.*

**The November 8, 2022 Draft Memorandum of Understanding.**

Later in the morning on November 8, 2022, Mr. Berutti circulated the latest draft memorandum of understanding to Mr. Harris, Jason Kreuscher (a Vice President and Mr. Harris's son), Mr. Ehr, Attorney Walton, and Attorney Rossmeissl.  Trial Ex. 225.  The November 8 MOU provided that Zero6 would pay $16.9 million to purchase Flambeau Hydro, Eau Galle Hydro, LCO Hydro, Grande Pointe Power, Grenfell, and Fallasburg Hydro.  Trial Ex. 225.  The purchase price would be allocated as follows:

- Zero6 would convert the entirety of its current $13.5 million loan into equity of Main Street Hydro.

- Zero6 would fund $2.9 million in cash to RWE.

- RWE would receive a common equity ownership interest of $500,000 in Main Street Hydro representing an initial ownership share of 2.94% of Main Street Hydro.

*Id.* at 3.  Zero6 also intended to reissue a loan in the amount of $1.5 million to Iowa Hydro secured by its assets on terms substantially similar to the outstanding loan in place between Zero6 and Iowa Hydro.  *Id.*

The November 8 draft MOU continued to provide that Main Street Hydro would have "the right to hire all existing employees of RWE Operations that currently manage and operate the hydro projects" and that all hired employees would "become full time employees of [Main Street Hydro]" and "cease to be employed by RWE Operations or any of its subsidiaries being retained by RWE."  Trial Ex. 225, ¶ 5.

The November 8 draft MOU provided that "RWEO will terminate Thomas A. Berutti's employment agreement at closing of this transaction."  *Id.*  It also provided that Mr. Berutti

26

would sign a five-year employment agreement to serve as president and have primary executive responsibility for Main Street Hydro.  *Id.*

**The November 8, 2022 Draft Memorandum of Understanding and the addition of language related to RWE Data's Power Purchase Agreement with Flambeau Hydro.**

The November 8 draft MOU also contained the following new paragraph:

> RWE Data's existing PPA for energy from the Flambeau Hydro shall be terminated and replaced with a new PPA to allow for the purchase of up to 1,350 KW from the Crowley plant at the rates equal to the rates shown on JCEA's Valuation Model dated October 11, 2022, for 10 years.

*Id.* at 5.  *See also* Trial Tr. 86 (April 18, 2024).  The November 8 draft MOU called for the termination of RWE Data's Power Purchase Agreement with Flambeau Hydro, in which RWE Data purchased power from Flambeau Hydro at a rate of $45 per megawatt hour, and for it to be replaced with a new power purchase agreement where RWE Data would purchase power from Flambeau Hydro, after the sale of Flambeau Hydro to Zero6, at the average rate of $65 per megawatt hour.  Trial Ex. 39, 225.  In other words, RWE Data would be paying $20 per megawatt hour more for the power that it was using upon the sale of Flambeau Hydro to Zero6.  Trial Tr. 252-55 (April 18, 2024).

As with so many things in this case, this proposed revision requires a bit of a backstory.  Back in 2021, Mr. Harris and Mr. Berutti, through his Trust, became equal owners of RWE Data, LLC, a Bitcoin mining company, that purchased power from one of RWE's subsidiaries, Flambeau Hydro, LLC.  Trial Ex. 35.[7]  "RWE Data was created to provide Flambeau Hydro with a customer that could purchase energy [at] above-market rates."  Trial Tr. 159 (April 17, 2024).  Mr. Berutti explained as follows:

> And also, we're trying to find a place for Flambeau. The Flambeau interconnects with the spot market, right? The spot market pricing at this time, between 2016 and 2020, is somewhere in the mid-teens.
>
> Break-even on a hydro plant requires somewhere in the mid-twenties.  We're losing money on every kilowatt hour we produce at Flambeau because we can't sell the energy to anybody that'll buy it at a fair - - what we consider a fair price. We've gone to Dahlberg's, we've gone to Xcel.
> …
> So we tried to find a market buyer - - conventional market buyer - - for the energy. We could not find one.

---

[7] Additional facts about the formation of RWE Data, LLC can be found in Section I.D., *infra*.

Trial Tr. 159-60 (April 17, 2024).  On April 14, 2021, RWE Data, as the buyer, and Flambeau Hydro, Iowa Hydro, and UP Hydro, as the sellers, and RWE, as the parent company of the sellers, entered into a Power Purchase Agreement (the "PPA").  Trial Ex. 39.  RWE Data agreed to purchase power for a period of fifteen years at the rate of $45 per megawatt hour.  Trial Ex. 39, §§ 8, 14.  *See also* Trial Tr. 215-16 (April 17, 2024).  RWE Data used the power it purchased from Flambeau Hydro to mine Bitcoin and, as a result of the PPA, Flambeau Hydro had a customer in RWE Data that was paying two-and-a-half times above the market rate for the hydroelectric power that it was producing.  Trial Tr. 106 (April 18, 2024).

The PPA contained the following exclusivity provision:

> Exclusivity. During the Term of this Agreement (herein defined) [Flambeau Hydro, Iowa Hydro, and UP Hydro] shall not, without [RWE Data's] express written consent, contract to sell or otherwise supply Energy to any person or entity conducting crypto currency mining, blockchain mining, or any other data processing activity identical or similar to [RWE Data's] operations. RWE shall prohibit its subsidiaries other than [Flambeau Hydro, Iowa Hydro, and UP Hydro] from entering into any contract or other arrangement prohibited by this paragraph without [RWE Data's] express written consent. [RWE Data's] consent as required under this paragraph may be withheld in [RWE Data's] sole discretion.

Trial Ex. 39.

At the time of the November 8 draft MOU, Mr. Harris and Mr. Berutti's Trust each owned fifty percent of RWE Data and they were the two Members of RWE Data.  Trial Ex. 38.  The Operating Agreement of RWE Data provided that "All Members are entitled to vote on any matter submitted to a vote of the Members."  The Operating Agreement for RWE Data further provided that:

> An affirmative and unanimous vote of the Members shall be required for . . . terminating any real property lease or power purchase agreement entered into by [RWE Data].

Trial Ex. 35.  In other words, both Mr. Harris and Mr. Berutti would have to unanimously agree to terminate any power purchase agreement entered into by RWE Data.

## The November 8, 2022 Draft Memorandum of Understanding's treatment of the RWE Data Power Purchase Agreement.

The November 8 draft MOU contemplated that RWE Data would purchase power from Flambeau Hydro, which was being conveyed to Zero6 as part of the proposed deal, at the average rate of $65 per megawatt hour, an increase of $20 per megawatt hour.  Trial Ex. 39, 225.  The addition of the language calling for the termination of RWE Data's PPA with Flambeau Hydro at $45 per megawatt hour was the result of an email that Mr. Berutti sent to Mr. Norrbom

on November 8, 2022: "when we originally formatted this plan it was to allow RWE Data to purchase energy at your projected rates….. we can[not] get into a market rate situation as we are going to sublease the mining facility to a third party." Trial Ex. 225. At trial, Mr. Berutti explained that he "was conveying to [Mr. Norrbom] that the proposed energy pricing for Flambeau Hydro that he had in his model could not be supported without a change to the RWE Data PPA." Trial Tr. 101 (April 19, 2024). Mr. Berutti further explained at trial that Mr. Norrbom wanted to increase the amount of money that RWE Data was paying for the power from Flambeau Hydro from $45 per megawatt hour to an average of $65 per megawatt hour "to justify [Zero6's] purchase price of Flambeau Hydro." Trial Tr. 106, 252-53 (April 18, 2024).

Mr. Berutti further explained at trial that Zero6's request to increase the amount of money that RWE Data was paying for power from Flambeau Hydro from $45 per megawatt hour to an average of $65 per megawatt hour was effectively transferring $1.8 million in profitability from RWE Data, a company owned 50% by Mr. Harris and 50% by Mr. Berutti's Trust, to Flambeau Hydro, an RWE subsidiary company owned 96% by Mr. Harris and 4% by Mr. Berutti. Trial Tr. 87, 106, 250-55 (April 18, 2024).

**HEG's accountant calculates Mr. Berutti's proposed payout under the 2017 Employment Agreement.**

On November 11, 2022, there was a call with Mr. Harris, Mr. Kreuscher, Attorney Rossmeissl, Mr. Berutti, and Attorney Walton. Trial Tr. 142 (April 19, 2024). The parties used that meeting to walk through the deal terms. *Id.* at 143. After that meeting, Attorney Rossmeissl reviewed Mr. Berutti's 2017 Employment Agreement and the Shareholders Agreement. *Id.* at 144 (April 19, 2024). In addition, Mr. Ehr, the companies' accountant at Baker Tilly, calculated the payout to Mr. Berutti under his 2017 Employment Agreement because the draft MOU was calling for RWEO to terminate Mr. Berutti's employment without cause. Trial Ex. 208 at 2. Trial Tr. 97 (May 9, 2024). Due to the "evergreen" provision in the 2017 Employment Agreement, Mr. Ehr calculated that the payout for four years of base salary would be $1,038,797. *Id.* at 97. He further calculated that the cost of the remaining unissued stock (including a gross up for taxes) would be $454,804.07. *Id.* Taken together, the total payout would be $1,493,601, not including the "stock buy back (roughly 4%) and the accrued vacation piece." Trial Ex. 208 at 3; Trial Tr. 97 (May 9, 2024). Mr. Harris and Attorney Rossmeissl each responded that it was a "steep pay out" to Mr. Berutti. Trial Ex. 208.

**The parties discuss Mr. Berutti's severance at a meeting on November 15, 2022.**

On November 15, 2022, there was another meeting at Mr. Ehr's office in Appleton. Trial Tr. 150 (April 19, 2024). In preparation for that meeting, Attorney Rossmeissl "wanted to establish clarity with [Mr. Berutti] that he was not planning on receiving severance benefits under the employment agreement resulting from a deal that he engineered." *Id.* at 149. To Attorney Rossmeissl, it seemed "preposterous that somebody could go out and make a deal, get a new job [at Main Street Hydro, Zero6's acquiring entity], and then come back and demand to be terminated" and receive all of the severance benefits included in the 2017 Employment Agreement, including 5 years of salary and 520 hours of PTO, which was a quarter of the work year. *Id.* at 149.

29

Attorney Rossmeissl, Mr. Harris and his wife, Peggy, Mr. Ehr, and Mr. Berutti attended the November 15 meeting and Attorney Walton attended by Zoom. *Id.* at 150; Trial Tr. 21 (May 10, 2024). Mr. Berutti "talked a little bit about generation and water being lower than expected or hoped, about cash flow being a problem, about some balloon payments being due, and generally, that there was a dire need to sell to Zero6, and soon, because of the - - because of what I just said." *Id.* at 150. Attorney Rossmeissl recalled that at the meeting, Mr. Berutti said that "if we don't do this, it's bankruptcy folks." *Id.* at 151.

When Attorney Rossmeissl finally spoke, he asked for clarification on his key points. *Id.* at 151. Mr. Berutti responded "[i]n sort of a bombastic fashion," saying "heck no, I'm getting what's coming to me." *Id.* Mr. Kreuscher remembers Mr. Berutti "refusing to resign. He would be terminated. He threatened his extortion demands again. He stated that Bill and Peggy would not be getting a pie without him getting a piece of it." Trial Tr. 22 (May 10, 2024).

At trial, Mr. Berutti testified about the meeting as follows:

Q:     So jumping ahead, at some point in October/November of 2022 did you tell anyone, Jason, Andy Rossmeissl, Bill Harris that you would somehow end the deal with Juhl if they didn't do something about the PPA?

A:     Yes.

Q:     What did you say?

A:     I believe it was Andy Rossmeissl when he hit me with it out of the blue in a meeting.

Q:     So what did he say?

A:     We're going to cancel the RWE Data PPA and I said, "You do that, I will blow up the deal." I -- he hit me out of the blue with it. I shouldn't have said that, but --

Q:     Let me stop you there. But you definitely said it.

A:     I definitely said it.

Q:     Did you blow up the deal?

A:     No . . . I calmed down.

Q:     Did the MOU you ultimately prepare -- negotiated that Bill Harris signed have 45 or 65?

A:     It has the rates that Juhl required at 65 average.

30

| | |
|---|---|
| Q: | Were you angry when he said what he said to you? |
| A: | Yes. |
| Q: | Did you calm down? |
| A: | Yes. |

Trial Tr. 256 (April 18, 2024).

      For Attorney Rossmeissl, this "took what was a pretty straightforward sale of a company, and made it very complex, with differing interests that had to be addressed or considered before we did anything else." Trial Tr. 151 (April 19, 2024). At the meeting, Attorney Rossmeissl "told [Mr. Berutti], there's just no way that we can do this deal if you are demanding to be terminated and expecting the company to live by the letter of your employment agreement, there's no way it's going to happen. And [Mr. Berutti] mentioned that there could be a meeting in the middle and that he was going to talk to his other lawyer, a guy by the name of Ed Hammond." Trial Tr. 155 (April 19, 2024).

### Attorney Rossmeissl and Attorney Walton reflect on Mr. Berutti's conduct.

      Following the meeting, Attorney Rossmeissl spoke with Attorney Walton. Trial Tr. 177 (April 19, 2024). Attorney Rossmeissl told Attorney Walton that "Tom had already breached his fiduciary duty and breached other duties." *Id*. Attorney Walton recalled the call as follows:

| | |
|---|---|
| A: | I think Mr. Rossmeissl had expressed, at least in his opinion, there was a possibility that Mr. Berutti had breached his fiduciary duties |
| Q: | Did he explain exactly what those breaches were? |
| A: | He mentioned the Eau Galle/Grande Pointe transaction. He mentioned the RWE Data and possibly the Sugarloaf transactions as corporate opportunities that should have been left with HEG. And I think we also discussed statements that Mr. Berutti had made along the lines of, you know, if I don't get what I'm demanding here, I'm going to prevent the PPA with Data, RWE Data, from being modified and it will just crater the whole thing. |
| Q: | And the whole thing being the Juhl transaction though, correct? |
| A: | Right. |

. . .

Q:     What did you say back to him when he suggested that Mr. Berutti may have breached his fiduciary duties?

A:     At least with respect to the statements about – that Mr. Berutti had made about basically cratering the whole thing, I think I was of the same opinion as Mr. Rossmeissl.

Walton Dep. Tr. 141-42 (Docket No. 51-49, 80).  As for the other alleged breaches of Mr. Berutti's fiduciary duty, Attorney Walton commented,

I don't agree with those.  But – and again, my – my understanding and my opinion was based on going into those transactions with the belief that Mr. Berutti and Mr. Harris were working together and had had discussions and had agreed between the two of them to move forward with those transactions.  And I drafted the documents to carry out what I had been led to believe was their agreement.

*Id.* at 143.

Mr. Berutti's threat to withhold his consent to terminate the RWE Data Power Purchase Agreement as part of the Zero6 sale was of particular concern to Attorney Walton.  Walton Dep. Tr. 141-42, 151-52 (Docket No. 51-49, 80).  The Operating Agreement for RWE Data required the members of RWE Data, Mr. Harris and Mr. Berutti, to unanimously vote to terminate any power purchase agreement entered into by RWE Data.  Trial Ex. 35.  The MOU with Zero6 required RWE Data to terminate its power purchase agreement with Flambeau Hydro, in which RWE Data purchased power from Flambeau Hydro at a rate of $45 per megawatt hour, and for it to be replaced with a new power purchase agreement where RWE Data would purchase power from Flambeau Hydro, after the sale of Flambeau Hydro to Zero6, at the average rate of $65 per megawatt hour.  Trial Ex. 39, 225.  If Mr. Berutti, or Mr. Harris for that matter, did not consent to terminate RWE Data's power purchase agreement with Flambeau Hydro, which was a requirement of the proposed sale to Zero6, the power purchase agreement could not be terminated and as Mr. Berutti threatened "it will just crater the [Juhl transaction]."  Trial Ex. 35; Walton Dep. Tr. 141 (Docket No. 51-49, 80).  Attorney Walton testified as follows:

Q:     Okay.  You testified earlier that you thought, "if I don't get what I'm demanding, I'm going to prevent the deal," might be a breach [of Mr. Berutti's fiduciary duty].  My question for you is, did Berutti have a right to not do that?  Did he have a right not to change the PPA?

A:     I was concerned that Mr. Berutti was attempting to put his interests ahead of those and ahead of the interests of the company.

Q: My question is different. My question is, did Mr. Berutti have a right under the PPA to say no to changing the PPA?

A: Well, you've got to let me finish my answer. To the extent that Mr. Berutti was putting his interests ahead of those of the company, it was my belief that that could be the basis for a claim against him for breach of fiduciary duty.

Q: Did you tell him that?

A: I don't know if I told him that in so many words. As I mentioned before, after the Rossmeissl discussion in which I was asked to approach Mr. Berutti, I did. And during that discussion, I told Mr. Berutti that under his contract he could be terminated for cause. Whether I tied it to the issue of the PPA or whether Mr. Berutti had even made those statements at that point in time, I don't remember the sequence.

Walton Dep. Tr. 151-52 (Docket No. 51-49, 80). Attorney Walton further elaborated on Mr. Berutti's actions forming a basis for terminating him for cause:

It was [Mr. Berutti's] position, I got a contract and it's iron clad, and there's no reason that I should back down on anything. And my response was, well, Tom, you know, you could be terminated for cause. You know, I didn't know everything that was going on at the time. And if you're terminated for cause, you know, you're not going to get what you're asking for.

Walton Dep. Tr. 152-53.

**Mr. Berutti discovers that Zero6 will likely reduce its offer.**

On November 16, 2022, at 8:52 a.m., Mr. Berutti emailed Mr. Harris, Attorney Rossmeissl, Mr. Kreuscher, and Attorney Walton indicating that:

The assumption in the Juhl model is using for spot market energy pricing (MISO pricing) on the Flambeau Interconnect (consisting of the 4 plants: Pixley, Crowley, Flambeau Upper & Flambeau Lower), is projected to start in 2023 at approx. $54/MWH. The MISO pricing for the first part of November 2022 has averaged $28/MWH. **This $27/MWH discrepancy/shortfall expanded out at a 11-x multiple REDUCES the value of Flambeau Hydro by approximately $3 Million. I anticipate a major reduction in the Juhl offer upon their Due Diligence.** I would anticipate a reduction of $2 - $3 million. RWE Data's pending PPA with

33

Sazming [sic] would hedge a large portion of the Flambeau Interconnect revenue as the new PPA pricing matches the Juhl valuation model (plus a couple dollars per MWH to cover Juhl's loss of MRETs). <u>The Sazming [sic] could be very important in holding the Juhl valuation</u>.

Ex. 200 at 1 (emphasis in original).

Mr. Berutti testified at trial that the "flaw in [Zero6's] analysis was they were projecting spot market energy rates of the mid-50s, which was probably a flaw caused by the unusually high market rates of energy recognized by the Flambeau in summer of 2022, which was a fluke. Energy rates have since returned to normal, which is down below 30. Like I said, it was 27 or 28." Trial Tr. 79 (April 18, 2024). Mr. Berutti acknowledged that "they're going to catch it eventually[.]" *Id.* Attorney Rossmeissl recollected that if Mr. Berutti's assessment were true, "it would've left nothing - - no equity for - - for Bill. If - - if Tom would've received what he demanded the previous day - - this is the 16th - - would he - - in rough numbers, there would've been nothing left for Bill, if there indeed was a two-to-three million-dollar reduction, at least no equity." Trial Tr. 154 (April 19, 2024). To Attorney Rossmeissl, this "was an even bigger reason to slow this deal down and make sure there was enough money to pay Tom anything, let alone what he was asking for." *Id.* at 155.

In the 8:52 a.m. email on November 16, 2022, Mr. Berutti acknowledged that "if the anticipated Juhl Valuation adjustment comes to fruition, RWE would be selling its assets for little more than debt value, which I believe the shareholders would find unattractive." Trial Ex. 200. According to Mr. Berutti, therefore RWE was going to need to address the following: (1) RWE needed $175,000 to fund the interest reserve account required by Zero6; and (2) RWE needed to formulate a plan to obtain $1 million to $1.5 million to fund operations. *Id.* Mr. Berutti also mentioned that Sugarloaf Hydro, LLC's loan with Berutti Energy in the amount of $600,000 would be maturing, was secured by Sugarloaf Hydro and LCO Hydro, and would need to be paid in the first quarter of 2023. *Id.* at 2. He noted that he had "PTO scheduled for the next couple of weeks" for a Kansas deer hunt that he had booked a year ago, but he said that he would "continue to work as many hours as needed to see a successful outcome to the recapitalization plan/sale to Juhl." *Id.* He concluded the email stating, "If RWE fails to consummate an acceptable sale to Juhl or recapitalize as summarized above, RWE may be forced into bankruptcy." *Id.* On November 16, 2022 at 9:00 a.m., Mr. Berutti sent another email to Mr. Kreuscher: "Jason you should check on the implication of a bankruptcy filing by a holding company on subsidiary FERC licenses." *Id.*

**<u>The parties continue to try to reach a compromise related to Mr. Berutti's compensation.</u>**

A couple of hours later on November 16, 2022 at 11:41 a.m., Mr. Berutti emailed Mr. Harris, Mrs. Harris, Mr. Kreuscher, Attorney Rossmeissl, and Attorney Walton what he called the "Berutti counteroffer." He started the email by stating, "Based on the previous emails I sent this morning, I believe this is a moot point, however, here it is." Trial Ex. 227. He noted that the email was "for discussion purposes and not a binding offer or agreement to perform." *Id.* He then presented his counteroffer:

34

I will **NOT** resign my position at RWE Operations, therefore, I will continue to be employed in my current position until terminated or until my contract expires.

If my employment is terminated and payout is agreed upon as outlined in my following Counter offer [sic], I will take the following actions:

> Accept employment with [Main Street Hydro] to ensure the smooth transfer of assets regardless of the employment package they offer.

> I have not discussed an employment agreement in detail with Main Street Hydro. I told Clay [Norrbom] that I need a 5 year deal at $250K/yr., the only response I received from him is in the MOU.

*Id.*

Mr. Berutti further stated that the "PTO Payout is not negotiable" and that he was entitled to a $169K cash payout for the PTO that he had accrued over the last ten years. *Id.* He stated that he would trade his stock in Harris Energy Group for the $500,000 in Main Street Hydro stock that was to be issued to RWE as part of the Zero6 sale. *Id.* He also stated that because his 2017 Employment Agreement would be terminated without cause, he was owed four times his annual wage under the terms of the Employment Agreement, which was approximately $259,000 per year (or in all $1,036,000). *Id.* He offered to have the wages owed to him paid as follows (1) two years of wages ($519,000) to be paid in cash, discounted to a $500,000 cash payout; and (2) two years of wages to be rolled into a real estate transaction where he would acquire 100% of Harris Real Estate Holdings, LLC (subject to the debt incurred by Harris Real Estate Holdings). *Id.* In all, Mr. Berutti was requesting a buyout of approximately $1.705 million. *Id.*

In the days that followed, Attorney Rossmeissl was in touch with Mr. Berutti's attorney, Attorney Hammond. Trial Tr. 155 (April 19, 2024). Attorney Hammond made it clear during those conversations that he wanted to know exactly what Mr. Berutti stood to receive if there was a closing with Zero6, and when he would receive it. *Id.* Attorney Rossmeissl told Attorney Hammond "by voice and email, that it's crazy to talk about what Tom's going to get when there may be nothing left for anybody based upon the email that we received from Tom the previous day, suggesting a two-to-three million dollar reduction in the purchase price." *Id.* at 156.

In the days that followed, Attorney Rossmeissl made a "leased employee proposal" to Mr. Berutti. Trial Tr. 160 (April 19, 2024). He described the proposal at trial:

> Well, I thought Tom had expressed in the November 15th meeting that there's no way that this deal with Juhl would close unless he went to work for Juhl, that Juhl needed him that bad, that they

35

would not be interested in these assets without Tom. And Tom also
demanded to be terminated without cause.

And my thought is, well, if they need you that bad, and Tom, if
you're really looking out for the company like you should be, then
you won't mind if we keep you on as an employee and we'll just
lease you to Juhl so they can use you as much as they want without
triggering any of these termination clauses. I thought it was a
creative - - a creative way to get past this.

*Id.* Mr. Kreuscher also explained the leased employee proposal as follows: "we were looking to
lease [Mr. Berutti] to Juhl to - - because, again, like I said, we had to figure out how much
money was going to be involved in the Juhl deal to - - and what was going to be available to pay
Tom, what his compensation was going to be at Juhl, and whether it was going to be an option to
meet in the middle and cover the difference in what his salary might be between those two."
Trial Tr. 194-95 (May 10, 2024).

Attorney Rossmeissl testified that he remembered that Attorney Hammond was initially
favorable to the leased employee concept, but that when he came back, "it was only for six
months, but [Mr. Berutti] still wanted guaranteed payouts. And then a day later, with no
response from me, he retracted even from that and provided a[n] even more regressive offer. And
Tom was right back to wanting everything at close." Trial Tr. 160-61, 229 (April 19, 2024).

On November 18, 2022, at 7:14 a.m., Mr. Kreuscher circulated an email to Attorney
Rossmeissl, Attorney Walton, Mr. Harris, and Mrs. Harris recapping a telephone conversation
that he had with Mr. Berutti:

All: Tom just called me. He is unwilling to accept the leased
employee deal in any way. He feels that it's a trap to terminate him
with cause after the deal because it violates his employment
agreement. Or to keep him for 4 years and make him miss out on
potential bonuses with Juhl. He also reminded [me] that he is due
another 520 vacation hours and a bonus in January. He is willing to
forgo those for a month or so if the deal is moving.

He has again threatened the RWE data PPA if he is not terminated
without cause. This will ruin the deal with Juhl.

It is my opinion that getting rid of Tom is of utmost importance
even at the cost of losing plants. We can't have our cake and eat it
too.

Tom and I discussed at length yesterday offline regarding his
counter offer. I think it's as fair as we are gonna get. There are still
some points to iron out. I don't think Tom will budge on any of
them though. We may have to bite the bullet to be rid of him.

36

Trial Ex. 222; Trial Tr. 48 (May 10, 2024). Mr. Kreuscher believed that "we needed to - - to negotiate with [Mr. Berutti] to figure out how to - - to get this - - this deal forward so that we can move on." Trial Tr. 48 (May 10, 2024).

On November 18, 2022, at 7:18 a.m., four minutes after Mr. Kreuscher sent his email summarizing his call with Mr. Berutti, Attorney Hammond emailed Attorney Rossmeissl indicating that "HEG/RWEO must spell out and agree to what they will be pay[ing] to Tom (based on his current agreement) in connection with their termination of Tom as part of this transaction." Trial Ex. 206. Attorney Hammond also indicated that "Tom is willing to negotiate this." *Id.*

Attorney Rossmeissl responded to Attorney Hammond's email at 10:08 a.m. on November 18, 2022. Attorney Rossmeissl testified at trial that "it looks like we were trying to bridge a gap between something that Bill might be able to extend by way of severance to address the issues in the employment agreement and something that Tom might accept." Trial Tr. 159 (April 19, 2024). In his email, Attorney Rossmeissl commented, "[t]he dilemma is that Juhl needs to see an MOU now - but Tom and Bill don't have enough information to conclusively negotiate the terms of their separation yet." Trial Ex. 206. He expressed the big problem: "how can we agree to divide the pie before we know how big the pie is?" *Id.* He noted that "[t]he 'leased employee' proposal was designed to provide Tom and RWE breathing room to work through their own separation after the terms of the Juhl deal are known with certainty." *Id.*

Attorney Rossmeissl stated in his November 18, 2022 email to Attorney Hammond that there were three "unknowns." The first unknown was "the amount of cash that RWE will take out of the deal after Juhl completes its due diligence. In a 'sign and close' deal like this, this number may change right up until the eve of closing." *Id.* Attorney Rossmeissl testified that his concern went to "the amount of cash that RW[E] will be able to take out of this deal after Juhl completes [its] due diligence, and that goes back to Tom's email from the 16th . . . Tom said that there's going to be, in my estimation, 2-to $3 million less than we're showing on the MOU right now. So for us really to talk about what Tom might be entitled to out of this deal, we need to know how much cash is coming first." Trial Tr. 161-62 (April 19, 2024).

Attorney Rossmeissl's second unknown was "the value of each parcel that is being horse traded in Tom's counter proposal (the parties agree on some but not all)." Trial Ex. 206. Mr. Berutti testified that he "was proposing to buy out Bill's interest in Harris Real Estate Holding, allowing him to keep some of the buildings in Wisconsin as part of his equity free and clear." Trial Tr. 119-20 (April 18, 2024). Attorney Rossmeissl testified that "Tom said, you know what, if you can't pay me what I want, maybe you could give me parcels of the real estate that I want instead of payment, or in some cases, when they owned parcels 50/50, he'd get all of it. That was - - that was the gist of Tom's counter proposal. But we needed to know values to know if that was even something that Bill might be willing to consider." Trial Tr. 162 (April 19, 2024).

Attorney Rossmeissl's third unknown was "the value of Tom's actual stock and the value of Tom's 'undelivered' stock." Trial Ex. 206. According to Dan [Ehr, the company's external accountant at Baker Tilly], Tom's expectations on this may not be realistic on this point."

Attorney Rossmeissl testified, "I had not been through any valuation. I'd only been on this job seven days, but the thought occurred to me is if this company is losing money like they're saying it is, and has the debt that they're saying it [has], could Tom's - - the value of Tom's 4 percent in this company possibly be worth the money that he was talking about? And I can't remember the exact dollars as I sit here today." Trial Tr. 163 (April 19, 2024).

After that meeting, Attorney Rossmeissl "wanted the accountant to put together - - put some numbers together to see what - - what - - what the payout would be." Trial Tr. 165 (April 19, 2024). He recalled "something in the early calculations based upon what we knew that payout was going to be between one and one-and-a-half million dollars." *Id.* at 166; *see also id.* at 252 (Mr. Rossmeissl testifying that "I asked Dan Ehr to quantify what Tom would stand to receive under the language of the initial MOU. And I know that Dan was using - - was assuming that Tom's value assigned to the company was - - was correct, that there was an independent analysis there, but I believe the answer was somewhere between 1 million and 1.5 million."); *id.* at 253 (Mr. Rossmeissl testifying that: "Q. So I'm going to go back to the 1 million, 1 million five. So Mr. Ehr told you that under this - - Mr. Berutti's employment agreement, he would be entitled to somewhere be[tween] 1- to 1.5-? A. Yeah. I think it was on the higher end of that.").

On November 21, 2022, Mr. Harris emailed his brother, Dave, and copied Mr. Kreuscher and Attorney Rossmeissl. Trial Ex. 256. In that email, Mr. Harris stated that the November 8 draft MOU was the first MOU he ever saw. *Id.* He further commented, "This set me off, it was over between Berutti and I then, because of his admitting to having worked a future employment agreement out [with Main Street Hydro, the Zero6 acquiring entity] while on our clock." *Id.*

On November 22, 2022, Attorney Rossmeissl sent an email to Mr. Harris about his ideas for gaining leverage in the negotiations with Mr. Berutti. Trial Ex. 212. Attorney Rossmeissl thought that the best course of action would be to "make a case that Tom's self-dealing and other actions provide grounds for termination with cause." *Id.* However, Attorney Rossmeissl noted that "Tom still holds the trump card . . . the only way that the Juhl deal can close is if RW[E] Data agrees to voluntarily terminate its favorable Power Purchase Agreement with RWE. With Tom owning half of RW[E] Data . . . you cannot terminate the contract without Tom's agreement. If you fire Tom – or even threaten to fire him – he will not cooperate." *Id.* Attorney Rossmeissl suggested that Mr. Harris "play nice with Tom even if you do have the power to terminate him for cause. It's the only way to terminate the [power purchase agreement] with RW[E] Data and the only way Juhl will close. And without Juhl, you've told me the best you could do is raise a little money to buy a month's time. Bankruptcy would be the next step." *Id.* Attorney Rossmeissl was still very concerned that Zero6 was going to reduce the purchase price after completing due diligence. He noted, "To be sure the landscape would change if Juhl tries to change the deal after due diligence. If Juhl reduced the cash component, that would put you in a position where Tom would stand to get everything he feels he is due and you'd get nothing. Under those circumstances, I'd recommend that you speak with a bankruptcy lawyer and not close with Juhl. Bankruptcy would be an easy way out of the RWE/RW[E] Data PPA which in theory would allow you [to] fire Tom for cause and try again with Juhl without Tom in the picture." *Id.*

**The November 23, 2022 Executed Memorandum of Understanding with Zero6.**

On November 23, 2022, Mr. Norrbom, on behalf of Zero6, and Mr. Harris, on behalf of RWE, Iowa Hydro, and RWE Operations, executed a Memorandum of Understanding (the "MOU"). Trial Ex. 30. The MOU contemplated that Zero6 would acquire Flambeau Hydro, Eau Galle Hydro, Grande Pointe Power, and Grenfell, and the hydroelectric projects that those entities owned, and LCO Hydro. *Id.* Zero6 intended to create a special purpose entity called Main Street Hydro that would directly purchase and own the assets. *Id.* The MOU contemplated that the parties would complete the closing by January 15, 2023. *Id.*; Trial Tr. 97-98 (April 18, 2024).

The MOU contemplated that Zero6 (through Main Street Hydro) would purchase Flambeau Hydro, Eau Galle Hydro, LCO Hydro, Grande Pointe Power, and Grenfell, for consideration equal to $16.9 million, to be paid as follows:

1. Zero6's $13.5 million outstanding loan to Flambeau Hydro would be satisfied;

2. Zero6 would pay $2.9 million in cash to RWE;

3. RWE would be granted a $500,000 common equity ownership interest in Main Street Hydro representing an initial ownership share of 2.94% of Main Street Hydro. At RWE's option, RWE may assign its rights under this subparagraph to Berutti as part of a prospective separation agreement.

Trial Ex. 30; Trial Tr. 98-99 (April 18, 2024). In addition, the MOU contemplated that Zero6 would reissue a loan in the amount of $1.5 million to Iowa Hydro secured by its assets on terms substantially similar to the outstanding loan in place between Zero6 and Iowa Hydro. Trial Ex. 30; Trial Tr. 99-100 (April 18, 2024).

As with the prior drafts of the MOU, under this executed MOU, Zero6 was not purchasing and RWE or Harris Energy Group was retaining: "UP Hydro with the Au Train hydro plant; Neshkoro Hydro with the Neshkoro hydro plant; Marseilles Hydro with the Marseilles building and property; Iowa Hydro with the Maquoketa, Anamosa, and Iowa Falls hydro plants; as well as the operating agreement with Neenah Paper to operate the Appleton middle dam." Trial Ex. 30; Trial Tr. 95-96 (May 10, 2024). The Au Train hydro plant was a significant liability that needed millions of dollars of repairs, had been mortgaged to Stephenson National Bank & Trust, and would incur hundreds of thousands of dollars of costs to surrender the dam license and to do wetland delineation and remediation. Trial Tr. 110-11 (Norrbom –

(April 22, 2024)[8]; Trial Tr. 85-87 (Kreuscher – May 10, 2024)[9]; Walton Dep. Tr. 122-23 (Docket No. 51-49, 80)[10]; Trial Tr. 147 (Harris – May 8, 2024). The Neshkoro plant produced enough to only cover operations. Trial Tr. 96 (Kreuscher – May 10, 2024). The Marseilles plant produced no power and was a liability with building maintenance and taxes. Trial Tr. 96-97 (Kreuscher – May 10, 2024). Of the three remaining plants in Iowa, one had been non-operational for nine years and it was going to be "very tight" to generate sufficient revenue from the two operating Iowa dams on a net and EBITDA basis to fund repayment of the $1.5 million interest only loan with Zero6 to retain the three Iowa plants. Trial Tr. 146-47 (Harris – May 8, 2024); Trial Tr. 96 (Kreuscher – May 10, 2024).

The MOU provided that Main Street Hydro would have "the right to hire all existing employees of RWE Operations that currently manage and operate the hydro projects" and that all hired employees would "become full time employees of Main Street Hydro" and "cease to be employed by RWE Operations or any of its subsidiaries being retained by RWE." Trial Ex. 30. The MOU further provided that "to facilitate transition for up to one year after closing: (i) [Main Street Hydro] will make former RWEO employees available to assist RWE and (ii) RWE will make its regulatory staff available to assist [Main Street Hydro]" and that such assistance would "be charged at no cost." *Id.*

The November 23 MOU also discussed Mr. Berutti's employment:

> Upon entering into a satisfactory written agreement to terminate his employment with HEG, RWE, and RWEO, Berutti agrees to negotiate a [5] year employment agreement to serve as President of [Main Street Hydro] and have primary executive responsibility of [Main Street Hydro]. Berutti's responsibilities will include oversight of the Assets and the hydro projects including lead responsibility for the operation and maintenance of the hydro projects, monitoring compliance with all contracts where [Main Street Hydro] and its subsidiaries are party to, ensuring compliance

---

[8] Regarding Au Train, Mr. Norrbom testified that "There are issues around the FERC license and what would need to be repairs to that facility in order to pass what's considered the probable maximum flood. And - - and that comes at a cost of being able to continue to operate the facility for electricity production." Trial Tr. 110 (April 22, 2024). He further testified that "it's probably fair to say it [Au Train] was not worth a whole lot," and that it could be a liability. *Id.* at 111.

[9] Regarding Au Train, Mr. Kreuscher testified that it is not economical to do the $3.7 million repair to keep Au Train operating because "it's well beyond the ability of Au Train to pay back that debt and to pay back that cost." Trial Tr. 85 (May 10, 2024). That leaves RWE with one option: abandoning the license, which would mean that Au Train could not generate power anymore. *Id.* at 86. Surrendering the license could require $600,000 in addition to costs associated with the wetland delineation and remediation. *Id.* at 87.

[10] Regarding Au Train, Attorney Walton added that "the MOU did not include Au Train" and he was "not aware that the issues with Au Train had been resolved." Walton Dep. Tr. 123 (Docket No. 51-49, 80). He believed that the range of liabilities related to solve the problem with Au Train, FERC, and the State of Michigan would be "at least a million dollars." *Id.* at 122. In addition to "not being worth a whole lot" and perhaps a liability, the Au Train land had also been mortgaged to Stephenson National Bank & Trust. *Id.* at 123; Case No. 23-21117, SNBT Claim No. 7.

with all regulatory authorities, managing the employees of the
Assets and [Main Street Hydro], and providing operating and
financial reports to the shareholders of [Main Street Hydro]. There
will also be incentives for Berutti to grow the [Main Street Hydro]
business through acquisition of additional hydroelectric assets
and/or the development of additional clean energy resources.

*Id.* The MOU did not include any language about terminating Mr. Berutti without cause. *Id.*;
Trial Tr. 102 (April 18, 2024).

The MOU also included a provision under which Zero6 would extend a $250,000 loan to
RWE. Trial Ex. 30, § 8. RWE pursued this loan because "[w]e were in a severe drought. We
weren't going to have enough money to meet payroll, meet our obligations at the end of the year,
. . . unless we acquired the $250,000." Trial Tr. 103 (April 18, 2024).

The MOU continued to include as a condition precedent the "completion of satisfactory
diligence, detailed requests of which will be provided to RWE after execution of this MOU."
Ex. 30, § 7.b. As Mr. Norrbom noted, "we certainly had not" completed due diligence. Trial Tr.
140 (April 22, 2024). The MOU also made clear that "the Parties acknowledge and agree that
there will be no obligation on the part of any of the Parties with respect to the goals contemplated
unless and until definitive agreements are executed and delivered by the respective Parties, one
to the other, and that any such obligation will be only as set forth in any such agreements." Trial
Ex. 30 § 9.a.; Trial Tr. 103-04 (April 18, 2024). Mr. Norrbom confirmed that the MOU was
non-binding:

Q:      If you found some derogatory or negative fact, you reserve the right to basically
        renegotiate.

A:      Yes. For sure. I mean, this whole MOU is a non-binding MOU anyways. But –
        but, yes. We're certainly saying there was more work to do.

Trial Tr. 140 (April 22, 2024).

The executed MOU further provided that, "At closing of this transaction and upon Berutti
entering into a separation agreement with RWEO on mutually-agreed terms, RWE Data's
existing PPA for energy from the Flambeau Hydro shall be terminated and replaced with a new
PPA to allow for the purchase of up to 1,350 KW from the Crowley plant at the rates shown in
Appendix A for ten years." Trial Ex. 30, § 9.d. The rates shown on Appendix A reflected an
average rate of $65 per megawatt hour.

According to Attorney Rossmeissl, the executed MOU "basically punted on the issue of
what Tom would receive." Trial Tr. 166 (April 19, 2024). The non-binding MOU executed with
Zero6 expressly conditioned any closing on a satisfactory severance agreement between HEG
and Mr. Berutti.

41

**The Harrises continue to loan funds to HEG and RWE.**

From September 19, 2022 until December 19, 2022, Mr. and Mrs. Harris loaned HEG and RWE $615,500 out of their personal funds because the companies were having "cashflow problems." Trial Ex. 48; Trial Tr. 237-39 (Berutti - April 17, 2024). By December 19, 2022, Mr. and Mrs. Harris were owed $2,171,008.05 by HEG and RWE. *Id.*

**The companies receive a $250,000 bridge loan from Zero6 in December 2022.**

On December 27, 2022, Zero6 and RWE consummated the bridge loan contemplated in the MOU through the execution of a Promissory Note in which RWE promised to pay $250,000 to Zero6 at an interest rate of 8% on or before the six-month anniversary of the Note. Trial Ex. 419.

**Mr. Berutti proposes a Severance and Release Agreement in January 2023.**

In late January of 2023, Mr. Berutti proposed a "Severance and Release Agreement" which Mr. Berutti viewed as a "universal, more or less, divorce of business relationships between myself and Bill Harris." Trial Tr. 129 (April 18, 2024). The Severance Agreement would have required:

1. HEG to pay Mr. Berutti five times his base salary pursuant to the 2017 Employment Agreement if the Zero6 sale did not close before February 15, 2023;

2. HEG to pay Mr. Berutti a lump sum of accrued paid time off (1,316 hours accrued, plus an additional 520 hours for 2023); and

3. HEG to pay Mr. Berutti a 2023 "water" bonus of $62,629.16.

Trial Ex. 31. In addition, under Mr. Berutti's proposal,

4. HEG would have been required to redeem Mr. Berutti's shares of HEG stock and purchase his membership interests in Sugarloaf Hydro and Fallasburg Hydro, LLC for $651,029.65 (provided that Mr. Berutti could elect instead in his sole discretion to receive from HEG shares of Main Street Hydro of equal value as of the date of the severance agreement);

5. HEG would have been required to purchase Mr. Berutti's 50% equity interest in Harris Real Estate Holdings for $557,000.00; and

6. HEG would have been required to purchase the mining servers owned by RWE Data for the balance of a loan with Nicolet Bank in the amount of $509,972.00.

*Id.* At trial, the Plaintiffs' expert assessed Mr. Berutti's proposal to require a payout of $3,417,406.81. Trial Ex. 120 at 104.

The proposed Severance Agreement also included a very broad mutual release. The mutual release provided that Mr. Berutti and HEG, RWE, RWE Operations and all of their related entities would "unconditionally release each other from any and all causes of action and liability including, but not limited to, those related to [Mr. Berutti's] employment, and termination of employment with HEG, RWE, and RWE Operations occurring prior to and up to his Termination Effective Date." Trial Ex. 31.

At the same time Mr. Berutti was trying to negotiate his severance from HEG, he was trying to negotiate an employment agreement with Zero6. Ex. 421. On March 3, 2023, Mr. Norrbom sent a draft employment agreement to Mr. Berutti for his review. *Id.* The draft agreement contemplated that Mr. Berutti would be employed by Main Street Hydro or Main Street Hydro Operations for five years with a starting base salary of $225,000. *Id.*; Trial Tr. 114 (April 18, 2024). Mr. Berutti confirmed in his testimony that he had "input into this draft" employment agreement, that his attorney, Attorney Hammond, was "handling the majority of the negotiation," and that he and Attorney Hammond were negotiating with Mr. Norrbom. Trial Tr. 112-13 (April 18, 2024).

**Attorney Rossmeissl's concerns about the proposed Severance Agreement.**

Attorney Rossmeissl recalled that the severance proposal "was even more enriching to Tom than any previous proposal, that it also included a payout for real estate that had never been discussed before." Trial Tr. 170 (April 19, 2024). He was concerned about the mutual release provision because "I had become aware of all sorts of transactions that occurred prior to my involvement. And I never really knew or understood the details because by the time the details came out, I was off the case [because the companies had hired bankruptcy counsel]. … So when I saw Paragraph 3A [the mutual release provision], I thought if we're ever going to sign anything like that, we have to have a much better understanding of everything that happened before today." Trial Tr. 174 (April 19, 2024).

After this proposal, Attorney Rossmeissl asked Mr. Ehr "to put numbers to the latest proposal, which was this severance and - - proposed severance and release agreement." Trial Tr. 175 (April 19, 2024); Trial Tr. 229-30 ("And then after January 21st, nothing happened between the signing of the MOU and us receiving Tom's separation proposal on January 24th. And we did not respond to that because again, we were waiting for Dan Ehr to put numbers to the proposal."). He waited "for probably a month, probably to late - - you know, middle to late February to really get numbers to go along with a severance and release agreement." *Id.* at 175.

Attorney Rossmeissl was also concerned because "there was also the reality that Juhl was expecting a deal soon, and that payments for interest and under various balloons were coming due." *Id.* at 175. An interest payment was due to Zero6 for the fourth quarter of 2022. Trial Ex. 404; Trial Tr. 152 (May 8, 2024). An interest payment would also be coming due to Zero6 for the first quarter of 2023. Trial Ex. 404; Trial Tr. 152 (May 8, 2024). If the payment was not made, HEG would be in default under the Zero6 loan agreements. *Id.* Mr. Kreuscher testified that Zero6's interest only payment was coming due at the end of March and "there was not money to pay that." Trial Tr. 132 (May 10, 2024).

43

Additionally, the $625,000 loan between Berutti Energy, as the lender, and Sugarloaf Hydro, as the borrower, was also maturing on March 19, 2023. Ex. 49, 52; Trial Tr. 152 (May 8, 2024); Trial Tr. 189 (April 19, 2024) (Attorney Rossmeissl testifying that a payment was coming due to Berutti Energy "within weeks, possibly, or a month of the date of the March 8th meeting."); Trial Tr. 225 (April 19, 2024) (Attorney Rossmeissl further testifying about "a balloon payment coming due in short order."). That loan was guaranteed by HEG, LCO Hydro, and Mr. Harris. That loan was also secured by Mr. Harris's membership interest in Sugarloaf Hydro and by HEG's membership interest in LCO Hydro. If that loan was not paid in full, Mr. Berutti could exercise the assignments of the membership interests and have Mr. Harris's membership interest in Sugarloaf Hydro and HEG's membership interest in LCO Hydro assigned to Berutti Energy.

After receipt of the proposed severance agreement, Attorney Rossmeissl testified that:

> I had no idea in early February what course of action we were going to take, whether we were going to reach a deal with Tom or not. But it was becoming apparent that some decisions might have to be made, and I was aware from reading the bylaws that there were supposed to be three board members, but there were only two left, and only Tom and Bill, which would result in a tie, so no decision, where they disagreed, could ever be made.
> I was also aware that still, as roughly a 95- or 96-percent owner of the company, that Bill could - - had the power himself to appoint another board member. So I did notice a - - a board meeting via - - for all of the entities. It was very roundabout way to do it, because there were so many entities with different rules. But there effectively was a way to appoint a controlling board member, a tiebreaker, so to speak.
>
> I noticed that up. We had a meeting; I can't recall the date. It was over the phone. Tom [Berutti] was on the meeting. I think Jason [Kreuscher] was, but I don't know. Bill [Harris] definitely was on the meeting - - on the call. Jonathan [Walton] was on the call. And the result of that was that Jason [Kreuscher, Mr. Harris's son] was appointed as a third board member. So at some point in the future, if decisions needed to be made, they could.

Trial Tr. 181 (April 19, 2024).

After Mr. Kreuscher was appointed to the board and before there could be a severance agreement with Mr. Berutti, Attorney Rossmeissl "wanted Dan [Ehr]'s review of the current deal and what might be left to - - to Bill after Tom did or didn't get what he asked for. But I also wanted to know - - get some sort of opinion on everything that had happened in the past before my involvement." Trial Tr. 182 (April 19, 2024). To Attorney Rossmeissl, "there was an order of operations here, in my mind, and number one was putting numbers to the severance and release agreement[.]" *Id.* at 197, 200-01.

44

**HEG terminates Mr. Berutti's employment and authorizes a bankruptcy filing at a March 2023 meeting of the Board of Directors.**

On February 28, 2023, Mr. Harris sent an email to Mr. Berutti stating that "I agree we need to talk about your separation agreement" and "about the [Main Street Hydro] update and status as it is very timely." Ex. 215 at 3. Mr. Harris proposed an in-person meeting on March 8, 2023, in Norway, Michigan. *Id.* That same day, Mr. Berutti emailed that he would "check with my attorney. I don't know if we need an in-person meeting. My contract is pretty cut and dry." *Id.* at 2.

The following day, after another email from Mr. Harris, Mr. Berutti responded:

> I will meet anytime, anywhere and with anyone you choose. Except for discussions involving my separation agreement, those discussions should be directed to my attorney Ed Hammond. The separation agreement Ed drafted is clear, concise and defined by my employment agreement. I will ask Ed to send a follow up email today to explain the methodology of each section in the agreement.

*Id.*

Mr. Harris reiterated that he wanted to "talk about both the [Zero6]deal but also your employment / separation agreement. If you need your attorney there, then get him there. These are the biggest issues we (I) have faced. Call it a board meeting." *Id.* at 1.

Mr. Berutti responded:

> Bill I will be in Norway for the meeting, as for my attorney <u>he will not be there and I will not discuss my separation agreement</u>, please direct all communications regarding this matter to him. In my opinion my separation agreement includes major concessions and no further discussions or concessions on my part will be offered.

*Id.* (underlining in original).

Attorney Rossmeissl testified that, "At that point [Bill Harris] hadn't had a[n] expert forensic analysis yet performed, and I knew that we would have no time to do that and keep the Juhl deal alive." Trial Tr. 184 (April 19, 2024).

The meeting of the Board of Directors for Harris Energy Group and its subsidiaries was convened on March 8, 2023, at Harris Energy's offices in Norway, Michigan. Those present were Mr. Harris, Mr. Berutti, Mr. Kreuscher, Attorney Rossmeissl, Attorney Walton (by telephone), Attorney Paul Swanson, and Attorney Hammond (by telephone).

Attorney Walton acted as the Secretary of the meeting and prepared the minutes of the meeting. Trial Ex. 223. The minutes reported as follows. Attorney Rossmeissl began the meeting, stating that "the purpose of the meeting was to address issues relating to the proposed

45

acquisition by Zero6 Energy (f/k/a Juhl Energy) of certain of the Subsidiaries and the agreement Mr. Berutti had proposed to HEG for the termination of his employment in connection with the proposed Zero6 acquisition." *Id.* at 2. Attorney Rossmeissl introduced Attorney Swanson and stated that "Mr. Swanson, his firm and finance professionals had been consulted to assist in analyzing these issues along with the Companies' cash flow and financial condition, and the potential for pursuing alternatives to the Zero 6 transaction." *Id.* at 2.

Attorney Swanson stated that "he and his law firm specialize in advising clients on bankruptcy and other matters pertaining to financial restructuring." *Id.* Attorney Swanson then stated that "he wanted to better understand the events leading up to the Companies' current financial condition, particularly the amount of indebtedness the Companies had taken on." *Id.* He said "it was possible that the Companies' net operating income might be sufficient for them to continue business, either through a Chapter 11 bankruptcy restructuring, or outside of bankruptcy." *Id.*

Attorney Swanson proceeded to ask Mr. Berutti "to provide background concerning how the Companies' indebtedness had come about and the origination of the Companies' relationship with Zero6." *Id.* Mr. Berutti's lawyer, Attorney Hammond, "objected to Mr. Berutti being questioned in the meeting and stated that if information was required from Mr. Berutti, it should be requested in writing and that he would respond." *Id.* Disregarding his counsel's objection, Mr. Berutti stated "that in 2013 the Companies had no debt, but that subsequently borrowing had been needed due to factors that included Kiser's significant losses on a fixed-cost project, acquisitions of the Three Rivers, Eau Galle, Grenfell and Cataract Hydro plants, and expenditures to refurbish the facilities at Cataract." *Id.* Mr. Berutti continued, stating "that low prices in the energy markets and low water flow in 2021 and 2022 had contributed to the Companies' financial problems. He described the financing undertaken with Juhl, and his purchase from and resale to the Companies of Grande Pointe and Eau Galle as attempts to address the Companies' reduced income and lack of other financing alternatives." *Id.* He noted that "at a meeting in the fall of 2022, with Messrs. Harris and Kreuscher and other stakeholders, he advised that the Companies would need $1 million in new funding to support operations until the Spring 2023 runoff." *Id.*

Attorney Walton's minutes of the Board Meeting further reported that "the creation of RWE Data as a Bitcoin mining operation owned 50% by Mr. Berutti was also discussed." *Id.* Mr. Berutti was questioned "as to why that venture had not been undertaken by the Companies, which could have received the profits that had been realized, instead of just being paid for energy sales." *Id.* It was further "pointed out that Mr. Berutti's participation in the venture and realization of a profit through the Grande Point and Eau Galle transaction breached his fiduciary duties to the Companies." *Id.* Attorney Rossmeissl noted "that investigation of those and other matters was on-going and that further details would be provided." *Id.*

Mr. Berutti responded "that he had originated the idea for the mining operation, and personally funded acquiring the mining equipment because no other lender would do so, and that the Companies benefitted by receiving income from energy sales at a level higher than was available in the market." *Id.* at 3. Mr. Hammond again reiterated his position "that the

46

questioning of Mr. Berutti in the meeting was not appropriate" and noted that "a person could 'wear two hats' without breaching fiduciary duties." *Id.*

Attorney Swanson recommended an immediate Chapter 11 bankruptcy filing by the Companies. *Id.* Attorney Swanson advised "that a Chapter 11 proceeding would give the Companies breathing room to explore alternatives to the Zero6 transaction." *Id.* Attorney Swanson also stated "that potential damages, if any, from an immediate termination of Mr. Berutti's employment contract would be limited under the Bankruptcy Code." *Id.*

After that discussion, Attorney Rossmeissl proposed a resolution authorizing all of the companies to file a Chapter 11 bankruptcy case. *Id.* Mr. Harris made a motion to adopt the resolution, which Mr. Kreuscher seconded. *Id.* The motion passed with two votes in favor, Mr. Harris and Mr. Kreuscher, and one vote against, Mr. Berutti. *Id.*

Attorney Rossmeissl also proposed a resolution to terminate Mr. Berutti's employment for cause under paragraphs 6.3.2, 6.3.5. and 6.3.6 of his 2017 Employment Agreement. *Id.* The minutes of the Board Meeting further reported that Attorney Rossmeissl made his resolution to terminate Mr. Berutti's employment "for cause" based upon the actions of Mr. Berutti, including the following:

1. "engaging in self-dealing and the personal receipt of financial benefits to the detriment of the Companies;"

2. "demanding to be terminated from his employment for the purpose of triggering payments provided under the Agreement that would have inflicted severe financial harm on the Companies, and threatening to prevent the Zero6 transaction from taking place if his demand was not met;" and

3. "directing his own time, the time of other staff of the Companies and other resources of the Companies to actions meant to benefit Zero6 and not the Companies."

*Id.* at 3-4. Mr. Harris made a motion to adopt the resolution, which Mr. Kreuscher seconded. *Id.* at 4. That motion also passed with two votes in favor, Mr. Harris and Mr. Kreuscher, and one vote against, Mr. Berutti. *Id.*

**Reasons for and responses to Mr. Berutti's termination.**

Mr. Kreuscher testified that "[a]fter the meeting was over, Mr. Berutti handed me his phone and informed me that he had transferred that phone number from the company plan to a plan that he had just opened himself and gotten himself a new phone. He handed me his computer. He handed us all a letter stating that he was - - he disagreed with the meeting itself, and then he left. And I found his office had been completely cleaned out of any and all personal items whatsoever." Trial Tr. 135 (May 10, 2024).

After the meeting, Attorney Rossmeissl drafted a letter in response to Attorney Hammond, who suggested that the Companies had not stated grounds for Mr. Berutti's

47

termination. Trial Tr. 186 (April 19, 2024). The letter explained that "Tom Berutti was discharged for cause under paragraph 6.3.2, 6.3.5, and 6.3.6 of the Executive Employment Agreement." Trial Ex. 100 at 1. The letter provided six "non-exhaustive" items amounting to "cause" under Mr. Berutti's employment agreement:

1. A recently exposed pattern of self-dealing pursuant to which Tom Berutti, while in his capacity as CEO (a key employee), and thus under a fiduciary duty to the Companies, recommended various courses of action designed to enrich himself at the expense of HEG and its subsidiaries, without proper disclosures made to company representatives. As a key employee, he owed the Companies a fiduciary duty of loyalty which he breached, and has continued to breach. Specifically, Tom engineered moving business resources and opportunities out of the Companies into separate entities from which he received a 50% interest in at the expense of the Companies. By Tom's design, the Companies took a loss on providing employees and other resources to the 50%-50% entities.

2. Tom's negotiating of a Memorandum of Understanding and an internal side agreement with Juhl which itself would result in Tom's violation of restrictive covenants against competition contained within his Executive Employment Agreement. This explains his insistence that he be terminated from his employment.

3. Tom threatening to "kill the deal" with Juhl if Bill Harris did not sign Tom's proposed (and incredibly one-sided) Severance Agreement. The Severance Agreement, if signed, would have plunged the companies deeper into insolvency to the tune of millions of dollars.

4. Tom actively working on Juhl business on HEG's time and while on its payroll; including but not limited to, working on planned subsequent acquisitions planned by Juhl including but not limited to the "Project Walleye Portfolio."

5. Tom demanding to be "terminated without cause" despite Bill Harris and Jason Kreuscher having no intention to terminate him. Said demand could only have been designed to enrich Tom while impoverishing HEG and its subsidiaries (see the terms of the "non-negotiable" Severance Agreement). Despite being the primary financial officer of the Companies, Tom insisted upon a "termination without cause" without even explaining the extreme financial implications to Bill Harris.

6. Other matters are currently under investigation. This is not an exhaustive list. Tom has clearly demonstrated a lack of loyalty to the companies which imminently threatened their continuing existence.

Trial Ex. 100 at 1-2.

Attorney Rossmeissl further explained during his trial testimony:

> Tom [Berutti], fairly consistently, through my three- or four-
> month involvement, including recently before this agreement, kept
> reminding everybody that he owned a trump card or several trump
> cards where he had the power to kill the deal with - - with Juhl.
> And that he had no qualms about doing it and that he would do it if
> we didn't sign the severance and release agreement.

Trial Tr. 267 (April 19, 2024).

Attorney Rossmeissl believed that the standard for "substantial, material harm" had been satisfied, and that the known facts "were plenty." Trial Tr. 187, 282 (April 19, 2024). He noted that there was a balloon payment due to Mr. Berutti (i.e., Berutti Energy) on the $625,000 Sugarloaf loan "within weeks, possibly, or a month of the date of the March 8th meeting. I can't recall the exact date." *Id.* at 189, 225. Additionally, Tom "was become more - - with the exception of March 8th, in which he was relatively well-behaved and, in my opinion, coached, he was becoming more and more bombastic with each conversation that we had." *Id.* at 219-220. To Attorney Rossmeissl, there was "interfering with bankruptcy, interfering with - - by interjecting in - - in Juhl, interfering with business operations, interfering with employees. That would all be substantial material harm." *Id.* at 224.

Mr. Kreuscher testified that the primary reason he voted to terminate Mr. Berutti was "because Tom was extorting us to be terminated without cause. And then later, this - - under the separation agreement, by withholding the negotiation of the RWE Data Flambeau Hydro power purchase agreement that would cause the Juhl deal to fail. And as - - under his representations, we would be unable to meet our loan obligations and Juhl would seize the entire company and it - - for nothing. He had taken control of the situation, painted us all in a box that we were having a hard time finding a way out of." Trial Tr. 248-49, 253 (May 10, 2024).

Mr. Harris testified that he "fired [Mr. Berutti] because he was not a loyal employee. I could not trust that he would have - - take[n] action of any sort that would be - - towards a good end with this company." Trial Tr. 261 (May 8, 2024). To Mr. Harris, Mr. Berutti "was not predictable. He wasn't a company man. He was highly paid. He was not a company man." *Id.* at 262. He voted to terminate Mr. Berutti because he was a "loose cannon." Trial Tr. 90 (May 9, 2024).

Attorney Rossmeissl made clear: "you have to analyze everything that Tom did here, considering everything else that Tom did." Trial Tr. 212-13 (April 19, 2024). *See also id.* 214 ("It was everything that happened together."); *id.* at 215 ("I - - I'm - - like I said, everything together."); *id.* at 220 ("Well, I've told you, it's everything together under these circumstances."); *id.* at 235 ("I've never taken that position because it's hypothetical. We don't have to look at each one individually because it's - - it's as a whole."); *id.* at 256 ("I think you can't analyze anything else that happened, including the deal that he was negotiating with Juhl, including his own - - including having a new employer in Juhl. You can't analyze that without also considering the impact under the employment agreement that he negotiated years earlier.").

Attorney Rossmeissl explained:

> In my opinion, at that time and still today, [Mr. Berutti] was continuing to breach his fiduciary duty by self-dealing above the - - instead of negotiating in the company's best interest. Not to mention he was continuing to deal with Juhl, and Juhl was expecting a - - that a closing was imminent and that needed to be shut down immediately. We absolutely needed Tom to - - we needed to be able to communicate to Juhl immediately that Tom had no authority to discuss any further pre-closing negotiations with Juhl.

Trial Tr. 188 (April 19, 2024).

The company also voted to seek relief under Chapter 11 in part to allow "time to have the forensic analysis performed to figure out the true value of the assets that were being sold, which we never were able to do prior to that time. That also the value of the company also was material to the value of Tom's stock that he was to receive." Trial Tr. 189-90 (Rossmeissl - April 19, 2024).

## The companies file for bankruptcy in March 2023.

On March 16, 2023, HEG, RWE, RWEO, Eau Galle Hydro, LLC, Grande Pointe Power Corporation, Iowa Hydro, LLC, Flambeau Hydro, LLC, LCO Hydro, LLC, and UP Hydro, LLC each filed their own Chapter 11 petition.

## Mr. Berutti files a proof of claim based upon his 2017 Employment Agreement and HEG and Mr. Harris object.

On March 22, 2023, Mr. Berutti filed a proof of claim in the amount of $672,206.20. The basis for Mr. Berutti's claim was his 2017 Employment Agreement with HEG. *See* Case No. 23-21117, Claim No. 1; Trial Ex. 16. Mr. Berutti asserted in his claim that he was terminated "without cause" and that he was entitled to compensation for five years, the entire balance of the employment term stated in the 2017 Employment Agreement, plus all unpaid personal time off. Mr. Berutti acknowledged in his claim that because of the limitations imposed under 11 U.S.C. § 502(b)(7), his claim would be limited in this bankruptcy case to one year of unpaid compensation under the 2017 Employment Agreement plus all unpaid personal time off.

HEG and Mr. Harris objected to Mr. Berutti's claim, asserting that Mr. Berutti's claim should not be allowed because Mr. Berutti was terminated "for cause" under the terms of the 2017 Employment Agreement with HEG. *See* Case No. 23-21117, Docket Nos. 125 and 130. According to HEG and Mr. Harris, HEG's Board of Directors determined that Mr. Berutti's continued employment would expose HEG to "substantial, material harm" and HEG's Board of Directors terminated Mr. Berutti "for cause" immediately and without notice. HEG and Mr. Harris asserted in their claim objections that because Mr. Berutti was properly terminated "for cause," his claim is contractually limited under the terms of the 2017 Employment Agreement to

50

his pro-rated compensation earned through the date of his termination plus his unpaid personal time off.

**Adversary Proceeding No. 23-2078.**

On June 28, 2023, HEG and RWE filed an adversary complaint against Mr. Berutti, the Berutti Trust, and Berutti Energy. HEG and RWE asserted eight causes of action in their complaint. In their first cause of action, they asserted that Mr. Berutti breached his fiduciary duty of loyalty by (1) causing RWE to transfer to Mr. Berutti 50% of RWE's equity interest in Sugarloaf Hydro without providing RWE with any consideration; (2) engineering a transaction with RWE for the sale and buyback of Eau Galle and Grande Pointe which deprived RWE of nearly $1 million; (3) negotiating a self-serving severance agreement in Mr. Berutti's favor that would have deprived HEG of all cash resulting from the sale of certain assets and saddling HEG with debts it could not support all to the detriment of HEG's creditors and equity holders; and (4) requiring that HEG and LCO Hydro guarantee a loan between Sugarloaf Hydro and Berutti Energy, when Mr. Berutti had caused RWE to transfer to Mr. Berutti 50% of its equity interest in Sugarloaf Hydro. In their second through fourth causes of action, HEG and RWE sought to avoid and recover alleged fraudulent transfers to Berutti Energy of RWE's equity interests in Eau Galle Hydro and Grande Pointe Power Corporation. In their fifth cause of action, HEG and RWE sought to avoid and recover an alleged fraudulent transfer to the Berutti Trust of RWE's equity interest in Sugarloaf Hydro. In their sixth and seventh causes of action, HEG and RWE sought to avoid and recover an alleged preferential transfer made by RWE to Berutti Energy in the amount of $175,000 and an alleged preferential transfer made by HEG to Berutti Energy of a security interest in HEG's membership interest in LCO Hydro. In their eighth cause of action, HEG and RWE requested that Mr. Berutti's and Berutti Energy's claims in the bankruptcy case be equitably subordinated to all other claims in the bankruptcy case.

**Adversary Proceeding No. 23-2080.**

On June 29, 2023, RWE filed an adversary complaint against Berutti Energy and Mr. Harris related to the Sugarloaf Hydro transaction. The three claims in the adversary proceeding sought to avoid and recover the alleged fraudulent transfer to Mr. Harris of RWE's equity interest in Sugarloaf Hydro and to avoid and recover the subsequent transfer by Mr. Harris to Berutti Energy of any interest in the membership interests in Sugarloaf Hydro transferred to Mr. Harris by RWE.

## ANALYSIS

### I.    BREACH OF FIDUCIARY DUTY CLAIMS

To succeed on a breach of fiduciary duty claim, a plaintiff must show "(1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that duty; and (3) the breach of duty caused the plaintiff's damage." *Berner Cheese Corp. v. Krug*, 2008 WI 95, ¶ 40, 312 Wis. 2d 251, 270, 752 N.W.2d 800, 809. Corporate officers and directors have a "fiduciary duty of individual loyalty, good faith and fair dealings in conducting corporate business." *Racine v. Weisflog*, 165 Wis. 2d 184, 190, 477 N.W.2d 326, 329 (Ct. App. 1991). This duty prevents

51

corporate directors from using their position of trust to further their own private interests. *Rose v. Schantz*, 56 Wis. 2d 222, 228, 201 N.W.2d 593 (1972). "A consistent facet of a fiduciary duty is the constraint on the fiduciary's discretion to act in his own self-interest because by accepting the obligation of a fiduciary he consciously sets another's interests before his own." *Zastrow v. Journal Commc'ns, Inc.*, 2006 WI 72, ¶ 28, 291 Wis. 2d 426, 444, 718 N.W.2d 51, 59. The "constraint on acting in one's own self-interest has been described as a fiduciary's duty of loyalty." *Id.* at ¶ 29. A fiduciary's "duty of loyalty" is "to act solely for the benefit of the principal in all matters connected with the agency, even at the expense of the agent's own interests." *Id.* at ¶ 31 (citation omitted). The duty of loyalty is "broader than simply requiring the fiduciary to refrain from acting in his own self-interest." *Id.* at ¶ 29. A fiduciary is required to "fully disclos[e] to the beneficiary all information relevant to the beneficiary's interest." *Id.* There are a number of ways that a breach of fiduciary duty can occur, including self-dealing by the fiduciary and failing to disclose material information to the beneficiary. *Zastrow*, 2006 WI 72 at ¶ 37.

The first element that must be established for a breach of fiduciary duty claim is that Mr. Berutti owed a fiduciary duty to the Plaintiffs. *Berner Cheese Corp.*, 2008 WI 95, ¶ 40. Mr. Berutti was the Chief Executive Officer of HEG and its subsidiary companies, which included RWE and LCO Hydro, as well as a member of the Board of Directors starting February 16, 2017. Trial Ex. 16, 17. There is no debate in this case that Mr. Berutti, as an officer and director of HEG and its subsidiary companies, owed a fiduciary duty to HEG and its subsidiary companies.

A. **Mr. Berutti did not breach his fiduciary duty in the negotiation of his 2017 Employment Agreement.**

The Plaintiffs assert that Mr. Berutti breached his fiduciary duty during the negotiation of his 2017 Employment Agreement with HEG. Adv. No. 23-2078, Docket No. 1 ¶¶ 22-30, 73-77. Docket No. 52, ¶ 33, Docket No. 157, p. 121.

To succeed on a breach of fiduciary duty claim, a plaintiff must show "(1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that duty; and (3) the breach of duty caused the plaintiff's damage." *Berner Cheese Corp.*, 2008 WI 95, ¶ 40. When it comes to negotiating an employment agreement, there is "inherent friction created when an individual is both an employee and a corporate officer." *Jacobson v. American Tool Cos.*, 222 Wis. 2d 384, 395, 588 N.W.2d 67, 72 (Ct. App. 1998). On the one hand, "a corporate officer is under a fiduciary duty of individual loyalty, good faith and fair dealings in conducting corporate business." *Id.* (citing *Weisflog*, 165 Wis. 2d at 190). On the other hand, "being a corporate officer does not permit the corporation to ignore the principle applicable to all employees, including officers and directors, that 'the laborer is worthy of his hire.'" *Id.* (quoting *Gauger v. Hintz*, 262 Wis. 333, 346, 55 N.W.2d 426, 433 (1952)). "A laborer is worthy of his hire" is a phrase that originates from the Bible and conveys the idea that those who contribute their labor, including corporate officers and directors, deserve to be compensated fairly for their time. "There is no rule of law which requires a director to act as an employee of the corporation without reasonable compensation for his services in management." *Gauger*, 262 Wis. at 345. The duty of loyalty to the corporation does, however, require a fiduciary to fully disclose to the corporation all information relevant to its interest. *Zastrow*, 2006 WI 72, ¶ 29.

52

The Plaintiffs assert in their breach of fiduciary duty claim that Mr. Berutti "sat on both sides of the negotiating table" for the 2017 Employment Agreement. However, at the time Mr. Harris executed Mr. Berutti's 2017 Employment Agreement, Mr. Harris was the sole owner and sole director of HEG. *See, e.g.*, Trial Ex. 17. Mr. Berutti was an employee who had not yet been issued an ownership interest (though he was entitled to one under his 2015 Employment Agreement), and he was not a member of the Board of Directors. Mr. Harris agreed to the terms of the Employment Agreement as Chairman of the Board of HEG and Chairman of the Board and Manager of RWE, RWEO, and Kiser Hydro. Trial Ex. 16 at 17. This is not a case where Mr. Berutti "determined his own compensation," unlike the cases cited by the Plaintiffs in their pre-trial brief including *Cambridge Retirement Systems v. Bosnjak*, No. 9178-CB, 2014 WL 2930869, at *3 (Del. Ch. June 26, 2014), where outside directors were able to set their own cash compensation <u>without</u> seeking stockholder approval of that fee structure.

The Plaintiffs further assert in their breach of fiduciary duty claim that when Mr. Harris received Mr. Berutti's proposed 2017 Employment Agreement, he was not offered an opportunity to independently consult with Attorney Walton, HEG's outside corporate counsel. The evidence presented at trial directly contradicted this claim. When asked whether Mr. Berutti blocked access to HEG's outside corporate counsel, Mr. Harris testified, "Certainly not." Trial Tr. 45 (May 9, 2024). Mr. Harris agreed that he was not prohibited from talking to Attorney Walton without Mr. Berutti present. *Id.*

The evidence presented at trial further showed that Mr. Harris had extensive discussions with Mr. Berutti, Mr. Gerhard, and Attorney Walton, HEG's outside corporate counsel, before executing the Employment Agreement. On February 15, 2017, Mr. Berutti, Mr. Harris, and Mr. Gerhard went over the draft Employment Agreement. Trial Exs. 15, 20. Mr. Gerhard wrote a letter to Attorney Walton summarizing the meeting:

> On Wednesday, February 15, 2017, Bill Harris, Tom Berutti and I went over all the documents associated with Tom Berutti's Employment Agreement and Shareholder's Agreement, along with the Unconditional Guaranty, The Action of the Shareholder and the letter from Tom Berutti to Bill Harris regarding the Rental Properties. We went over the Summary of Changes for both the Employment Agreement and the Shareholders agreement. We pointed out and explained the documents to Bill.
>
> I then gave an entire set of the above documents to Bill to keep and review before our formal meeting Thursday night with Jonathan Walton, HEG's Corporate Attorney.

Trial Ex. 20.

On February 16, 2017, Attorney Walton, HEG's outside corporate counsel, traveled to Iron Mountain, Michigan and met with Mr. Harris in person to discuss the draft employment agreement. Trial Tr. 70 (April 17, 2024); Trial Exs. 13, 19; Walton Dep. Tr. 17-18, 43, 47-50 (Docket No. 51-49, 80). Attorney Walton had a lengthy discussion with Mr. Harris at the

February 16, 2017 meeting.  Walton Dep. Tr. 17-18, 43, 47-50 (Docket No. 51-49, 80); Trial Ex. 19.  Attorney Walton summarized this meeting in a letter that he wrote to Attorney Hammond, Mr. Berutti's personal attorney, as follows:

> As to the Employment Agreement, the points covered included: increasing the duration of the contract from the three-year term currently under Tom's 2015 employment contract to a five-year evergreen term; the salary to be paid, including a lump-sum payment during the second quarter of each year; the provisions for a 3% annual increase in the lump sum payment and the base salary; reimbursement to Tom of premiums for the life insurance policies covering Bill that Tom holds; and the benefit package. We also discussed the provisions in the Employment Agreement that fulfill and protect Bill's agreement that Tom would receive a 10% ownership share in HEG, including the time table for issuing shares to Tom. We reviewed the provision to pay Tom the equivalent of an annual S corporation shareholder distribution based on the difference between the amount payable to a 10% holder and the amount of stock actually issued to him. We also reviewed the requirement that upon termination of employment Tom receive payment for the value of the portion of a 10% holding not yet issued to him (in addition to a buy back of his issued shares under the Shareholders Agreement). We also covered Bill's Guaranty of the Employment Agreement, that also extends to RWEO.
>
> One provision of the Employment Agreement that was extensively discussed was Section 14, which requires that if Tom or his trust/heirs wind up in litigation against HEG relating to the Employment Agreement, then during the pendency of the case the company must reimburse the legal costs of Tom or his trust/heirs on a monthly basis. It was decided in discussions with Tom to limit the duration of this provision. To do so, language was added so that Section 14 will expire upon the earlier of establishing a governance and succession plan relating to Bill's ownership in HEG, or two years from the signing of the agreement-February 16, 2019.

Trial Ex. 19.  Attorney Walton concluded the summary of the meeting by stating, "Bill indicated that all of his questions had been answered, and that he agreed with terms presented.  He and Tom shook hands on the deal. At the conclusion of our meeting all documents were signed, initialed and witnessed."  *Id*.

54

Mr. Gerhard's letter to Attorney Walton offers the same account:

> On Thursday, February 16, 2017, Jonathan Walton and Bill Harris went over all of the above documents at greater length [Tom Berutti's Employment Agreement and Shareholder's Agreement, along with the Unconditional Guaranty, The Action of the Shareholder and the letter from Tom Berutti to Bill Harris regarding the Rental Properties]. I, Bob Gerhard, was also in the room the entire time.
>
> The only alteration to any of the documents came at Bill Harris' request. Bill Harris requested that in the Employment Agreement, Section 14: Legal Expenses, the line: "This Section 14 will expire upon the earlier of: (i) the completion of a succession and governance plan with respect to William D. Harris's ownership share in HEG or (ii) February 16, 2019", be added to the section.
>
> This change was agreed to by all parties and the entire set of documents were then signed by all parties involved and witnessed.

Trial Ex. 20.

The Plaintiffs assert that they were damaged in the amount of $18,232 as a result of the increase in Mr. Berutti's salary in the 2017 Employment Agreement and the annual 3% raises included in the 2017 Employment Agreement. Trial Ex. 120, Ex. 1.0 (cited in Adv. No. 23-2078, Docket No. 157, p.122). However, this salary increase was fully disclosed in Attorney Walton's meeting with Mr. Harris. Trial Ex. 19. Additionally, this salary increase was clearly stated in Section 4.1 of the 2017 Employment Agreement that was signed by Mr. Harris. Trial Ex 16.

The Plaintiffs also assert that they were damaged in the amount of $67,244 for the "incremental cost of additional PTO of 23 days in 2021 and 45 days in 2022." Trial Ex. 120, Ex. 1.0. However, Attorney Walton had a lengthy discussion with Mr. Harris about the 2017 Employment Agreement before Mr. Harris signed the agreement. Walton Dep. Tr. 17-18, 43, 47-50 (Docket No. 51-49, 80); Trial Ex. 19. Additionally, the "personal time off" provision was clearly stated in Section 5.2 of the 2017 Employment Agreement that was signed by Mr. Harris. Trial Ex. 16. That provision stated that Mr. Berutti would "receive twenty (20) days of personal time off per year" and that personal days would "be managed in a manner consistent with RWEO's employee manual" except that Mr. Berutti would "not be subject to any limit on his accrued but unused personal time off." *Id.* § 5.2.

The Plaintiffs' alleged damages in the amount of $67,244 for the "incremental cost of additional PTO of 23 days in 2021 and 45 days in 2022" also are not directly attributable to the Plaintiffs' claim that Mr. Berutti breached his fiduciary duty during the negotiation of his 2017 Employment Agreement with HEG. The provision requiring HEG to pay out accumulated and unused personal time off was not included in the 2017 Employment Agreement. Trial Ex. 16.

That provision was not included until the Addendum to the Employment Agreement was executed by Mr. Harris and Mr. Berutti in June 2021. Trial Ex. 25. The Plaintiffs have not asserted a claim that Mr. Berutti breached his fiduciary duty during the negotiation of the Addendum to the Employment Agreement with HEG in June 2021.

After considering all of the evidence and the testimony presented at trial, the Court does not believe that Mr. Berutti sat on both sides of the negotiating table for the 2017 Employment Agreement, that Mr. Berutti actively took steps to preclude Mr. Harris from receiving independent legal counsel regarding the new proposed terms of the 2017 Employment Agreement, or that Mr. Harris was not offered an opportunity to independently consult with Attorney Walton, HEG's outside corporate counsel, regarding the 2017 Employment Agreement.

To the contrary, Mr. Gerhard provided a copy of the draft 2017 Employment Agreement to Mr. Harris to review and study. Attorney Walton went over the agreement with Mr. Harris extensively. The contractual provisions in the agreement regarding personal time off and salary were clear, were fully disclosed to Mr. Harris before he signed the agreement, and did not require any additional background beyond Mr. Harris's expertise to understand. The Court concludes that Mr. Berutti did not breach a fiduciary duty during the negotiation of his 2017 Employment Agreement with HEG.

**B.**     **Mr. Berutti breached his fiduciary duty by engineering the Eau Galle/Grande Pointe "sale-and-buyback" transaction that converted his unissued ownership interest in HEG to a cash payment of $1 million.**

The Plaintiffs assert that Mr. Berutti breached his fiduciary duty of loyalty by "[e]ngineering a transaction with RWE for the sale and buyback of Eau Galle Hydro and Grande Pointe which deprived RWE of nearly $1 million." Adv. No. 23-2078, ¶ 75(b). The Court agrees that Mr. Berutti breached his duty of loyalty through his actions in connection with the Eau Galle/Grande Pointe transaction, both through his failure to disclose all necessary information to Mr. Harris and by engineering a transaction that converted his unissued ownership interest in HEG with a value of roughly $387,974 to a cash payment of $1 million ($702,078.84 plus Mr. Berutti's taxes on that compensation). The company was damaged as a result.

A corporate officer or director, as a fiduciary, has a "duty of loyalty" to the corporation and is prohibited from "self-dealing." *Zastrow*, 2006 WI 72, ¶¶ 28-31; *Weisflog*, 165 Wis. 2d at 190. A corporate officer or director, as a fiduciary, must act solely for the benefit of the company, even at the expense of his or her own interests. *Zastrow*, 2006 WI 72, ¶ 28.

This alleged breach of fiduciary duty involves these facts:

- As of October 2020, Mr. Berutti had a vested interest in at least 4.92% ownership of HEG under his 2017 Employment Agreement, but the company had not issued this stock to him. Trial Ex. 16, § 11.1; Trial Ex. 144; Trial Tr. 172 (April 18, 2024).

- The 2017 Employment Agreement required HEG to pay Mr. Berutti's taxes on any stock issuance. Trial Ex. 16, § 11.3.

- Under Mr. Berutti's 2017 Employment Agreement, HEG could defer issuing stock until the first taxable year that it would not "jeopardize the ability of HEG or its subsidiaries to continue as a going concern." Trial Ex. 16, §§ 11.1, 11.4.

- Mr. Berutti agreed that if HEG could not financially make the tax payments called for by § 11.3 of the 2017 Employment Agreement, the company could defer issuing the stock. Trial Tr. 172 (April 18, 2024).

- HEG could not afford to pay $550,000 in taxes on a stock issuance in October 2020. Trial Tr. 121 (Berutti - April 17, 2024).

- HEG was required to repurchase Mr. Berutti's stock at a certain price if certain "Triggering Events" occurred. Trial Ex. 17, § 3.2. None of these "Triggering Events" had occurred in October 2020. Trial Tr. 89 (April 17, 2024).

- In 2020, one of the HEG/RWE subsidiary companies, Iowa Hydro, LLC, needed $500,000 for a hydro plant upgrade. Trial Tr. 59-61 (May 8, 2024).

- Ostensibly to address the Iowa Hydro plant upgrade and to address HEG's "obligation" to issue stock, Mr. Berutti came up with a plan where he would purchase two RWE subsidiaries, Eau Galle Hydro, LLC and Grande Pointe Power Corporation.

- On October 6, 2020, Mr. Berutti presented a summary of the Eau Galle/Grande Pointe "sale-and-buyback" transaction to Mr. Harris in an email. Trial Ex. 135; *see* Walton Dep. Ex. 21 (Docket No. 51-49, 80). He described the transaction in the following way.

  o "I will buy the Eau Galle Hydro LLC for $600K and Grande Point Power Corp LLC (GPPC) for $600K for a total of $1.2 million." Trial Ex. 135; *see* Walton Dep. Ex. 21 (Docket No. 51-49, 80).

  o "I will use $700K of my unpaid ownership in HEG (to be confirmed by Dan Ehr [HEG's accountant at Baker Tilly]) towards the purchase and pay RWE $500K in cash at closing." *Id.*

  o "RWE will then lease the LLCs back from me for 10 years at rent of $8K/month, RWE will operate and maintain the plants during the lease and keep whatever revenue the plants generate." *Id.*

  o "RWE will have the right to repurchase the two LLC's at any time for the purchase price plus tax [sic] my adverse tax effect caused by this transaction." *Id.*

57

- o "I will have the right to sell the two LLC's back to RWE on the same terms if there is a breach of the leases, when the leases expire, and if my employment terminates for any reason. If RWE does not buy back then I will have the right to sell the LLC's to any third party buyer, and RWE will have to make up any shortfall in the purchase price. I will need you and HEG to guaranty this part of the transaction." *Id.*

- o The email concluded, "If you want more details Jonathan [Walton] can provide." *Id.*

- Attorney Walton, HEG's company attorney, drafted documents for the Eau Galle/Grande Pointe sale-and-buyback transaction based on "the belief that Mr. Berutti and Mr. Harris were working together and had had discussions and had agreed between the two of them to move forward with those transactions." Walton Dep. Tr. 143 (Docket No. 51-49, 80). He "drafted the documents to carry out what I had been led to believe was their agreement." *Id.*

- In October 2020, Mr. Berutti did not have an unpaid ownership of $700,000 as stated in his email to Mr. Harris. Instead, he was entitled to issuance of at least a 4.92% ownership interest in HEG but had not yet been issued stock. Trial Ex. 16 § 11.1; Trial Ex. 144; Trial Tr. 172 (April 18, 2024).

- In a 2017 stock valuation, HEG had a value of $15,956,609, calculated by taking its assets of $29,995,000 and subtracting its liabilities of $14,038,391. Trial Ex. 144; *see also* Trial Ex. 17 at 13.

- By 2020, the value of HEG had decreased to $7,885,654. *See* Trial Ex. 120 ¶¶ 119-20. HEG had sold Cataract Hydro, one of the hydro plants included in the 2017 valuation with a value of $6,630,000. Trial Tr. 98 (April 17, 2024); Trial Ex. 17 at 13. Its liabilities had increased from $14,038,391 to $15,479,346. Trial Ex. 144; Trial Ex. 120 ¶ 120.

- While a 4.92% ownership interest in HEG would have been worth $785,065 in 2017, by 2020, it would have been worth only roughly half that, or $387,974. Trial Exs. 17, 120, 144.

- The final Eau Galle/Grande Pointe sale-and-buyback transaction in 2020 converted what Mr. Berutti believed to be the value of his unissued HEG stock (using the 2017 valuation) to a promissory note in the amount of $702,078.84. Ex. 61 at 1; Trial Tr. 121, 153 (April 17, 2024) (Mr. Berutti testifying that HEG "was in breach of paying me the -- my vested shares.").

- Mr. Berutti then took ownership through Berutti Energy of two RWE subsidiaries (Eau Galle Hydro, LLC and Grande Pointe Power Corporation) that each owned their own hydro plant in exchange for $500,000 in cash and satisfaction of the $702,078.84 note payable to him. Trial Ex. 61 at 2-3, 6-40.

58

- RWE leased back the hydro plants from Berutti Energy for $8,000/month and continued to run them and receive the revenue from energy production. Trial Ex. 61 at 17-38.

- To buyback the two company assets, RWE was required to pay Berutti Energy $500,000, plus $702,078.84, plus an amount equal to Mr. Berutti's taxes on the $702,078.84. Trial Ex. 61 at 9-10 (Equity Purchase Agreement § 2.3).

- If certain conditions were met and RWE was unable to buyback the assets, Berutti Energy was "permitted to sell the Eau Galle/Grande Pointe Equity to third parties on such terms as [Berutti Energy] determines are acceptable." Trial Ex. 61 at 10 (Equity Purchase Agreement §§ 2.1(a), 2.4).

- The Equity Purchase Agreement did not explicitly address what would happen in the event there were excess proceeds from the sale. *Id.* at 10 (Equity Purchase Agreement § 2.4).

- If there was a deficiency, RWE would remain liable to Mr. Berutti and Berutti Energy for $1,202,078.84 plus amounts attributable to tax liability as a result of the sale, "after deducting all of the reasonable expenses of the third-party sale." *Id.*

- HEG and Mr. Harris guaranteed RWE's obligation. *Id.* at 39-40.

- In the summer of 2021, a drought started to hit HEG. Trial Tr. 120 (April 17, 2024). Mr. Harris began loaning money to the company. Trial Ex. 48; Trial Tr. 181-82 (April 22, 2024). Mr. Berutti put together a plan to reduce wages and expenses in June 2021 because the "drought is coming into play very severely right now." Trial Ex. 24; Trial Tr. 194 (April 17, 2024).

- In August 2021, RWE and Flambeau Hydro, LLC, an RWE subsidiary, borrowed $1.8 million from Zero6. *See* Trial Ex. 404 at 4.

- Flambeau Hydro used some of the loan proceeds to buyback the membership interests in Eau Galle Hydro from Berutti Energy for $750,000. Trial Ex. 62; Trial Tr. 120 (April 17, 2024).

- In May 2022, RWE, Flambeau Hydro, and Iowa Hydro borrowed $6.5 million in additional funds from Zero6. Trial Ex. 404; Trial Ex. 29.

- Iowa Hydro used some of the loan proceeds to buyback the stock interests in Grande Pointe from Berutti Energy for $750,000. Trial Ex. 63.

Mr. Berutti had a duty to act solely for the benefit of HEG and its subsidiaries, even if it came at the expense of his own interests. He breached that duty by arranging a complicated and convoluted transaction where the company committed to paying him $702,078.84 (plus his taxes

59

on that amount) at a time it could not afford to pay $550,000 towards taxes from issuing stock or $500,000 for a hydro plant upgrade. *See* Trial Tr. 121 (April 17, 2024).

Mr. Berutti also breached his fiduciary duty by arranging a complicated and convoluted transaction where the company committed to paying him $702,078.84 in cash (plus his taxes on that amount) at a time when his Employment Agreement did not call for any stock issuance at all. In October 2020, Mr. Berutti was entitled to issuance of stock in the first taxable year that the stock grant would not "jeopardize the ability of HEG or its subsidiaries to continue as a going concern." Trial Ex. 16 §§ 11, 11.1, 11.2, 11.4; Trial Ex. 144. In October 2020, HEG could not afford to issue the stock. Instead of deferring the issuance, Mr. Berutti arranged a deal requiring the company to pay him $702,078.84 in cash (plus his taxes on that amount). Trial Ex. 61 at 9-10, Trial Exs. 62, 63. There was no requirement in the Employment Agreement for HEG/RWE to do this.

Mr. Berutti also breached his fiduciary duty by arranging a complicated and convoluted transaction where the company committed to paying him $702,078.84 in cash (plus his taxes on that amount) at a time when HEG's Shareholders Agreement did not require an issuance of new shares and an immediate buyback of those new shares. Trial Ex. 17. There was no requirement in the Shareholders Agreement that HEG issue stock in October 2020 and then repurchase it.

Mr. Berutti breached his fiduciary duty by using the value of HEG from 2017 in order to "cash out" his vested but unissued ownership interest for roughly twice its value in 2020. Mr. Berutti explained that his design for the Eau Galle/Grande Pointe transaction did not use the 2020 value of the stock, but rather used the December 28, 2017 value of the stock, as shown on Exhibit A to the Action of the Directors by Consent. Trial Tr. 114 (April 17, 2024); Trial Tr. 91 (April 19, 2024); Trial Ex. 144; Trial Ex. 17 at 13. But in 2020, the value of HEG was roughly half of what it was in 2017. *See* Trial Ex. 120 ¶¶ 118-20; Trial Tr. 98 (April 17, 2024); Trial Ex. 17 at 13; Trial Ex. 144. Thus, the value of Mr. Berutti's vested but unissued ownership interest in 2020 was roughly only half of what it had been in 2017. Mr. Berutti "cashed out" the vested but unissued ownership interest at its 2017 value, resulting in him extracting twice the value of the ownership interest he would have received if HEG had issued stock in 2020.

Mr. Berutti breached his fiduciary duty by taking ownership of RWE assets to secure payment of cash compensation in lieu of the issuance of stock. He put his own interests ahead of the interests of the company by giving himself the ability to sell the assets if the company could not pay him $702,078.84 in cash (plus his taxes on that amount), even though the loss of access to the assets might harm the company.

Mr. Berutti breached his fiduciary duty by ultimately requiring the companies to take on $1.5 million in debt to cover the $500,000 upgrade at the Iowa Hydro plant plus payment of $702,078.84 to Mr. Berutti for the "value" of his unissued stock in the company that was not required to be issued and repurchased plus Mr. Berutti's taxes on that amount. While suffering the impact of a drought, the company later had to "refinance" that obligation with additional loans from Zero6.

60

Mr. Berutti argues that Mr. Harris ratified this breach of fiduciary duty under Wis. Stat. § 180.0831. Under that statute, a "conflict of interest transaction" (defined as "a transaction with the corporation in which a director of the corporation has a direct or indirect interest") is not voidable by a corporation if:

(a)     The material facts of the transaction and the director's interest were disclosed or known to the board of directors or a committee of the board of directors and the board of directors or committee authorized, approved or specifically ratified the transaction; or

(b)     The material facts of the transaction and the director's interest were disclosed or known to the shareholders entitled to vote and they authorized, approved or specifically ratified the transaction; or

(c)     The transaction was fair to the corporation.

Wis. Stat. § 180.0831(1)-(2).

There was no evidence that Mr. Harris received full disclosure of the material facts such that he could ratify the conversion of Mr. Berutti's unissued ownership interest in HEG with a value of roughly $387,974 to a cash payment of $1 million ($702,078.84 plus Mr. Berutti's taxes on that amount).

This was an extremely convoluted transaction. Even if he fully understood the structure of the transaction, to be able to make an informed decision about whether HEG should go forward with the convoluted mechanism for compensating Mr. Berutti, Mr. Harris, a hydroelectric engineer and not a finance professional, would have needed at least the following material facts:

- In October 2020, HEG could not afford to grant the unissued stock to Mr. Berutti because it could not cover his tax liability.

- HEG could continue to defer the stock grant to a time when it would not jeopardize the ability of HEG or its subsidiaries to continue as a going concern.

- HEG was not obligated to repurchase stock it had already issued to Mr. Berutti unless a "Triggering Event" occurred, and no Triggering Event had occurred.

- The value of the company (and consequently, the value of the stock Mr. Berutti had yet to receive) was different in 2020 from what it was in 2017 when HEG issued stock to Mr. Berutti.

- Nothing required RWE to transfer ownership of its assets to Mr. Berutti as security for payment of compensation and risk losing those assets if it could not pay.

61

There was no evidence that Mr. Berutti disclosed any of these material facts to Mr. Harris. Nothing in Mr. Berutti's email summarizing the transaction disclosed these facts. Mr. Harris testified that Mr. Berutti never sat down with pencil and paper to sketch out what the $500,000 hydro plant upgrade was going to cost the company. Trial Tr. 67 (May 8, 2024). Ultimately, the $500,000 hydro plant upgrade cost the company $1.5 million.

None of these background facts could be gleaned from any of the documents that effectuated the transaction. The information needed to decide whether the transaction was good for the company was entirely separate from the structure of the transaction. It is not apparent from the Promissory Note for $702,078.84, the Equity Purchase Agreement, the Assignment of Membership Interest in Eau Galle Hydro, LLC, the Assignment of Stock Ownership in Grande Pointe Power Corporation, the Consent Resolution of Renewable World Energies, LLC for Sale of the Equity Ownership of Eau Galle Hydro, LLC and Grande Pointe Power Corporation, the Commercial Leases, or the Unconditional Guaranty. Trial Ex. 61.

There was no evidence that Mr. Ehr, the company's accountant, disclosed any of these material facts to Mr. Harris. Trial Tr. 62-65 (Ehr – April 19, 2024); Trial Tr. 70 (Harris – May 8, 2024).

There was also no evidence that Attorney Walton, the company's attorney, disclosed any of these material facts to Mr. Harris. Attorney Walton simply drafted documents to carry out what he had been led to believe was an agreement between Mr. Berutti and Mr. Harris. Walton Dep. Tr. 143 (Docket No. 51-49, 80). There was no evidence that Mr. Berutti tasked Attorney Walton with explaining HEG/RWE's obligations and options to Mr. Harris so that Mr. Harris could make an informed decision about the transaction. There was no evidence that Attorney Walton's role was anything other than acting as a scrivener. Mr. Harris testified that Attorney Walton never sat down with pen and paper to sketch out what the $500,000 hydro plant upgrade was going to cost the company. Trial Tr. 70 (May 8, 2024).

The fact that Mr. Harris signed an Equity Purchase Agreement stating that "Each of the parties has had all information necessary to make an informed and voluntary decision regarding this Agreement and the Leases and the Unconditional Guaranty" does not mean that he received the material information necessary to ratify the transaction under Wis. Stat. § 180.0831. The fact that a document says that the parties had all necessary information does not make it so. A beneficiary of a fiduciary duty often cannot independently determine whether he or she has all the information necessary to make an informed decision, precisely because he or she is relying on the fiduciary to disclose that information. For example, "a lawyer can breach his fiduciary duty of loyalty to a client by entering into a contract with a client without full disclosure that the contract will benefit the lawyer and potentially disadvantage the client." *Zastrow*, 2006 WI 72, ¶ 30. How is the client supposed to know that the contract will benefit the lawyer and potentially disadvantage the client? The answer is, because the lawyer tells the client. The law does not charge the client with independently discerning that the contract is potentially disadvantageous to the client and advantageous to the lawyer. Rather, it places the duty on the fiduciary, the party in the position of ascendency, to fully disclose all relevant information to the beneficiary. Here, Mr. Berutti did not fully disclose all relevant information to Mr. Harris and breached his fiduciary duty as a result.

62

The Court finds that this breach of fiduciary duty damaged the company in the amount of $1 million. This represents the $1.5 million that the Debtors paid to buy back Eau Galle and Grande Pointe, less the $500,000 that Mr. Berutti (through Berutti Energy) advanced to RWE for the hydro plant upgrade.

**C.      The Plaintiffs have not proven any damages associated with any breach of a fiduciary duty by Mr. Berutti related to the pre-bankruptcy negotiations with Zero6 for the sale of HEG or Mr. Berutti's negotiation of his proposed Severance and Release Agreement with HEG.**

The Plaintiffs have articulated, in a number of different ways, a breach of fiduciary duty claim against Mr. Berutti related to the proposed sale of the company assets to Zero6 and Mr. Berutti's negotiation of his proposed Severance and Release Agreement with HEG. In their Complaint, the Plaintiffs assert that Mr. Berutti breached his fiduciary duty by "[n]egotiating a self-serving severance agreement in Mr. Berutti's favor that would have deprived HEG of all cash resulting from the sale of certain assets and saddling HEG with debts it could not support, all to the detriment of HEG's creditors and equity holders." Adv. No. 23-2078, Docket No. 1, ¶ 75(c). In their pre-trial brief, the Plaintiffs assert that Mr. Berutti breached his fiduciary duty when he "attempted to leverage the Employment Agreement and his position as RWE Data's manager to extract substantial financial benefits arising from the sale of certain assets to Zero6" and by "actively working for Zero6 while employed by HEG." *Id.*, Docket No. 52, ¶ 35. In their post-trial brief, the Plaintiffs assert that Mr. Berutti breached his fiduciary duty through "the negotiation of the sale of substantially all RWE's operating assets" and by "placing his personal financial interests ahead of those of HEG and its subsidiaries, including leveraging his 2017 employment agreement and the RWE PPA to extract financial benefits from the contemplated Zero6 sale transaction." *Id.*, Docket No. 157, p. 5, 121.

There are three elements that a plaintiff must prove to succeed on a breach of fiduciary duty claim: "(1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that duty; and (3) the breach of duty caused the plaintiff's damage." *Berner Cheese Corp.*, 2008 WI 95, ¶ 40. Even if the Court were to find that Mr. Berutti breached his fiduciary duty related to the proposed sale of the company assets to Zero6 or the negotiation of his Severance and Release Agreement with Zero6, the Plaintiffs have not proven any damages on this claim, so the Plaintiffs cannot succeed on this claim.

The Plaintiffs' alleged damages are listed on Exhibit 1.0 of their expert's report. Trial Ex. 120, Ex. 1.0; Adv. No. 23-2078, Docket No. 157, p. 122. The Plaintiffs' expert categorizes the Plaintiffs' damages as follows:

- Sugarloaf Hydro - equity transfer from RWE to the Berutti Trust and Harris

- Interest Arbitrage by Berutti Energy on the Loan from Berutti Energy to Sugarloaf Hydro

- Eau Galle and [Grande Pointe Power Corporation] sale and buy-back

63

- Incremental cost of additional PTO of 23 days in 2021 and 45 days in 2022

- Additional salary increase in 2017 (base set in the Employment Agreement higher than salary per 2015 Agreement with annual increases of 3% in 2016 and 2017, respectively).

None of these items are damages from the pre-bankruptcy negotiations with Zero6 that did not result in a sale of the company or from Mr. Berutti's January 2023 proposal to HEG of a Severance and Release Agreement that HEG did not accept. Because the Plaintiffs have not shown damages from Mr. Berutti's alleged breach of fiduciary duty during the negotiations with Zero6 or through the proposal of the severance agreement, the Court denies relief on this claim.

**D.**     **The ownership of RWE Data, LLC by Mr. Harris and Mr. Berutti's Trust was not a diversion of a corporate opportunity from the Plaintiffs.**

The Plaintiffs seem to assert in their pre-trial brief and their post-trial brief that they have a claim for breach of fiduciary duty related to the creation of RWE Data. In their pre-trial brief, the Plaintiffs assert that Mr. Berutti usurped a corporate opportunity from HEG by taking a 50% interest in RWE Data. Adv. No. 23-2078, Docket No. 52, p. 15. In their post-trial brief, the Plaintiffs assert that Mr. Berutti breached his fiduciary duty to HEG and its subsidiaries by usurping a corporate opportunity from HEG by taking a 50% equity interest in RWE Data. *Id.*, Docket No. 157, p. 121. The Plaintiffs do not appear to have pled a breach of fiduciary duty claim in their Complaint related to the creation of RWE Data. *See* Adv. No. 23-2078, Docket No. 1, ¶¶ 73-77; *but see* ¶¶ 46-47. Based upon the evidence received at trial, it appears that this issue was tried by the parties' implied consent, so it will be treated as if it was raised in the pleadings. *See* Fed. R. Bankr. P. 7015, which incorporates by reference Fed. R. Civ. P. 15.

After considering the evidence presented at the trial, the Court denies relief on this claim because Mr. Berutti did not usurp a corporate opportunity from HEG by taking a 50% equity interest in RWE Data.

Under the doctrine of corporate opportunity, "one who occupies a fiduciary relationship to a corporation may not acquire, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy or which is essential to its existence." *Gauger*, 262 Wis. at 352. The doctrine of corporate opportunity "precludes an officer or director from exploiting the use of his or her position as a corporate insider for personal gain when the benefit or gain properly belongs to the corporation." *Weisflog*, 165 Wis. 2d at 190; *see also Gauger*, 262 Wis. at 351 ("a director cannot be allowed to profit personally by acquiring property that he knows the corporation will need or intends to acquire . . .").

A finding of "corporate opportunity" will be denied "where the company is unable to avail itself of the opportunity." *Id.* at 192 (quoting *Gauger*, 262 Wis. at 352). In determining whether a corporate opportunity exists, the court must "examine the facts and circumstances relevant to the question of whether a true corporate opportunity existed by scrutinizing the corporation's ability to take advantage of the opportunity presented to and seized by the director or officer." *Id.* at 194. Among the factors that a court must consider is "whether the corporation,

by reason of insolvency or lack of resources, has the financial ability to acquire the opportunity." *Id.* For example, in the event "a business opportunity is reasonably related to the corporation's existing business purposes and current activities, yet the corporation does not have the ability to finance an expansion . . . then no corporate opportunity exists because the opportunity and the ability to seize the opportunity do not exist simultaneously." *Id.* at 195.

RWE Data, LLC is owned by Mr. Harris and Mr. Berutti (through the Berutti Trust). Each owns 50% of the company. Mr. Berutti testified at trial that he conceptualized the RWE Data business after hearing about a hydro plant that sold in Idaho at a very high multiple of EBITDA, which did not make a lot of sense to him. Trial Tr. 159 (April 17, 2024). He looked into it and came to learn that the hydro plant was doing Bitcoin mining. *Id.*

Mr. Berutti testified at trial that RWE Data was created to provide Flambeau Hydro with a customer that could purchase energy at above-market rates. *Id.* at 159, 164, 168. He explained that the spot market pricing for energy between 2016 and 2020 was in the mid-teens, but the break-even pricing for a hydro plant was in the mid-twenties, so Flambeau Hydro was losing money on every kilowatt hour it produced because it could not sell the energy to the market at a high enough price. *Id.* at 159-60.

Mr. Berutti further testified that he then had some discussions about creating a partnership or other relationship between Harvest Technologies and Flambeau Hydro to form a blockchain mine that would use power sourced by Flambeau Hydro's renewable energy assets. Trial Ex. 34; Trial Tr. 161 (April 17, 2024). Harvest was willing to pay $42 a megawatt hour. Trial Tr. 161 (April 17, 2024). At some point, Mr. Harris and Mr. Berutti decided that Mr. Harris would figure out the electrical end and Mr. Berutti would figure out the money end and that they would attempt to start mining Bitcoin themselves. *Id.* at 161-62, 169, 170.

A beta test was performed at Flambeau Hydro's Crowley plant. Trial Tr. 162-63 (Mr. Berutti – April 17, 2024); Trial Tr. 46 (Mr. Harris – May 8, 2024). Mr. Harris testified, "We connected 10, eventually 12, small computers up to a power source and we let them run six months. And we observed the amount of Bitcoin production that was created." Trial Tr. 47 (May 8, 2024). Following the beta test, Mr. Harris stated that "the conclusion, with fairly low-quality computer equipment, was that it would be a profitable endeavor to buy bigger and better equipment and expand that whole concept." *Id.* at 47. *See also* Trial Tr. 278 (May 9, 2024) (Mr. Kreuscher testifying that "[u]tilizing the electricity and converting that into crypto currency was more profitable than selling the electricity on the grid.").

HEG and Mr. Berutti, as the Trustee of the Thomas A. Berutti Revocable Living Trust, entered into the Operating Agreement of RWE Data, LLC. Trial Ex. 35. HEG owned fifty percent of the membership interests in RWE Data and the Berutti Trust owned the other fifty percent of the membership interests in RWE Data. *Id.* p. 17. Mr. Harris and Mr. Berutti subsequently executed an Agreement for Transfer of Membership Interest in RWE Data, LLC that assigned HEG's fifty percent interest in RWE Data to Mr. Harris. Trial Ex. 38; Trial Tr. 176-77, 213 (April 17, 2024). This was done to avoid a complicated true-up that was being caused by Mr. Harris owning 96% of HEG and Mr. Berutti owning 4% of HEG and HEG owning 50% of RWE Data and Mr. Berutti owning 50% of RWE Data. Trial Tr. 175-77, 213

65

(April 17, 2024).  By having HEG's 50% allocated to Mr. Harris, the parties could avoid a situation where Mr. Berutti owned more than 50% of RWE Data due to his ownership interest in HEG.  *Id.*

On April 14, 2021, RWE Data, Flambeau Hydro, Iowa Hydro, UP Hydro, and RWE entered into a Power Purchase Agreement under which RWE Data would purchase power for a period of fifteen years at the rate of $45 per megawatt hour.  Trial Ex. 39.

RWE Data's initial funding was the result of borrowing money from a number of different sources.  Trial Tr. 177 (April 17, 2024).  RWE Data borrowed approximately $200,000 from RWE via a short-term loan from the proceeds of the sale of Cataract.  *Id.* at 177, 202, 264; Trial Ex. 442.  That loan was repaid with interest in a very short period of time.  Trial Tr. 178-79, 202, 264 (April 17, 2024).

In order for RWE Data to get from an idea to a start-up, RWE Data needed to borrow $1.5 million for infrastructure investment.  Trial Tr. 173, 201-02, 209-11 (Berutti – April 17, 2024); Trial Tr. 9-10 (Harris – May 9, 2024).  RWE did not have $1.5 million to build out RWE Data.  Trial Tr. 10 (Harris – May 9, 2024).  Mr. Harris acknowledged during his testimony:

Q:  And did RWE have $1.5 million to build out RWE Data?

A:  As I remember, we were searching for money continuously for managing and maintaining projects because we were always short of money.

Q:  The ones that already existed, you were looking for money, right?

A:  Yes.

Q:  There wasn't a surplus $1.5 million to build out RWE Data, right?

A:  I think that's fair to say.

Trial Tr. 10 (May 9, 2024).  RWE did not have the financial wherewithal to acquire the money that Mr. Harris and Mr. Berutti did to keep reinvesting in RWE Data by purchasing additional infrastructure and computers.  Trial Tr. 173 (April 17, 2024).

The Plaintiffs' expert also conceded during her trial testimony:

Q:  Did RWE have an additional $1.5 million to give to RWE Data?

A:  No.

Trial Tr. 50 (Temkin – May 30, 2024).

As a result, RWE Data borrowed $750,000 from Nicolet Bank and Harris Real Estate Holdings, a company owned by Mr. Berutti and Mr. Harris, borrowed $750,000 from SNBT,

66

which it then lent to RWE Data. Trial Tr. 201-02, 209-11 (Berutti – April 17, 2024); Trial Tr. 9-10 (Harris – May 9, 2024). Mr. Harris and Mr. Berutti each personally guaranteed the $1.5 million in loans to RWE Data. Trial Tr. 173, 210-11 (Berutti – April 17, 2024); Trial Tr. 120 (Harris – May 9, 2024). As noted by Mr. Berutti:

> Q: Are you saying that because of your financial strength is the only reason that the loans were made to RWE Data LLC?
>
> A: Bill's and mine together.

*Id.* at 173 (April 17, 2024).

Under the doctrine of corporate opportunity, Mr. Berutti is precluded from exploiting his position as Chief Executive Officer of the companies for personal gain when the benefit or gain properly belongs to the companies. However, a finding of corporate opportunity must be denied "where the company is unable to avail itself of the opportunity." *Weisflog*, 165 Wis. 2d at 192 (quoting *Gauger*, 262 Wis. at 352). The evidence presented at trial demonstrated that RWE did not have the resources or the financial ability to finance RWE Data. Therefore, Mr. Berutti did not usurp a corporate opportunity from RWE by becoming the owner of a 50% equity interest in RWE Data.

**E.   Sugarloaf Hydro Breach of Fiduciary Duty Claims**

**1.   The transfer of RWE's equity interest in Sugarloaf Hydro was not a diversion of corporate opportunity from the Plaintiffs.**

The Plaintiffs assert that Mr. Berutti breached his fiduciary duty by "causing RWE to transfer to Berutti 50% of RWE's equity interest in Sugarloaf Hydro without providing RWE with any consideration." Adv. No. 23-2078, Docket No. 1, ¶ 75(a). In their post-trial brief, the Plaintiffs describe this as usurping a corporate opportunity from HEG by taking a 50% equity interest in Sugarloaf Hydro. *Id.*, Docket No. 157, p. 121.

After considering the evidence presented at the trial, the Court denies relief on this claim because Mr. Berutti did not usurp a corporate opportunity from HEG or RWE by taking a 50% equity interest in Sugarloaf Hydro.

Under the doctrine of corporate opportunity, "one who occupies a fiduciary relationship to a corporation may not acquire, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy or which is essential to its existence." *Gauger*, 262 Wis. at 352. The doctrine of corporate opportunity "precludes an officer or director from exploiting the use of his or her position as a corporate insider for personal gain when the benefit or gain properly belongs to the corporation." *Weisflog*, 165 Wis. 2d at 190; *see also Gauger*, 262 Wis. at 351 ("a director cannot be allowed to profit personally by acquiring property that he knows the corporation will need or intends to acquire . . .").

A finding of "corporate opportunity" will be denied "where the company is unable to avail itself of the opportunity." *Weisflog*, 165 Wis. 2d at 192 (quoting *Gauger*, 262 Wis. at 352). In determining whether a corporate opportunity exists, the court must "examine the facts and circumstances relevant to the question of whether a true corporate opportunity existed by scrutinizing the corporation's ability to take advantage of the opportunity presented to and seized by the director or officer." *Id.* at 194. Among the factors that a court must consider is "whether the corporation, by reason of insolvency or lack of resources, has the financial ability to acquire the opportunity." *Id.* For example, in the event "a business opportunity is reasonably related to the corporation's existing business purposes and current activities, yet the corporation does not have the ability to finance an expansion . . . then no corporate opportunity exists because the opportunity and the ability to seize the opportunity do not exist simultaneously." *Id.* at 195.

The Plaintiffs have not established that Mr. Berutti usurped a corporate opportunity from HEG by taking a 50% equity interest in Sugarloaf Hydro because the evidence presented at trial showed that the Plaintiffs did not have the financial ability to acquire the Sugarloaf hydro plant.

In 2021, Mr. Berutti and Mr. Harris became aware of the opportunity to purchase a hydro plant near Leadville, Colorado. Trial Tr. 101-03 (May 8, 2024). According to Mr. Kreuscher, "RWE became aware of the property's availability for sale, or purchase I should say, came about through general discussions with Eagle Creek and their subsidiaries and what they were looking to offload[.]" Trial Tr. 282 (May 9, 2024).

The plant was not operating at the time, but it "had potential historically to generate electricity." Trial Tr. 226 (April 17, 2024). It was in "horrible" condition. Trial Tr. 102 (May 8, 2024). The roof had leaked for almost three years and there was six feet of water in many areas inside the plant. *Id.* at 102. Mr. Harris appreciated the challenge of repairing the plant. He had a "burning desire to acquire Sugarloaf" because "it could make money. It needed work. I could provide that work and that solution for the problems that they had there. It was in terrible condition and I knew how to remedy that." Trial Tr. 171-72 (May 9, 2024).

Mr. Harris initially estimated that it would cost between $200,000 and $300,000 to do the repairs. Trial Tr. 103 (May 8, 2024). He first told Mr. Berutti that the Sugarloaf hydro plant would be up and running by Christmas 2022. Trial Tr. 108 (Harris – May 8, 2024).

RWE formed a new subsidiary for the project, Sugarloaf Hydro, LLC. On September 20, 2021, Sugarloaf Hydro entered into an asset purchase agreement with STS Hydropower LLC to acquire the hydro plant for $305,000. Trial Ex. 41. RWE executed the agreement as Sugarloaf Hydro's parent company, and it agreed to guarantee Sugarloaf Hydro's obligations to the seller. *Id.* at 12.

When asked at trial whether there was a commitment for the financing to purchase the hydro plant at the time of the asset purchase agreement with STS in September 2021, Mr. Berutti testified that "Bill Harris gave me -- I asked Bill, Bill said he'd cover it. . . I had a commitment from Bill Harris. I trusted Bill. He said he'd cover it. If we couldn't find a partner, he'd cover it. He wanted this hydro plant bad." Trial Tr. 35-36 (April 18, 2024).

68

Mr. Berutti made numerous attempts to find financing for the project. Stephenson National Bank & Trust, HEG's lender for the past 10 years, would not lend funds the Sugarloaf hydro plant as collateral. Timothy Stauss, a loan officer at SNBT, testified that the bank would not take a dam in Colorado as collateral because it was too far outside of the bank's jurisdiction. Trial Tr. 83 (May 7, 2024); Trial Ex. 47.

The evidence presented at trial further demonstrated that HEG/RWE did not really have other assets available to offer SNBT or another lender as collateral. The Marseilles hydro plant might have been free and clear at the time, but Mr. Kreuscher testified that the Marseilles hydro plant produced no power and was a liability with building maintenance and taxes. Trial Tr. 44 (April 22, 2024); Trial Tr. 96-97 (May 10, 2024). LCO Hydro could have been offered as collateral, but it was "not a very bankable deal." Trial Tr. 274-76 (Berutti - April 18, 2024). LCO Hydro did not own any hard assets (i.e., it did not own the hydro plant). *Id.* Instead, it had an operating agreement and lease with the Lac Courte Oreilles Indian tribe where the company operated, maintained, and fixed the plant and received 80% of the gross revenue from the plant's power purchase agreement. *Id.* Clay Norrbom, Zero6's president, confirmed that LCO Hydro was "not a very bankable" asset, testifying that Zero6 was never interested in having LCO Hydro as part of its collateral package because "I always understood it as having a little bit more complexity because it wasn't owned free and clear. It was a lease in terms of with the LCO tribe, but there was -- there was just more difficulty around trying to perfect that as a -- as a collateral asset. So we had always kind of left it at -- on the side as it related to the loans." Trial Tr. 169 (April 22, 2024).

Zero6 was not an option for financing. Mr. Norrbom testified at trial that "Sugarloaf itself did not fit our model from a Juhl Clean Energy Assets perspective. We - - we looked for relatively stable cash flow from the production of electricity and the sale of electricity to a, you know, to a utility or - - or what I call a normal buyer of electricity. I think I made it clear to Tom and Bill over time that Juhl Clean Energy Assets was not going to invest in Bitcoin mining or - - or those things." Trial Tr. 113 (April 22, 2024).

Although Zero6 was not interested in financing a Bitcoin mine, Mr. Norrbom was open to referring Mr. Berutti to other investors and making introductions and Mr. Berutti reached out to him for that purpose in April of 2022. Trial Tr. 265 (April 18, 2024); Trial Tr. 113-14 (April 22, 2024); *see* Trial Exs. 423-24. Mr. Berutti unsuccessfully reached out to a number of potential joint venture partners. Trial Tr. 20 (April 18, 2024). He testified:

> I contacted a number of potential people. That included
> Baker Tilly Capital . . . I talked to HashGuild, which are
> some Bitcoin developers down here somewhere around Milwaukee,
> Wisconsin. I talked to Barefoot Mining of the Southeast, who
> actually do hydro -- Bitcoin mining at a hydro plant down
> there. I talked with Frank Albo of Canada, who is quite a
> successful Bitcoin miner. I'm trying to think who else I
> talked to. I have made numerous contacts with everybody I

> could think of. There's another Bob guy out of Texas. I can't
> think of what his name is.

Trial Tr. 262 (April 18, 2024).

One potential joint venture partner, Frank Albo, met with Mr. Harris for a tour of HEG's Wisconsin hydro plants. Trial Tr. 263-64 (April 18, 2024); Trial Tr. 234-35 (May 8, 2024). The conversation was short lived because Mr. Harris told Mr. Albo that HEG wanted to retain the right to sell electricity to the grid if the price went high enough. Trial Tr. 263-64 (April 18, 2024); Trial Tr. 234-35 (May 8, 2024). Mr. Albo had no interest in shutting down the cryptocurrency mining so that HEG could make more money selling energy into the grid. Mr. Berutti testified that this promptly "killed the deal." Trial Tr. 263-64 (April 18, 2024).

HashGuild was interested, but they needed to have the plant up and running before they could get any investors. Trial Tr. 263 (April 18, 2024). Barefoot Mining was also concerned that the hydro plant was not up and running, as they had issues getting their own hydro plant up and running. *Id*. at 263.

Eventually, Mr. Berutti told Mr. Harris that he could not find the money and asked if Mr. Harris wanted to lend funds:

> I called Bill up and said, "Bill, I cannot find any alternative sources
> of funding. I can't find any joint venture partners. Can you put the
> money in to purchase this for RWE?" He said, no. He said, "Tom,
> can you help out?" I said, "Bill, if I have to do this, I have to
> mortgage my house, and if I'm going to mortgage my house,
> ownership condition precedent goes that you and I are owners
> because I need -- you tie -- you and I are owners of this, if we're
> going to do it. Otherwise, there's no money from Berutti Energy."
> That's the way it was. It's yes or no.

Trial Tr. 175-76 (April 18, 2024); Trial Tr. 241 (April 17, 2024) ("When we got a call from STS [the seller] and [they] said we had -- we had to exercise our purchase -- Sugarloaf had to exercise its purchase agreement and we -- and I asked Bill, I said, what are we going to do, Bill? Do you want to lend money? We can't -- I can't find the money.").

Mr. Harris testified that he had the ability personally to finance the transaction but confirmed that, "I told Tom I didn't want to." Trial Tr. 104 (May 8, 2024); Trial Tr. 74 (May 9, 2024) ("I recall Tom asking me, don't you have that money? Could you put that money in? I recall my answer was to Tom Berutti, I don't want to."). Mr. Harris was already making loans to the company throughout 2022 because it was having cash problems. Trial Ex. 48; Trial Tr. 238 (April 17, 2024); Trial Tr. 36 (April 18, 2024); Trial Tr. 181 (April 22, 2024).

Ultimately, Berutti Energy borrowed funds from SNBT to loan to Sugarloaf Hydro for the purchase and repair of the hydro plant in Colorado and Mr. Berutti mortgaged his personal residence as collateral for that loan. Trial Tr. 240-41 (April 17, 2024). On September 20, 2022,

70

Berutti Energy loaned $550,000 to Sugarloaf Hydro.  Trial Ex. 49; Trial Ex. 53.  Pursuant to the Financing and Security Agreement, interest would accrue at the rate of 10% per annum and be payable on a monthly basis.  Trial Ex. 49, § 1.  The loan was scheduled to mature in March 2023, "on the six month anniversary of the date of the first advance."  *Id*. § 1(c); Trial Tr. 242-43 (April 17, 2024).  Mr. Berutti testified that the loan was a short-term loan based on a plan to refinance it once the Sugarloaf hydro plant was operational.  He testified that he could not get a commercial financer until the hydro plant was up and running, but he thought it would be pretty easy after that.  Trial Tr. 277 (April 18, 2024).  He figured out the six-month term because "Bill said he could have [the Sugarloaf hydro plant] up and running in a couple of months and then a couple of months for me to find" a takeout lender.  *Id*. at 277.  The plan was for Sugarloaf to make "interest payments off of revenues, and then when we refinance it, I would just get paid off on the refinance."  *Id*.

The sale of the hydro plant to Sugarloaf Hydro, LLC closed on or about September 20, 2022.  Sugarloaf Hydro paid the seller $302,665 (the purchase price of $305,000 plus two small fees, less the property taxes through closing).  Trial Ex. 53.

Also, on or about September 20, 2022, RWE transferred its interest in Sugarloaf Hydro, LLC to Berutti Energy and Mr. Harris.  In an operating agreement intended to "become effective immediately following" Sugarloaf Hydro's purchase of the hydro plant, RWE withdrew as a member of Sugarloaf Hydro.  Trial Ex. 54 §§ 1.1, 3.1.  Berutti Energy and Mr. Harris became members of Sugarloaf Hydro, each with a 50% interest.  *Id.* at 16.

As it turned out, the Sugarloaf hydro plant was not up and running by Christmas 2022 as Mr. Harris had initially estimated.  Trial Tr. 243 (April 17, 2024).  In December 2022, Berutti Energy increased the amount of the loan to Sugarloaf Hydro to $625,000.  Trial Ex. 52.  The Sugarloaf hydro plant was still not up and running by March 2023, when the Berutti Energy note came due.  Trial Tr. 243 (April 17, 2024).  The Sugarloaf hydro plant came online in June 2023.  Trial Tr. 292-94 (May 9, 2024).  This was three months after the Debtors filed their bankruptcy cases and the same month that the Debtors filed the adversary complaints in this case.

Under the doctrine of corporate opportunity, Mr. Berutti is precluded from exploiting his position as Chief Executive Officer of the companies for personal gain when the benefit or gain properly belongs to the companies.  However, a finding of corporate opportunity must be denied "where the company is unable to avail itself of the opportunity."  *Weisflog*, 165 Wis. 2d at 192 (quoting *Gauger*, 262 Wis. at 352).  The evidence presented at trial demonstrated that RWE did not have the financial ability to acquire the Sugarloaf hydro plant.  At the time of the closing of the purchase of the Sugarloaf hydro plant, RWE was having cashflow problems and Mr. Harris was making loans to the company.  SNBT would not take a hydro plant in Colorado as collateral because it was outside of the bank's jurisdiction.  The Court is not convinced that RWE or HEG had other assets available at the time that would be appealing to SNBT or another commercial lender as collateral.  Mr. Berutti credibly testified that he tried to find outside financing so that RWE could close on the deal and own the hydro plant through Sugarloaf Hydro.  He contacted numerous companies and people, including Baker Tilly, Hash Guild, Barefoot Mining, and Frank Albo.  He was unsuccessful.  Many of the potential joint venture partners were not interested in the project because the hydro plant was not up and running.  Given its mission of clean energy

71

creation, Zero6 was not interested in investing in Bitcoin mining. Finally, Mr. Berutti asked Mr. Harris if Mr. Harris would put the money in to purchase the hydro plant for RWE. Mr. Harris said no. RWE did not prove that it had the financial ability to acquire the hydro plant through Sugarloaf Hydro; therefore, Mr. Berutti did not usurp a corporate opportunity when he obtained a 50% interest in Sugarloaf Hydro.

### 2. Mr. Berutti breached his fiduciary duty by requiring HEG and LCO Hydro to guarantee the Berutti Energy loan to Sugarloaf Hydro.

The Plaintiffs assert that Mr. Berutti breached his fiduciary duty by placing his personal financial interests ahead of those of HEG and its subsidiaries by requiring HEG and LCO Hydro to guarantee a loan between Berutti Energy, which was owned by Mr. Berutti's Trust, and Sugarloaf Hydro, which was owned 50% by Mr. Harris and 50% by Mr. Berutti. Adv. No. 23-2078, Docket No. 1, ¶ 75(d); Docket No. 52 ¶ 17; Docket No. 157, p. 121. The Court agrees.

A corporate officer or director, as a fiduciary, has a "duty of loyalty" to the corporation and is prohibited from "self-dealing." *Zastrow*, 2006 WI 72, ¶¶ 28-31; *Weisflog*, 165 Wis. 2d at 190. A corporate officer or director, as a fiduciary, must act solely for the benefit of the company, even at the expense of his or her own interests. *Zastrow*, 2006 WI 72, ¶ 28. "The mortgaging of corporate assets to secure a personal obligation of a shareholder would, without additional factors, violate the fiduciary duty of the directors and officers involved." *McGivern v. AMASA Lumber Co.*, 77 Wis. 2d 241, 252, 252 N.W.2d 371, 376 (1977).

This alleged breach of fiduciary duty involves these facts:

- Berutti Energy borrowed funds from SNBT to loan to Sugarloaf Hydro for the purchase and repair of the Sugarloaf hydro plant in Colorado, and Mr. Berutti mortgaged his personal residence as collateral for that loan. Trial Tr. 240-41 (April 17, 2024).

- On September 20, 2022, Berutti Energy loaned $550,000 to Sugarloaf Hydro for the purchase and repair of the Sugarloaf hydro plant in Colorado. Trial Ex. 49, 53. The amount of this loan increased to $625,000 in December 2022. Trial Ex. 52.

- To secure repayment on the Berutti Energy loan to Sugarloaf Hydro, HEG granted Berutti Energy a security interest in its membership interest in LCO Hydro. Trial Ex. 49.

- To secure repayment of the Berutti Energy loan to Sugarloaf Hydro, HEG and LCO Hydro also guaranteed Sugarloaf Hydro's repayment obligation to Berutti Energy. *Id.*

- After the closing of the sale of the hydro plant to Sugarloaf Hydro, RWE immediately withdrew as a member of Sugarloaf Hydro and transferred its 100% membership interest in Sugarloaf Hydro to Mr. Harris (50%) and Mr. Berutti's Trust (50%). Trial Ex. 54, §§ 1.1, 3.1.

72

HEG and LCO Hydro (the companies where Mr. Berutti and Mr. Harris are directors and Mr. Harris is a 96% shareholder) had no interest in Sugarloaf Hydro (which is owned personally by Mr. Berutti and Mr. Harris in equal shares), and yet those companies guaranteed Sugarloaf Hydro's repayment obligation to Berutti Energy (Mr. Berutti's personal company). The pledging of company assets (the HEG and LCO Hydro guarantees) to secure a personal obligation (the loan made by Berutti Energy to Sugarloaf Hydro) appears to be a "conflict of interest transaction."

The Wisconsin Statutes define a "conflict of interest transaction" as "a transaction with the corporation in which a director of the corporation has a direct or indirect interest." Wis. Stats. § 180.0831(1). The director of a corporation has an "indirect interest" in a transaction if "another entity in which the director has a material financial interest or in which the director is a general partner is a party to the transaction" or "another entity of which the director is a director, officer or trustee is a party to the transaction and the transaction is or, because of its significance to the corporation, should be considered by the board of directors of the corporation." Wis. Stat. § 180.0831(3)(a)-(b).

In the Sugarloaf Hydro transaction, both Mr. Berutti and Mr. Harris had a conflict of interest. Mr. Berutti had a conflict of interest because he stood on all three sides of the transaction. He was an owner of the borrower (Sugarloaf Hydro) through his Trust, a director of the guarantors (HEG and LCO Hydro), and an owner of the lender (Berutti Energy). Mr. Harris also had a conflict of interest because he stood on two sides of the transaction. He was an owner of the borrower (Sugarloaf Hydro), and a director of the guarantors (HEG and LCO Hydro).

A "conflict of interest transaction" can be "cleansed" and is not voidable by the corporation if the material facts are disclosed and ratified or the transaction is "fair" to the companies. Wis. Stat. § 180.0831. The Wisconsin Statutes specifically provide that a conflict of interest transaction is not voidable by the corporation solely because of the director's interest in the transaction if any of the following are true:

> (a)    The material facts of the transaction and the director's interest were disclosed or known to the board of directors or a committee of the board of directors and the board of directors or committee authorized, approved or specifically ratified the transaction; or

> (b)    The material facts of the transaction and the director's interest were disclosed or known to the shareholders entitled to vote and they authorized, approved or specifically ratified the transaction; or

> (c)    The transaction was fair to the corporation.

Wis. Stat. § 180.0831(2)(a)-(c). A conflict of interest transaction can be authorized, approved, or ratified by a majority vote of directors "who have no direct or indirect interest in the transaction." Wis. Stat. § 180.0831(4). A conflict of interest transaction can also be authorized, approved, or ratified by a majority vote of the shareholders, but shares owned or controlled by interested directors or entities cannot be counted. Wis. Stat. § 180.0831(5).

73

There was no evidence presented at trial that the Sugarloaf Hydro conflict of interest transaction was "cleansed" under Wis. Stat. § 180.0831(2). There was no evidence presented at trial that the transaction was ratified by disinterested directors or shareholders who had received full disclosure. Indeed, there were no disinterested directors or shareholders who could ratify the transaction after receiving full disclosure.

The Sugarloaf Hydro conflict of interest transaction also cannot be "cleansed" under Wis. Stat. § 180.0831 because these transactions were not fair to the companies. HEG and LCO Hydro (the companies where Mr. Berutti was the Chief Executive Officer and a director) had no interest in Sugarloaf Hydro, and yet those companies guaranteed Sugarloaf Hydro's repayment obligation to Berutti Energy (Mr. Berutti's personal company). There was no business reason for HEG or LCO Hydro to guarantee a loan to Sugarloaf Hydro when Sugarloaf Hydro was personally owned by Mr. Berutti and Mr. Harris and not the companies. The loan to Sugarloaf Hydro provided no benefit to HEG or LCO Hydro. Mr. Berutti and Mr. Harris caused companies that were not affiliated with Sugarloaf Hydro to incur financial obligations to Berutti Energy. Mr. Berutti and Mr. Harris breached their fiduciary duty of loyalty to HEG and LCO Hydro by pledging HEG's and LCO Hydro's assets to secure a personal obligation (the loan made by Berutti Energy to Sugarloaf Hydro).

The Plaintiffs have not requested any monetary damages in connection with Mr. Berutti's breach of fiduciary duty in these transactions. They requested that the Court award breach of fiduciary duty damages "consistent with Exhibit 1.0 attached to Ms. Temkin's expert report." Adv. No. 23-2078, Docket No. 157, p. 122; Trial Ex. 120, Ex. 1.0. But Exhibit 1.0 does not contain any damages related to HEG's and LCO Hydro's guarantees. Accordingly, the Court will not award any monetary damages to the Plaintiffs on their breach of fiduciary duty claim against Mr. Berutti related to the HEG and LCO Hydro guarantees.

## II. MR. BERUTTI WAS NOT PROPERLY TERMINATED "FOR CAUSE" UNDER HIS EMPLOYMENT AGREEMENT AND IS ENTITLED TO THE AMOUNT DUE TO HIM AS IF HE WERE TERMINATED "WITHOUT CAUSE."

At the trial, the Court heard evidence related to the proof of claim filed by Mr. Berutti based upon his 2017 Employment Agreement with HEG and the objections to that claim filed by HEG and Mr. Harris. The issue before the Court is whether HEG properly terminated Mr. Berutti for cause without notice and effective immediately under the terms of the 2017 Employment Agreement.

A proof of claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). If a party in interest objects, then the Court shall determine the amount of the claim as of the petition date and allow the claim except to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1).

A proof of claim constitutes prima facie evidence of the validity and amount of the claim. Fed. R. Bankr. P. 3001(f). The objecting party carries the initial burden to produce "some

evidence" to rebut the prima facie allowability of the claim. *In re Sentinel Mgmt. Grp.*, 417 B.R. 542, 550 (Bankr. N.D. Ill. 2009). Once the objecting party has produced evidence that challenges the allowance of the claim, the burden shifts to the claimant to establish by a preponderance of the evidence that the claim is in fact allowable. *In re Nejedlo*, 324 B.R. 697, 699 (Bankr. E.D. Wis. 2005). "The ultimate burden rests with the [claimant], but only after the [objecting party] has produced some evidence to rebut the claim. *Id.*

In this case, Mr. Berutti's claim is prima facie evidence of the validity and amount of his claim. *See* Case No. 23-21117, Claim No. 1. HEG and Mr. Harris have the initial burden to produce some evidence to rebut the prima facie allowability of the claim. Once HEG and Mr. Harris have produced some evidence that challenges the allowance of Mr. Berutti's claim, the burden shifts to Mr. Berutti to establish by a preponderance of the evidence that his claim is in fact allowable.

The basis for Mr. Berutti's claim is his 2017 Employment Agreement with HEG. *See* Claim No. 1; Trial Ex. 16. On February 16, 2017, Mr. Berutti entered into an employment agreement with HEG to serve as Chief Executive Officer of HEG. That agreement automatically renewed for another five years on February 16, 2023. HEG terminated Mr. Berutti's employment on March 8, 2023. Mr. Berutti asserted in his claim that he was terminated "without cause" and that he is entitled to compensation for five years, the entire balance of the employment term stated in the Employment Agreement, plus all unpaid personal time off. *See* Claim No. 1; Trial Ex. 16, § 6.4. Mr. Berutti acknowledged in his claim that, because of the limitations imposed under 11 U.S.C. § 502(b)(7), his claim is limited in this bankruptcy case to one year of unpaid compensation under the 2017 Employment Agreement plus all unpaid personal time off. *See* Claim No. 1. The parties have agreed that if the Court determines that HEG terminated Mr. Berutti "without cause," Mr. Berutti's claim based upon the 2017 Employment Agreement should be allowed in the amount of $499,902.20, of which $3,086.49 would be entitled to priority under § 507(a)(4). Adv. No. 23-2078, Docket No. 157, p. 23 n.17, p. 126 n.92; Trial Tr. 5-6 (April 17, 2024).

HEG and Mr. Harris objected to Mr. Berutti's claim and presented evidence at trial that Mr. Berutti's claim should not be allowed because Mr. Berutti was terminated "for cause" under the terms of his employment agreement with HEG. *See* Case No. 23-21117, Docket No. 125 and Docket No. 130. According to HEG and Mr. Harris, HEG's Board of Directors determined that Mr. Berutti's continued employment would expose HEG to "substantial, material harm" and HEG's Board of Directors terminated Mr. Berutti for cause immediately and without notice effective March 8, 2023. *Id.* If Mr. Berutti was properly terminated "for cause," then his claim is contractually limited to his pro-rated compensation earned through the date of his termination plus his unpaid personal time off. Trial Ex. 16, § 6.3. The parties have agreed that if the Court determines that HEG terminated Mr. Berutti "for cause," Mr. Berutti's claim based upon his 2017 Employment Agreement with HEG should be allowed in the amount of $234,037.69, of which $3,086.49 would be entitled to priority under § 507(a)(4). *See* Adv. No. 23-2078, Docket No. 157, p. 23 n.17, p. 126 n.92; Trial Tr. 5-6 (April 17, 2024).

The 2017 Employment Agreement between HEG and Mr. Berutti governs the Court's analysis of whether Mr. Berutti was terminated "for cause" or "without cause" and whether Mr. Berutti was required to receive notice prior to his termination. The Employment Agreement states that it "shall be construed and enforced in accordance with and governed by the laws of the state of Wisconsin." Trial Ex. 16, § 19. The canons of contract interpretation are well-established under Wisconsin law. The primary objective of contract interpretation is to ascertain the intentions of the parties based on the actual language used in the contract. *Tufail v. Midwest Hospitality, LLC*, 2013 WI 62, ¶ 25, 348 Wis. 2d 631, 833 N.W.2d 586. Courts begin by examining the actual words of the contract and construing the contract language according to its "plain or ordinary meaning," consistent with "what a reasonable person would understand the words to mean under the circumstances." *Id.* ¶¶ 26, 28 (quoting *Seitzinger v. Cmty. Health Network*, 2004 WI 28, ¶ 22, 270 Wis. 2d 1, 676 N.W.2d 426). If the terms of a contract are clear and unambiguous, the contract will be construed according to its "literal terms." *Id.* ¶ 26. Courts "presume the parties' intent is evidenced by the words they chose, if those words are unambiguous." *Id.* (quoting *Kernz v. J.L. French Corp.*, 2003 WI App 140, ¶ 9, 266 Wis. 2d 124, 134, 667 N.W.2d 751, 755). Courts construe contracts "as they are written." *Id.* ¶ 29 (quoting *Columbia Propane, L.P. v. Wisconsin Gas Co.,* 2003 WI 38, ¶ 12, 261 Wis. 2d 70, 661 N.W.2d 776). "The office of judicial construction is not to make contracts . . . but to determine what the parties contracted to do." *Id.* (quoting *Marion v. Orson's Camera Centers, Inc.,* 29 Wis. 2d 339, 345, 138 N.W.2d 733 (1966)).

HEG and Mr. Berutti entered into the Amended and Restated Executive Employment Agreement dated effective as of February 16, 2017. Trial Ex. 16. In the Employment Agreement, Mr. Berutti continued to be employed to serve as the Chief Executive Officer of HEG and its subsidiary companies. Ex. 16, § 2. The Employment Agreement had a term of five years and an "evergreen" provision that automatically extended the agreement for another five years on each anniversary of the commencement date. *Id.* § 1. The Employment Agreement stated as follows:

> **Term of Employment.** HEG hereby agrees to employ and [Mr. Berutti] hereby accepts employment for a period of five (5) years (hereinafter referred to as the "Employment Period") commencing on [February 16, 2017] unless otherwise earlier terminated pursuant to the terms of this Agreement. Provided the parties have not elected not to renew this Agreement in writing at least thirty (30) days prior to each anniversary of [February 16, 2017], and provided this Agreement has not otherwise been terminated pursuant to the terms of this Agreement, the Employment Period shall automatically be extended five (5) years from each anniversary of [February 16, 2017]. Mr. Berutti hereby accepts such employment and agrees to perform the services hereinafter described, all upon the terms and conditions herein stated.

76

*Id.*  In other words, the Employment Agreement automatically renewed on February 16th of each year for successive five-year periods subject to the termination provisions in the agreement.

Mr. Berutti was "employed to serve as Chief Executive Officer of HEG and its subsidiary companies."  *Id.* § 2.  The Employment Agreement defined Mr. Berutti's "scope of duties," in pertinent part, as follows:

1.    Mr. Berutti "will primarily be responsible for all aspects of the management of HEG and each of its subsidiary companies as customarily exercised by executives in similar positions, and he shall report directly to the Board of Directors of HEG."

2.    "[I]t is expected that [Mr. Berutti] shall work cooperatively with the Board and other members of management of HEG and provide input on the future direction of HEG and its subsidiary companies."

3.    Mr. Berutti "covenants, represents, and warrants that he will at all times honestly and fairly conduct his duties as described herein, or as otherwise directed by the Board, and will at all times maintain the highest of professional standards in representing the interests of HEG and its subsidiary companies."

4.    Mr. Berutti "agrees to devote his full time and best efforts to the performance of his duties as proscribed in writing by the Board."

*Id.*

Mr. Berutti agreed at trial that "compliance with the highest professional standards in representing the interests of HEG and its subsidiary companies" meant that:  (1) he was to act in the best interest of the company and its shareholders; (2) he was to provide the Board of Directors with the information they may need to make informed decisions on behalf of the company; (3) he could not engage in self-dealing with corporate assets; and (4) he could not misappropriate assets or opportunities of the companies.  Trial Tr. 150-51 (April 18, 2024).

HEG and Mr. Berutti agreed to the following compensation package for Mr. Berutti:

1.    HEG would pay Mr. Berutti an annual base salary of $224,042 subject to an annual increase of 3%.  *Id.* §4.1; Trial Tr. 76 (April 17, 2024).

2.    HEG would pay Mr. Berutti a bonus "in an amount equal to the amount of ordinary income that would be reportable on a Schedule K-1 for the prior calendar year with respect to a HEG shareholder at all times during the previous calendar year owning a number of HEG shares equal to the excess of (a) the number of shares of HEG a ten percent (10%) owner of HEG would own over (b) the number of HEG shares [Mr. Berutti] owns as of the last day of the prior calendar year.  *Id.* § 4.2; Trial Tr. 76-77 (April 17, 2024).

77

3.     HEG would pay Mr. Berutti a fixed bonus of $52,451, subject to an annual increase of 3%. *Id.* § 4.3; Trial Tr. 79.

4.     In addition, Mr. Berutti was eligible for discretionary bonuses, reimbursement for ordinary and necessary business expenses, and an $800.00 monthly vehicle allowance. *Id.* § 4.4, § 4.6, § 4.7.

5.     Mr. Berutti also received twenty days of personal time off per year that would accrue and "not be subject to any limit." *Id.* § 5.2. The Employment Agreement further provided that if Mr. Berutti "emails or texts for any business purpose during any day, that day (whether or not scheduled as personal time off) will not be considered as a personal time off day." *Id.* § 5.2.

Section 6.4 of the Employment Agreement provided that in the event of a termination "without cause" Mr. Berutti would receive compensation as follows:

> HEG shall take any and all action necessary (i) ***to pay or have RWEO continue to pay Mr. Berutti his unpaid Base Salary for the remainder of the Employment Period*** in accordance with RWEO's regular payroll cycle, and (ii) within thirty (30) days of the date of his separation from service, pay [Mr. Berutti] an amount equal to the excess of the Purchase Price of ten percent (10%) of the issued and outstanding stock of HEG over the Purchase Price of the shares of HEG actually transferred to and owned by [Mr. Berutti] pursuant to Section 11, plus an additional amount equal to the income taxes payable by [Mr. Berutti] on such payment, plus the amount necessary to put [Mr. Berutti] in the same after-tax position (taking into account any and all applicable federal, state, local income, employment and excise taxes) that he would have been in if [Mr. Berutti] had not incurred any tax liability upon receiving such payments.

*Id.* § 6.4 (emphasis added). In other words, because the Employment Agreement also automatically extended the contract term on a rolling basis every year, if HEG terminated Mr. Berutti "without cause," he was entitled to receive five years of annual salary, plus additional benefits. *Id.* § 1, § 6.4.

Section 6.3 of the Employment Agreement provided that Mr. Berutti's employment with HEG and its subsidiaries could be terminated "for cause" upon the occurrence of one or more of the following events:

6.3.1   Any intentional act of dishonesty of [Mr. Berutti] that involves a substantial and material aspect of his employment and causes material harm to HEG;

78

6.3.2     The occurrence of any event or circumstance caused by [Mr. Berutti's] intentional, reckless or grossly negligent act or omission which would constitute just cause for termination at common law or in equity;

6.3.3     [Mr. Berutti's] conviction of a felony involving dishonesty or any other crime involving dishonesty by any court of competent jurisdiction;

6.3.4     [Mr. Berutti's] conviction for embezzlement or misappropriation of funds or other resources of RWEO, RWE, or HEG;

6.3.5     Abandonment by [Mr. Berutti] of, or chronic, habitual or continuous failure by [Mr. Berutti] to perform, his job duties for any reason that is unrelated to his death or disability;

6.3.6     Material violation, default or breach of any of [Mr. Berutti's] duties under this Agreement.

*Id.* §§ 6.3.1-6.3.6

In the event of a termination "for cause," Mr. Berutti was to receive "his pro-rated compensation earned through the date of his separation from service." *Id.* § 6.3. The Employment Agreement stated as follows:

> In the event of [Mr. Berutti's] Termination for Cause, HEG shall take any and all action necessary to pay or have RWEO (i) ***pay [Mr. Berutti] his pro-rated compensation earned through the date of his separation from service***, and (ii) pay an amount equal to the excess of the Purchase Price of ten percent (10%) of the issued and outstanding stock of HEG over the Purchase Price of the shares of HEG actually transferred to and owned by [Mr. Berutti] pursuant to Section 11 as of the date of [Mr. Berutti's] separation, plus an additional amount equal to the income taxes payable by [Mr. Berutti] on such payment, plus the amount necessary to put [Mr. Berutti] in the same after-tax position (taking into account any and all applicable federal, state, local income, employment and excise taxes) that he would have been in if [Mr. Berutti] had not incurred any tax liability upon receiving such payments.

*Id.* § 6.3 (emphasis added).

If Mr. Berutti was to be terminated "for cause," the Employment Agreement directed HEG's Board of Directors to provide Mr. Berutti - - prior to his termination - - with written notice of the "cause" for his termination and afford him thirty days to review and respond unless his "continued employment would expose [HEG] to substantial, material harm." *Id.* § 6.3. In the event that Mr. Berutti's "continued employment would expose [HEG] to substantial, material

79

harm," HEG could terminate Mr. Berutti "immediately" and "without notice." The Employment Agreement stated as follows:

> In the event any one or more of the foregoing circumstances should occur [justifying a termination for cause], ***prior to [Mr. Berutti's] termination, the Board must provide written notice of the applicable event or circumstance and further afford [Mr. Berutti] a period of at least thirty (30) calendar days to review and respond to said event or circumstance <u>(unless continued employment would expose [HEG] to substantial, material harm, in which event HEG may terminate [Mr. Berutti] immediately without notice)</u>.*** After the expiration of the thirty-calendar-day review and response period provided for above, the Board may, at its option, terminate [Mr. Berutti's] employment immediately with HEG and its subsidiaries if no response has been provided by [Mr. Berutti]. In the event a response is provided by [Mr. Berutti], [Mr. Berutti's] employment shall not be terminated unless the Board, at a duly scheduled meeting, gives full and fair consideration to the response provided by [Mr. Berutti] and affords [Mr. Berutti] the opportunity, at his option, to appear at said meeting and address the issues raised in the written notice. Should the Board thereafter determine to proceed with the termination, it shall, within fifteen (15) calendar days of the Board meeting, provide [Mr. Berutti] a written explanation setting forth its reasons for so proceeding.

*Id.* (emphasis added).

On March 8, 2023, the Board of Directors for HEG invoked Sections 6.3.2, 6.3.5, and 6.3.6 of the Employment Agreement and voted to terminate Mr. Berutti for cause, without notice, and with immediate effect. Trial Ex. 223. The minutes of the Board meeting report that Attorney Rossmeissl proposed a resolution to terminate Mr. Berutti's employment "for cause" based upon the actions of Mr. Berutti, including the following:

1. "engaging in self-dealing and the personal receipt of financial benefits to the detriment of the Companies;"

2. "demanding to be terminated from his employment for the purpose of triggering payments provided under the Agreement that would have inflicted severe financial harm on the Companies, and threatening to prevent the Zero 6 transaction from taking place if his demand was not met;" and

3. "directing his own time, the time of other staff of the Companies and other resources of the Companies to actions meant to benefit Zero6 and not the Companies."

80

*Id.* at 3-4.  Mr. Harris made a motion to adopt the resolution, which Mr. Kreuscher seconded.  *Id.* at 4.  That motion passed with two votes in favor, Mr. Harris and Mr. Kreuscher, and one vote against, Mr. Berutti.  *Id.*

After the meeting, Attorney Rossmeissl drafted a letter in response to Attorney Hammond, who suggested that HEG had not stated grounds for Mr. Berutti's termination.  Trial Tr. 186 (April 19, 2024).  The letter explained that "Tom Berutti was discharged for cause under paragraph 6.3.2, 6.3.5, and 6.3.6 of the Executive Employment Agreement."  Trial Ex. 100 at 1.  The letter provided six "non-exhaustive" items amounting to "cause" under Mr. Berutti's employment agreement:

1.  A recently exposed pattern of self-dealing pursuant to which Tom Berutti, while in his capacity as CEO (a key employee), and thus under a fiduciary duty to the Companies, recommended various courses of action designed to enrich himself at the expense of HEG and its subsidiaries, without proper disclosures made to company representatives. As a key employee, he owed the Companies a fiduciary duty of loyalty which he breached, and has continued to breach. Specifically, Tom engineered moving business resources and opportunities out of the Companies into separate entities from which he received a 50% interest in at the expense of the Companies. By Tom's design, the Companies took a loss on providing employees and other resources to the 50%-50% entities.

2.  Tom's negotiating of a Memorandum of Understanding and an internal side agreement with Juhl which itself would result in Tom's violation of restrictive covenants against competition contained within his Executive Employment Agreement. This explains his insistence that he be terminated from his employment.

3.  Tom threatening to "kill the deal" with Juhl if Bill Harris did not sign Tom's proposed (and incredibly one-sided) Severance Agreement.  The Severance Agreement, if signed, would have plunged the companies deeper into insolvency to the tune of millions of dollars.

4.  Tom actively working on Juhl business on HEG's time and while on its payroll; including but not limited to, working on planned subsequent acquisitions planned by Juhl including but not limited to the "Project Walleye Portfolio."

5.  Tom demanding to be "terminated without cause" despite Bill Harris and Jason Kreuscher having no intention to terminate him. Said demand could only have been designed to enrich Tom while impoverishing HEG and its subsidiaries (see the terms of the "non-negotiable" Severance Agreement). Despite being the primary financial officer of the Companies, Tom insisted upon a "termination without cause" without even explaining the extreme financial implications to Bill Harris.

6.  Other matters are currently under investigation. This is not an exhaustive list. Tom has clearly demonstrated a lack of loyalty to the companies which imminently threatened their continuing existence.

Trial Ex. 100 at 1-2.

The issue before the Court is whether HEG properly terminated Mr. Berutti for cause without notice and effective immediately under the terms of the 2017 Employment Agreement. The Court interprets the Employment Agreement by analyzing its actual language and construing its terms according to their plain and ordinary meaning, with the goal of determining the parties' intent and understanding what the parties contracted to do. *Tufail*, 2013 WI 62, ¶¶ 25-26, 28-29.

The Employment Agreement stated that if Mr. Berutti was terminated for cause for one of the events or circumstances stated in the contract (see sections 6.3.1-6.3.6),

> prior to [Mr. Berutti's] termination, the Board must provide written notice of the applicable event or circumstance and further afford [Mr. Berutti] a period of at least thirty (30) calendar days to review and respond to said event or circumstance (unless continued employment would expose [HEG] to substantial, material harm, in which event HEG may terminate [Mr. Berutti] immediately without notice). After the expiration of the thirty-calendar-day review and response period provided for above, the Board may, at its option, terminate [Mr. Berutti's] employment immediately with HEG and its subsidiaries if no response has been provided by [Mr. Berutti]. In the event a response is provided by [Mr. Berutti], [Mr. Berutti's] employment shall not be terminated unless the Board, at a duly scheduled meeting, gives full and fair consideration to the response provided by [Mr. Berutti] and affords [Mr. Berutti] the opportunity, at his option, to appear at said meeting and address the issues raised in the written notice. Should the Board thereafter determine to proceed with the termination, it shall, within fifteen (15) calendar days of the Board meeting, provide [Mr. Berutti] a written explanation setting forth its reasons for so proceeding.

Trial Ex. 16 § 6.3.

HEG and Mr. Berutti agreed in the plain language of the Employment Agreement that prior to terminating Mr. Berutti for cause, HEG must provide written notice of the reasons and grant Mr. Berutti a thirty-day period to review and respond to the alleged grounds for termination for cause. If Mr. Berutti's "continued employment exposed HEG to substantial, material harm," then the written notice and the review and response period were not required prior to terminating Mr. Berutti for cause.

There was no evidence presented at trial that HEG provided written notice of the reasons that Mr. Berutti was being terminated for cause prior to the Board meeting on March 8, 2023, as required by the Employment Agreement.

As a result, under the plain language of the Employment Agreement, Mr. Berutti could only be terminated for cause if Mr. Berutti's "continued employment" exposed HEG to "substantial, material harm."

The Employment Agreement does not define "substantial, material harm" so the Court must afford that phrase its "plain or ordinary meaning, consistent with 'what a reasonable person would understand the words to mean under the circumstances.'" *Tufail*, 2013 WI 62, ¶¶ 26, 28 (citation omitted). "Substantial" means "of ample or considerable amount or size." *Substantial*, Oxford English Dictionary, December 2024, https://doi.org/10.1093/OED/8404779949 (last accessed April 1, 2025). "Material" means "of serious or substantial import; significant, important." *Material*, Oxford English Dictionary, December 2024, https://doi.org/10.1093/OED/1347973062 (last accessed April 1, 2025).

It is important to note that the plain language of the Employment Agreement states that it is Mr. Berutti's "continued employment" that must expose HEG to substantial, material harm. To justify immediate termination for cause, there should be evidence that Mr. Berutti's continued employment past the date of the March 8, 2023 Board meeting would cause substantial, material harm (i.e., a considerable amount of significant damage).

There was sufficient evidence presented at trial that HEG was exposed to "substantial, material harm." At the time of Mr. Berutti's termination, HEG was facing a deadline to make a quarterly interest payment to Zero6 for the first quarter of 2023. If that payment was not made, HEG would be in default under the Zero6 loan agreement and Zero6 could accelerate the note and declare the entire unpaid principal balance of the note (approximately $13.5 million) and any interest that had accrued thereon immediately due and payable, and as Mr. Kreuscher said, Zero6 "would seize the entire company . . . for nothing." Trial Ex. 29; Trial Ex. 404; Trial Tr. 152 (May 8, 2024); Trial Tr. 249 (May 10, 2024).

Additionally, the $625,000 loan between Berutti Energy, as the lender, and Sugarloaf Hydro, as the borrower, was maturing toward the end of March 2023. Trial Exs. 49, 52; Trial Tr. 152-53 (May 8, 2024); Trial Tr. 189 (April 19, 2024). That loan was guaranteed by HEG, LCO Hydro, and Mr. Harris. Trial Ex. 50. That loan was also secured by Mr. Harris's membership interest in Sugarloaf Hydro and by HEG's membership interest in LCO Hydro. Trial Ex. 49, 51, 52. If the loan was not paid in full by the maturity date, Berutti Energy could exercise the assignments of the membership interests and have Mr. Harris' membership interest in Sugarloaf Hydro and HEG's membership interest in LCO Hydro assigned to Berutti Energy. *Id.* If the loan was not paid in full by the maturity date, Berutti Energy could also seek to collect via its guarantees from HEG, LCO Hydro, and Mr. Harris. In other words, as of the maturity date of the loan toward the end of March 2023, Berutti Energy could exercise its guarantees and/or become the 100% owner of Sugarloaf Hydro and take a company asset, LCO Hydro, a HEG subsidiary, to satisfy the loan.

But the plain language of the Employment Agreement does not require just "substantial, material harm." It requires that Mr. Berutti's continued employment expose HEG to substantial, material harm. There was insufficient evidence presented at trial for the Court to make a finding that Mr. Berutti's continued employment exposed HEG to substantial, material harm.

83

Mr. Berutti's continued employment was not going to cause the company to default on the Zero6 loan. HEG's inability to pay the interest-only quarterly payment due to Zero6 and HEG's and Mr. Berutti's inability to agree on the terms of a severance agreement with Mr. Berutti, which was a condition precedent to being able to sell the company's assets to Zero6 and to avoid a default on the Zero6 loan, was going to cause the company to default on the Zero6 loan.

On the Berutti Energy loan, Mr. Berutti's continued employment was not going to cause the company to default on the Berutti Energy loan. HEG's inability to pay the loan at its maturity was going to cause HEG to default on the Berutti Energy loan.

There was a claim made at trial that Mr. Berutti's continued employment was going to cause substantial, material harm because he would be "communicating with Juhl." Trial Tr. 219 (April 19, 2024). However, it was quickly acknowledged that HEG could have told Zero6 "not to communicate with [Mr. Berutti] anymore." *Id.*

There was a claim made at trial that Mr. Berutti was "becoming more and more bombastic with each conversation." Trial Tr. 219-20 (April 19, 2024). However, it was quickly acknowledged that was not the substantial and material harm envisioned by the contract. *Id.* at 220.

There was a claim made at trial that Mr. Berutti would "interfere with the bankruptcy." *Id.* at 224. However, there were no examples given of how Mr. Berutti could interfere with the bankruptcy when Mr. Harris owned 96% of HEG and Mr. Berutti owned 4%, there were three voting members of the Board, Mr. Harris, Mr. Kreuscher, and Mr. Berutti, and Mr. Harris and Mr. Kreuscher held the majority of the votes on the Board.

There was a claim made at trial that Mr. Berutti would "interfere with business operations." *Id.* However, there were no examples given of how Mr. Berutti's continued employment would result in interference with the company's business operations.

There was a claim made at trial that Mr. Berutti would "interfere with employees." However, the Zero6 MOU -- signed by Mr. Harris -- expressly contemplated that the Zero6 acquiring entity, Main Street Hydro, would have "the right to hire all the existing employees of RWE Operations, LLC that currently manage and operate the hydro projects" and that all hired employees would "become full time employees of" Main Street Hydro and "cease to be employed by RWE Operations, LLC (RWEO) or any of its subsidiaries being retained by RWE." Trial Ex. 30.

There was a claim made at trial that Mr. Harris was "scared for his own physical safety." Trial Tr. 221 (April 19, 2024). There is absolutely nothing in the trial record that Mr. Berutti made any threats of physical violence to Mr. Harris.

The evidence presented at trial does not show that Mr. Berutti's continued employment after March 8, 2023 would have resulted in substantial, material harm. Therefore, under the plain language of the Employment Agreement, prior to his termination, Mr. Berutti was entitled

84

to written notice of the events and circumstances that justified terminating his employment for cause and he was entitled to a thirty-day period to review and respond to the alleged grounds for termination. No written notice was provided prior to his termination. Therefore, Mr. Berutti was not properly terminated for cause under the plain language of the Employment Agreement and Mr. Berutti is entitled to the amount due to him as if he were terminated without cause under the Employment Agreement.

Based upon the Court's conclusions, and the parties' stipulated agreement, Mr. Berutti's claim based upon his Employment Agreement with HEG will be allowed in the amount of $499,902.20, of which $3,086.49 is entitled to priority under § 507(a)(4).

## III. FRAUDULENT TRANSFER CLAIMS

### A. The transfer of RWE's membership interest in Sugarloaf Hydro to the Berutti Trust and Mr. Harris is not avoidable as a fraudulent transfer.

RWE seeks to avoid as a constructively fraudulent transfer RWE's transfer of (1) 50% of its membership interest in Sugarloaf Hydro, LLC to the Berutti Trust; and (2) 50% of its membership interest in Sugarloaf Hydro, LLC to Mr. Harris under 11 U.S.C. § 548(a)(1)(B) and/or 11 U.S.C. § 544(b) and Wis. Stat. § 242.04(1)(b).

In 2021, Mr. Berutti and Mr. Harris became aware of the opportunity to purchase a hydro plant near Leadville, Colorado. Trial Tr. 101 (May 8, 2024). RWE formed a new subsidiary for the project, Sugarloaf Hydro, LLC. On September 20, 2021, Sugarloaf Hydro entered into an asset purchase agreement with STS Hydropower, LLC to acquire the hydro plant for $305,000. Trial Ex. 41. RWE executed the agreement as Sugarloaf Hydro's parent company, and it agreed to guarantee Sugarloaf Hydro's obligations to the seller. *Id.* at § 2.9. If Sugarloaf Hydro failed to pay, then the seller had the right to specific performance from RWE. *Id.* at § 10.12; Trial Tr. 88 (May 30, 2024).

Sugarloaf Hydro and RWE did not have the funds to pay the purchase price and Mr. Berutti was unable to find other financing partners to finance the purchase price on behalf of Sugarloaf Hydro and RWE. *See supra* p. 69-72. Instead, Berutti Energy borrowed funds from SNBT to loan to Sugarloaf Hydro for the purchase and repair of the hydro plant in Colorado, and Mr. Berutti mortgaged his personal residence as collateral for that loan. Trial Tr. 240-41 (April 17, 2024). On September 20, 2022, Berutti Energy loaned $550,000 to Sugarloaf Hydro.[11] Trial Ex. 49. To secure repayment on the Berutti Energy loan to Sugarloaf Hydro, Mr. Harris granted Berutti Energy a security interest in his membership interest in Sugarloaf Hydro and HEG granted Berutti Energy a security interest in its membership interest in LCO Hydro. *Id.* Mr. Harris, HEG, and LCO Hydro also guaranteed Sugarloaf Hydro's repayment obligation to Berutti Energy. *Id.*

---

[11] The amount of the loan from Berutti Energy to Sugarloaf Hydro eventually increased to $625,000 in December 2022. Trial Ex. 52.

Using the proceeds of the Berutti Energy loan, on or about September 20, 2022, Sugarloaf Hydro closed on the purchase of the hydro plant in Colorado. Sugarloaf Hydro paid the seller $302,665 (the purchase price of $305,000 plus two small fees, less the property taxes through closing). Trial Ex. 53.

On or about September 20, 2022, RWE transferred its interest in Sugarloaf Hydro, LLC to the Thomas A. Berutti Revocable Living Trust dated April 7, 2004 (the "Berutti Trust") and Mr. Harris. In an operating agreement intended to "become effective immediately following" Sugarloaf Hydro's purchase of the hydro plant in Colorado, RWE withdrew as a member of Sugarloaf Hydro. Trial Ex. 54 at §§ 1.1, 3.1. The Berutti Trust and Mr. Harris became members of Sugarloaf Hydro, each with a 50% interest. *Id.* at 16. The operating agreement provided that the Berutti Trust and Mr. Harris would each make a $100 capital contribution. *Id*.

Regarding the Berutti Trust, Plaintiffs HEG and RWE alleged that RWE's transfer of 50% of its membership interest in Sugarloaf Hydro to the Berutti Trust is a constructively fraudulent transfer under 11 U.S.C. § 548(a)(1)(B)[12] and under 11 U.S.C. § 544(b) and Wis. Stat. § 242.04(b)(1). *See* Adv. No. 23-2078, Docket No. 1, Cause of Action No. 5.

Regarding Mr. Harris, Plaintiff RWE alleged that RWE's transfer of 50% of its membership interest in Sugarloaf Hydro to Mr. Harris is a constructively fraudulent transfer under 11 U.S.C. § 548(a)(1)(B) and under 11 U.S.C. § 544(b) and Wis. Stat. § 242.04(1)(b). *See* Adv. No. 23-2080, Docket No. 1, Cause of Action Nos. 1 and 2.

Under § 548(a)(1)(B) of the Bankruptcy Code, a debtor-in-possession may avoid any transfer of an interest of the debtor in property that was made or incurred on or within 2 years before the date of the filing of the petition, if:

(1)     the debtor "received less than a reasonably equivalent value in exchange for such transfer"; and

(2)     the debtor satisfies any one of the following four criteria:

(i)     the debtor "was insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer";

(ii)    the debtor "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital";

---

[12] The Complaint did not contain a claim under § 548 of the Bankruptcy Code, but the Plaintiffs requested leave to amend the complaint. *See* Adv. No. 23-2078, Docket No. 52 at ¶ 39 n.7; Trial Tr. 9-13 (April 17, 2024); Docket No. 157 at 104 n.83. The Court entered an Order on Request to Amend Complaint requiring the Defendants to file an objection by January 17, 2025, if they opposed the request. *See* Adv. No. 23-2078, Docket No. 160. No objection was filed, so the Court construes the request as a motion to amend the complaint and hereby grants that motion.

(iii) the debtor "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured"; or

(iv) the debtor "made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business."

11 U.S.C. § 548(a)(1)(B)(i)-(ii)(I)-(IV).

Section 544(b) of the Bankruptcy Code permits a debtor-in-possession to avoid a transfer of the debtor's interest in property if the transfer is voidable under applicable state law. *See* 11 U.S.C. § 544(b). In this case, the Plaintiffs assert that RWE's transfer of its membership interest in Sugarloaf Hydro to Mr. Harris and Mr. Berutti's Trust is voidable under Wis. Stat. § 242.04(1)(b). Section 242.04(1)(b) of the Wisconsin Statutes provides that a transfer made by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made:

(1) if the debtor made the transfer "without receiving a reasonably equivalent value in exchange for the transfer or obligation," and

(2) the debtor meets either of the following criteria:

i. the debtor "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction"; or

ii. the debtor "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

*See* Wis. Stat. § 242.04(1)(b)1.-2.

Both § 548(a)(1)(B) of the Bankruptcy Code and § 544(b) of the Bankruptcy Code/Wis. Stat. § 242.04(1)(b) allow a debtor-in-possession to avoid a transfer of the debtor's interest in property if the debtor did not receive "reasonably equivalent value" in exchange for the transfer. The Bankruptcy Code does not define "reasonably equivalent value." The test to determine "reasonably equivalent value" requires the court "to determine the value of what was transferred and to compare it to what was received." *Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997). The "formula for determining reasonably equivalent value is not a fixed mathematical formula; rather, the standard for 'reasonable equivalence should depend on all the facts of each case,' an important element of which is fair market value." *Id*. (citation omitted). "Another important factor in assessing reasonably equivalent value is whether the sale was 'an arm's length transaction between a willing buyer and a willing seller.'" *Id*.

The determination of "reasonably equivalent value" is made as of the time of the transfer. *See, e.g., In re Tribune Co. Fraudulent Conveyance Litig.*, 10 F.4th 147, 172 (2d Cir. 2021) ("reasonably equivalent value is determined by the value of the consideration exchanged between the parties at the time of the conveyance or incurrence of debt which is challenged"); *In re Morris Communications NC, Inc.*, 914 F.2d 458, 466 (4th Cir. 1990) ("the critical time is when the transfer was 'made'"); *Baldi v. Lynch (In re McCook Metals, LLC)*, 319 B.R. 570, 589 (Bankr. N.D. Ill. 2005) ("Equivalent value must be measured as of the time of the transfer"). "Courts will not factor in post-transfer appreciation or depreciation." 5 Collier on Bankruptcy ¶ 548.05[2][a] (16th ed. 2025); *see also Morris*, 914 F.2d at 466 ("Neither subsequent depreciation in nor appreciation in value of the consideration affects the value question whether reasonable equivalent value was given."); *McCook Metals*, 319 B.R. at 589 ("[s]ubsequent appreciation or depreciation" does not affect reasonably equivalent value").

After considering the evidence presented at trial, the Court finds that RWE received reasonably equivalent value in exchange for the transfer of its membership interest in Sugarloaf Hydro to the Berutti Trust and Mr. Harris. Because RWE received reasonably equivalent value, RWE's transfer of its membership interest in Sugarloaf Hydro to the Berutti Trust and Mr. Harris is not a constructively fraudulent transfer under 11 U.S.C. § 548(b) or Wis. Stat. § 242.04(1)(b) and thus not avoidable.

The test to determine "reasonably equivalent value" requires the Court "to determine the value of what was transferred and to compare it to what was received." *Barber,* 129 F.3d at 387. The Court must first consider "the value of what was transferred." In this case, that requires the Court to assess the value of RWE's membership interest in Sugarloaf Hydro. At the time of the transfer of RWE's membership interest in Sugarloaf Hydro, Sugarloaf Hydro's liabilities exceeded its assets. Sugarloaf Hydro used a $550,000 loan from Berutti Energy to pay the $305,000 purchase price for the hydro plant in Colorado. The plant was not operating at the time of the purchase, but it "had potential historically to generate electricity." Trial Tr. 226 (April 17, 2024). It was in "horrible" condition. Trial Tr. 102 (May 8, 2024). The roof had leaked for almost three years and there was six feet of water in many areas inside the plant. *Id*. at 102. It would seem that the value of RWE's membership interest in Sugarloaf Hydro was the hydro plant purchase price of $305,000 less the liabilities of $550,000, amounting to a negative net value of -$245,000.

The Plaintiffs' expert advocated for using an income approach to calculate "the value of what was transferred." She calculated the potential future value of Sugarloaf Hydro at between $3.3 million and $4.7 million. Trial Tr. 145, 158-80 (May 29, 2024); Trial Ex. 120 ¶¶ 46-49, Exs. 5.0, 5.1. The determination of "reasonably equivalent value" is required to be made at the time of the transfer. The Plaintiffs' expert's calculation of the potential future value of Sugarloaf Hydro based upon its potential income stream when the hydro plant is eventually operable does not help the Court to assess the value of what was transferred at the time of the transfer in September 2022. At the time of the transfer, the hydro plant was inoperable, in "horrible" condition, the roof had leaked for three years, and certain parts of the plant were under six feet of water. The best indication of the value of the Sugarloaf hydro plant at the time of the transfer is the actual $305,000 purchase price paid in the arms' length transaction between a willing buyer and a willing seller in September 2022.

88

Additionally, Sugarloaf Hydro's liability to Berutti Energy in the amount of $550,000 must also be factored into determining the value of Sugarloaf Hydro. The Plaintiffs' expert's valuation did not account for Sugarloaf Hydro's loan from Berutti Energy. Despite not including the loan, the expert recognized in her testimony and in her written report that it would be appropriate to do so. *See* Trial Ex. 120 at 24 n. 99 ("I did not adjust for the encumbrance of Berutti Energy's loan to Sugarloaf Hydro. Adjusting for the UCC filing on Sugarloaf Hydro would reduce the asset's value."). *See also* Trial Tr. 179 (May 29, 2024).

Given the asset value of Sugarloaf Hydro of $305,000 and the Sugarloaf Hydro liabilities of $550,000, it does not appear that RWE's membership interest in Sugarloaf Hydro had any value at all at the time of the transfer in September 2022.

In assessing reasonably equivalent value, the Court must next consider "the value of what was received." RWE transferred its membership interest in Sugarloaf Hydro in exchange for $100 capital contributions from the Berutti Trust and Mr. Harris. RWE also transferred its membership interest in Sugarloaf Hydro in exchange for relief from the guarantee that it provided to the seller of the hydro plant. In the asset purchase agreement, Sugarloaf Hydro agreed to pay $305,000 to the seller for the hydro plant in Colorado. Trial Ex. 41. As Sugarloaf Hydro's parent company, RWE absolutely, unconditionally, irrevocably, and jointly and severally guaranteed to the seller the "due and punctual payment and discharge of all of [Sugarloaf's] obligations" under the asset purchase agreement. *Id.* § 2.9. RWE was contractually obligated to pay the $305,000 purchase price of the Sugarloaf hydro plant if Sugarloaf Hydro failed to do so. *Id.* When Sugarloaf Hydro and RWE did not have the funds to pay the full purchase price, Berutti Energy stepped in, preventing Sugarloaf Hydro from defaulting on the asset purchase agreement and preventing RWE from defaulting on its guarantee in the asset purchase agreement.

Comparing "the value of what was transferred" (that is, -$245,000) and "the value of what was received ($100 capital contributions and the satisfaction of RWE's guarantee), leads the Court to the conclusion that RWE received reasonably equivalent value in exchange for the transfer of its membership interest in Sugarloaf Hydro to the Berutti Trust and Mr. Harris. Therefore, RWE's transfer of 50% of its membership interest in Sugarloaf Hydro to the Berutti Trust and RWE's transfer of 50% of its membership interest in Sugarloaf Hydro to Mr. Harris is not a constructively fraudulent transfer under 11 U.S.C. § 548(a)(1)(B) or 11 U.S.C. § 544(b) and Wis. Stat. § 242.04(1)(b) and thus not avoidable.

**B.**     **Mr. Harris's subsequent transfer to Berutti Energy of a security interest in his 50% membership interest in Sugarloaf Hydro is not avoidable as a fraudulent transfer.**

RWE also seeks to avoid Mr. Harris's subsequent transfer to Berutti Energy of a security interest in his 50% membership interest in Sugarloaf Hydro under 11 U.S.C. § 550. Adv. No. 23-2080, Docket No. 1, Cause of Action No. 3.

On September 20, 2022, Mr. Berutti, through Berutti Energy, loaned $550,000 to Sugarloaf Hydro. Trial Ex. 49. To secure repayment on the Berutti Energy loan, Mr. Harris

89

granted Berutti Energy a security interest in his 50% membership interest in Sugarloaf Hydro. *Id.*

Section 550 of the Bankruptcy Code provides that to the extent a transfer is avoided under § 544 or § 548, the debtor-in-possession "may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from — (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."

Section 550 of the Bankruptcy Code is only applicable "to the extent a transfer is avoided under" sections of the Bankruptcy Code including § 544 or § 548. For the reasons noted above, RWE's transfer of 50% of its membership interest in Sugarloaf Hydro, LLC to Mr. Harris is not avoidable under § 544 or § 548. Because RWE cannot avoid the initial transfer of the membership interest to Mr. Harris, it cannot avoid the security interest Mr. Harris subsequently granted to Berutti Energy under § 550 of the Bankruptcy Code.

**C.** **The Eau Galle and Grande Pointe sale-and-buyback transaction is not avoidable as a constructively fraudulent transfer.**

**1.** **The transfer of RWE's equity interests in Eau Galle Hydro, LLC and Grande Pointe Power Corporation to Berutti Energy is not avoidable as a constructively fraudulent transfer under § 544(b) of the Bankruptcy Code and Wis. Stat. § 242.04(1)(b).**

RWE seeks to avoid as a constructively fraudulent transfer RWE's transfer of its equity interests in Eau Galle Hydro, LLC and Grande Pointe Power Corporation to Berutti Energy under § 544(b) of the Bankruptcy Code and Wis. Stat. § 242.04(1)(b). Adv. No. 23-2078, Docket No. 1, Cause of Action No. 2.

On or about October 30, 2020, RWE and Berutti Energy entered into a "sale-and-buyback" transaction involving RWE's equity interests in Eau Galle Hydro, LLC and Grande Pointe Power Corporation. RWE agreed to sell its equity interests in Eau Galle and Grande Pointe to Berutti Energy for $1,202,078.84. Trial Ex. 61 at 6. The purchase price was composed of (1) $500,000 in cash and (2) Mr. Berutti's release of a promissory note payable from HEG in the amount of $702,078.84. *Id*. at 7. The Equity Purchase Agreement allocated $601,039.42 of the purchase price to Eau Galle and $601,039.42 of the purchase price to Grande Pointe. *Id.* at 6.

RWE asserts that its transfer of the equity interests in Eau Galle Hydro and Grande Pointe to Berutti Energy was a constructively fraudulent transfer under Wis. Stat. § 242.04(1)(b)

that RWE can avoid under § 544(b) of the Bankruptcy Code. [13]  Section 242.04(1)(b) provides that a transfer made by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made:

    (1)    if the debtor made the transfer "without receiving a reasonably equivalent value in exchange for the transfer or obligation", and

    (2)    the debtor meets either of the following criteria:

        i.    the debtor "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction"; or

        ii.    the debtor "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

*See* Wis. Stat. § 242.04(1)(b)1.-2.

Like with the Sugarloaf Hydro transaction, the Court must assess whether RWE received "reasonably equivalent value" in exchange for the transfer of its equity interests in Eau Galle and Grande Pointe to Berutti Energy.  The test to determine "reasonably equivalent value" requires the Court "to determine the value of what was transferred and to compare it to what was received." *Barber*, 129 F.3d at 387.  The "formula for determining reasonably equivalent value is not a fixed mathematical formula; rather, the standard for 'reasonable equivalence should depend on all the facts of each case,' an important element of which is fair market value." *Id.* (citation omitted).  "Another important factor in assessing reasonably equivalent value is whether the sale was 'an arm's length transaction between a willing buyer and a willing seller.'" *Id.*  The determination of "reasonably equivalent value" is made as of the time of the transfer.  *See, e.g., Tribune Co.*, 10 F.4th at 172; *Morris*, 914 F.2d at 466; *McCook Metals*, 319 B.R. at 589.  RWE has the burden of proving that the transfer of its equity interests in Eau Galle and Grande Pointe was made without receiving "reasonably equivalent value." *In re Loyal Cheese Co. Inc.*, 969

---

[13] The Court disagrees with Berutti Energy that there cannot be a fraudulent transfer because the Debtors received the Eau Galle and Grande Pointe equity interests back before this bankruptcy case was filed and "there is *nothing* to transfer back."  Adv. No. 23-2078, Docket No. 156, p. 53-54 (emphasis in original).  Before this bankruptcy was filed, Berutti Energy conveyed the equity interests in Eau Galle back to Flambeau Hydro, LLC (an RWE subsidiary) for $750,000 in August 2021 and conveyed the equity interests in Grande Pointe back to Iowa Hydro, LLC (an RWE subsidiary) for $750,000 in May 2022.  Trial Exs. 62, 63.  Section 550 of the Bankruptcy Code expressly contemplates that the debtor-in-possession can recover the property **or** the value of the property.  11 U.S.C. § 550(a) ("to the extent that a transfer is avoided . . . the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property."  Under the single satisfaction rule, the estate is limited to recovering either the property or the value of the property post-petition.  11 U.S.C. § 550(d).  In its fraudulent transfer claims related to Eau Galle and Grande Pointe, RWE is not attempting to recover the equity interests, but is instead attempting to recover the value that Berutti Energy extracted from those equity interests in the sale-buyback transaction that resulted from RWE selling the equity interests to Berutti Energy for $600,000 each but then causing its subsidiaries to repurchase the equity interests from Berutti Energy a short time later for $750,000 each.

F.2d 515, 518 (7th Cir. 1992); *In re Atkinson*, 63 B.R. 266 (Bankr. W.D. Wis. 1986); *see also* Wis. Stat. § 242.04(3).

The test to determine "reasonably equivalent value" requires the Court "to determine the value of what was transferred and to compare it to what was received." *Barber*, 129 F.3d at 387. The Court must first consider "the value of what was transferred." In this case, that requires the Court to assess the value of RWE's equity interests in Eau Galle and Grande Pointe at the time of the transfer on or around October 30, 2020. RWE presented evidence about four different ways to calculate "the value of what was transferred" but none of them help the Court determine the value of RWE's equity interests in Eau Galle and Grande Pointe as of the date of the transfer in October 2020.

One might look to the purchase price stated in the Equity Purchase Agreement to determine "the value of what was transferred" by RWE to Berutti Energy. The Equity Purchase Agreement allocated $601,039.42 of the purchase price to Eau Galle and $601,039.42 of the purchase price to Grande Pointe. Trial Ex. 61 at 6. However, the Equity Purchase Agreement was not an arm's length transaction. The purchase price in the Equity Purchase Agreement for Eau Galle and Grande Pointe was solely dictated by the fact that RWE needed $500,000 for the repairs at Iowa Hydro's Maquoketa plant and allegedly needed to pay $702,078.84 to Mr. Berutti for his unpaid ownership in HEG. Trial Ex. 61 at 1, 6-7. RWE's counsel asked Mr. Berutti at trial if he understood that RWE sold Eau Galle and Grande Pointe for "significantly under fair market value" and "under book value." Trial Tr. 149-50 (April 17, 2024). Mr. Berutti responded that Eau Galle and Grande Pointe were sold for an "agreed-upon value." *Id*. at 150. But that "agreed-upon value" was not the fair market value or appraised value of those hydro plants. It was just the value that Mr. Berutti chose. Trial Ex. 59; Trial Tr. 105-06 (April 17, 2024); Trial Tr. 65-66 (May 8, 2024); Trial Tr. 101 (May 29, 2024). There was no evidence that Mr. Berutti fixed the purchase price by examining the market. As Mr. Harris testified related to the $1,202,078.84 purchase price for the two plants, "if somebody had said those numbers to me, I would have said, 'what?' Those sound very low to me." Trial Tr. 66 (May 8, 2024). The $601,039.42 purchase price for Eau Galle and the $601,039.42 purchase price for Grande Pointe had nothing to do with the actual value of those hydro plants. Consequently, the Court cannot use the purchase price to determine the "value of what was transferred" in its analysis of whether RWE received "reasonably equivalent value" in exchange for the transfer of its equity interests in Eau Galle and Grande Pointe to Berutti Energy.

The Plaintiffs' expert suggested that the appraised values of Eau Galle and Grande Pointe could be used to determine the "value of what was transferred" by RWE to Berutti Energy. According to the expert's report, the August 25, 2016 Appraisal Report of the Eau Galle Dam Facility provided an appraisal of $750,000 as of April 5, 2016 and the September 20, 2016 Appraisal Report of the Grande Pointe Facility provided an appraisal of $1,750,000 as of April 14, 2016. Trial Ex. 120, ¶ 102; Trial Tr. 104 (May 29, 2024). At first glance, it appears that RWE transferred its equity interest in Eau Galle for $601,039.42 when it was worth $750,000 and that RWE transferred its equity interest in Grande Pointe for $601,039.42 when it was worth $1,750,000. Trial Ex. 61; Trial Ex. 120, ¶ 102.

92

However, the Court cannot use the 2016 appraisals to determine the "value of what was transferred" by RWE to Berutti Energy in October 2020.  First, the 2016 appraisal reports did not come into evidence during the trial.  Second, even if they had, it is entirely unclear whether the 2016 appraisals were appraising RWE's equity interests in Eau Galle and Grande Pointe or just the physical plants and dams.  Finally, the calculation of "reasonably equivalent value" is required to be made at the time of the transfer in October 2020.  As acknowledged by the Plaintiffs' expert, the 2016 appraisals were "not current as of late 2020."  *Id.* at ¶ 102 n. 253.  The 2016 appraisals do not tell the Court the value of RWE's equity interests in Eau Galle and Grande Pointe as of the date of the transfer in October 2020.  Consequently, the Court cannot use the 2016 appraised values to determine the "value of what was transferred" by RWE to Berutti Energy in October 2020.

There were some appraised values for Eau Galle and Grande Pointe attached to the Shareholders Agreement between Mr. Harris, Mr. Berutti, and HEG dated February 16, 2017.  Trial Ex. 17 at p. 13.  In that attachment, the appraised value of the Eau Galle hydro plant is listed as $710,000 and the appraised value of the Grande Pointe hydro plant is listed as $1,750,000.  *Id.*  At first glance, it appears that RWE transferred its equity interest in Eau Galle for $601,039.42 when it was worth $710,000 and that RWE transferred its equity interest in Grande Pointe for $601,039.42 when it was worth $1,750,000.  Trial Ex. 61; Trial Ex. 17 at p. 13.  Except the appraisal reports that form the basis for the valuations attached to the 2017 Shareholders Agreement also did not come into evidence during the trial.  The Court also does not know if the alleged appraised values are for RWE's equity interests in Eau Galle and Grande Pointe or just for the physical plants and dams.  Additionally, the calculation of "reasonably equivalent value" is required to be made at the time of the transfer in October 2020.  The attachment to the 2017 Shareholders Agreement does not tell the Court the value of RWE's equity interests in Eau Galle and Grande Pointe as of the date of the transfer in October 2020.  Consequently, the Court cannot use the attachment to the 2017 Shareholders Agreement to determine the "value of what was transferred" by RWE to Berutti Energy in October 2020.

The Plaintiffs' expert also suggested that the "net book value" of Eau Galle and Grande Pointe could be used to determine the "value of what was transferred" by RWE to Berutti Energy.  According to the expert's report, the net book value of Eau Galle was $873,215.18 and the net book value of Grande Pointe was $1,106,540.07.  Trial Ex. 120 ¶ 147(d)-(e), Ex. 9.3, Ex. 9.4.  The expert used RWE's Depreciation Expense Report dated October 31, 2020, detailing the fixed asset costs and accumulated depreciation, to arrive at these net book values.  *Id.*  At first glance, using the net book values, it appears that RWE transferred its equity interest in Eau Galle for $601,039.42 when it was worth $873,215.18 and that RWE transferred its equity interest in Grande Pointe for $601,039.42 when it was worth $906,540.07.  Trial Ex. 61; Trial Ex. 120 ¶ 147(d)-(e), Ex. 9.3, Ex. 9.4.

However, the Court cannot use the "net book value" to determine the "value of what was transferred" by RWE to Berutti Energy in October 2020.  First, the "net book value" calculation is based on RWE's Depreciation Expense Report, but that report did not come into evidence during the trial.  Second, the "net book value" does not help the Court determine the value of what was transferred by RWE to Berutti Energy.  "Net book value" is an accounting figure based on historical cost and depreciation.  "Net book value" is not an estimate of the current market

93

value for the properties. The "net book value" does not tell the Court the market value of RWE's equity interests in Eau Galle and Grande Pointe as of the date of the transfer in October 2020. Consequently, the Court cannot use the "net book value" of Eau Galle and Grande Pointe to determine the "value of what was transferred" by RWE to Berutti Energy in October 2020.

To prevail on this fraudulent transfer claim, RWE must prove that the transfer of its equity interests in Eau Galle and Grande Pointe was made without receiving "reasonably equivalent value." The test to determine "reasonably equivalent value" requires the Court to compare "the value of what was transferred" with "the value of what was received." RWE has not proven "the value of what was transferred," so the Court cannot determine whether the value of what RWE received was reasonably equivalent. RWE has not met its burden of proving, either by clear and convincing evidence or by a preponderance of the evidence, that it did not receive "reasonably equivalent value" for the transfer of its equity interests in Eau Galle and Grande Pointe. The transfer is therefore not avoidable under 11 U.S.C. § 544(b) and Wis. Stat. § 242.04(1)(b).

**2.**     **The transfer of RWE's equity interests in Eau Galle Hydro, LLC and Grande Pointe Power Corporation to Berutti Energy is not avoidable as a constructively fraudulent transfer under § 544(b) of the Bankruptcy Code and Wis. Stat. § 242.05(1).**

RWE seeks to avoid as a constructively fraudulent transfer RWE's transfer of its equity interests in Eau Galle Hydro, LLC and Grande Pointe Power Corporation to Berutti Energy under § 544(b) of the Bankruptcy Code and Wis. Stat. § 242.05(1). Adv. No. 23-2078, Docket No. 1, Cause of Action No. 3.

The same fact pattern applies to this cause of action. On or about October 30, 2020, RWE and Berutti Energy entered into a "sale-and-buyback" transaction involving RWE's equity interests in Eau Galle Hydro, LLC and Grande Pointe Power Corporation. RWE agreed to sell its equity interests in Eau Galle and Grande Pointe to Berutti Energy for $1,202,078.84. Trial Ex. 61 at 6. The purchase price was composed of (1) $500,000 in cash and (2) Mr. Berutti's release of a promissory note payable from HEG in the amount of $702,078.84. *Id.* at 7. The Equity Purchase Agreement allocated $601,039.42 of the purchase price to Eau Galle and $601,039.42 of the purchase price to Grande Pointe. *Id.* at 6.

According to Wis. Stat. § 242.05(1), a transfer can be avoided if the following conditions are met:

    (1)    there was a transfer made by a debtor to another party;

    (2)    a creditor's claim against the debtor arose before the transfer;

    (3)    the debtor made the transfer "without receiving a reasonably equivalent value in exchange for the transfer"; and

(4)     the debtor was "insolvent at [the time of the transfer] or the debtor became insolvent as a result of the transfer".

*See* Wis. Stat. § 242.05(1). Under Wisconsin's fraudulent transfer law, a debtor is insolvent, if "at a fair valuation," the sum of the debtor's debts is greater than the sum of the debtor's assets. Wis. Stat. § 242.02. RWE has the burden of proving that the transfer of its equity interests in Eau Galle and Grande Pointe is a fraudulent transfer, which means that RWE has the burden of proving that the transfer was made without receiving "reasonably equivalent value" and that RWE was insolvent at the time of the transfer or became insolvent as a result of the transfer. *Loyal Cheese*, 969 F.2d at 518; *Atkinson*, 63 B.R. 266; *see also* Wis. Stat. § 242.05(3).

As discussed *supra*, RWE has not met its burden of proving that the transfer of its equity interests in Eau Galle and Grande Pointe was made without receiving "reasonably equivalent value." As a result, the transfer is not avoidable under 11 U.S.C. § 544(b) and Wis. Stat. § 242.05(1).

The transfer is also not avoidable because RWE has not met its burden of proving that the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer. There was some evidence presented at trial related to HEG's solvency at the time of RWE's transfer of its equity interests in Eau Galle and Grande Pointe to Berutti Energy on October 30, 2020, specifically in the form of HEG's 2020 tax return. Trial Ex. 115 at 9; *see also* Adv. No. 23-2078, Docket No. 157, p. 40. Schedule L of HEG's 2020 tax return, entitled "Balance Sheets per Books," provides the following information:

|  | January 1, 2020 (Trial Ex. 115 at 9) | December 31, 2020 (Trial Ex. 115 at 9) |
|---|---|---|
| Total Assets (Line 15) | $18,371,157 | $10,126,436 |
| Total Liabilities (Lines 16-21) | $17,251,425 | $14,775,370 |
| Net Equity (Lines 22-24) | $1,119,732 | ($-4,648,934) |

Trial Ex. 115 at 9. According to Schedule L, HEG's assets (line 15) exceeded its liabilities (lines 16-21) on January 1, 2020, but by December 31, 2020, HEG's liabilities exceeded its assets. *Id.*

HEG's 2020 tax return does not satisfy RWE's burden of proving that RWE was insolvent at the time of the transfer of RWE's equity interests in Eau Galle and Grande Pointe to Berutti Energy or that RWE became insolvent as a result of the transfer. First, there is an entity problem. This is HEG's tax return, not RWE's tax return. RWE is a wholly owned subsidiary of HEG, but at least as of the bankruptcy filing, HEG was also the parent of at least one non-RWE company, LCO Hydro, LLC. The assets and liabilities listed on Schedule L could be for HEG, RWE, LCO Hydro, and/or the other "disregarded entities" listed on the 2020 tax return. Trial Ex. 115, p. 85. The assets and liabilities listed on Schedule L of HEG's 2020 tax return do not prove that RWE was insolvent at the time of the transfer of RWE's equity interests in Eau Galle and Grande Pointe.

95

There is also a "fair valuation" problem with Schedule L of HEG's 2020 tax return serving as the basis for finding that RWE was insolvent at the time of the transfer of RWE's equity interests in Eau Galle and Grande Pointe to Berutti Energy. Under Wisconsin law, a debtor is "insolvent" if the sum of its debts is greater than the sum of its assets "at a fair valuation." Wis. Stat. § 242.02(2). Schedule L does not appear to show the value of RWE's assets "at a fair valuation." No one explained how the values of "buildings and other depreciable assets" "less accumulated depreciation" in columns (b) and (d) are the same as the values "at a fair valuation." Courts emphasize that the '[m]arket value of both assets and liabilities,' not book value (cost less depreciation), determines solvency under the bankruptcy code and the UFTA.'" *Janssen v. Reschke*, No. 17 C 8625, 2020 WL 6044284, at *9 (N.D. Ill. Oct. 13, 2020) (quoting *Covey v. Commercial Nat. Bank of Peoria*, 960 F.2d 657, 660 (7th Cir. 1992)).

There is also a timing problem with Schedule L of HEG's 2020 tax return serving as the basis for finding that RWE was insolvent at the time of the transfer of RWE's equity interests in Eau Galle and Grande Pointe to Berutti Energy on October 30, 2020. Schedule L contains snapshots of two moments in time. It shows that on January 1, 2020, HEG's assets exceeded its liabilities. It also shows that on December 31, 2020, HEG's liabilities exceeded its assets. These two snapshots do not show that RWE's liabilities exceeded its assets on October 30, 2020. They also do not establish that the transfer of the Eau Galle and Grande Pointe equity interests was what caused the liabilities to exceed the assets by the end of the year. Perhaps another transaction or transactions accounted for the changes during the year. Schedule L does not contain any of this information.

RWE has not met its burden of proving, either by clear and convincing evidence or by a preponderance of the evidence, that it was insolvent at the time of the transfer of its equity interests in Eau Galle and Grande Pointe or that it became insolvent as a result of the transfer. The transfer is therefore not avoidable under 11 U.S.C. § 544(b) and Wis. Stat. § 242.05(1).

**3.** **The transfer of RWE's equity interests in Eau Galle Hydro, LLC and Grande Pointe Power Corporation to Berutti Energy is not avoidable as a constructively fraudulent transfer under § 544(b) of the Bankruptcy Code and Wis. Stat. § 242.05(2).**

RWE seeks to avoid as a constructively fraudulent transfer RWE's transfer of its equity interests in Eau Galle Hydro, LLC and Grande Pointe Power Corporation to Berutti Energy under § 544(b) of the Bankruptcy Code and Wis. Stat. § 242.05(2). Adv. No. 23-2078, Docket No. 1, Cause of Action No. 4.

The same fact pattern applies to this claim. On or about October 30, 2020, RWE and Berutti Energy entered into a "sale-and-buyback" transaction involving RWE's equity interests in Eau Galle Hydro, LLC and Grande Pointe Power Corporation. RWE agreed to sell its equity interests in Eau Galle and Grande Pointe to Berutti Energy for $1,202,078.84. Trial Ex. 61 at 6. The purchase price was composed of (1) $500,000 in cash and (2) Mr. Berutti's release of a promissory note payable from HEG in the amount of $702,078.84. *Id.* at 7. The Equity Purchase Agreement allocated $601,039.42 of the purchase price to Eau Galle and $601,039.42 of the purchase price to Grande Pointe. *Id.* at 6.

According to Wis. Stat. § 242.05(2), a transfer can be avoided if the following conditions are met:

(1)    there was a transfer made by a debtor to another party;

(2)    a creditor's claim arose before the transfer was made;

(3)    "the transfer was made to an insider for an antecedent debt";

(4)    "the debtor was insolvent at that time"; and

(5)    "the insider had reasonable cause to believe that the debtor was insolvent."

Wis. Stat. § 242.05(2); *Beck v. BidRX, LLC*, 2018 WI App 61, ¶ 15, 384 Wis. 2d 207, 918 N.W.2d 96 (2018). This statute "attacks a transfer by an insolvent debtor to pay an antecedent debt to preferred insiders." *Id.* at ¶ 14. It curtails the ability of debtors to "prefer one creditor over another in applying assets to discharge their obligations . . . if the debtor is insolvent at the time and the preference is to an insider." *Id.* RWE has the burden of proving that the transfer of its equity interests in Eau Galle and Grande Pointe is a fraudulent transfer. *Id.* at ¶¶ 10, 16, 21; *see also* Wis. Stat. § 242.05(3).

As discussed *supra*, RWE has not met its burden of proving, either by clear or convincing evidence or by a preponderance of the evidence, that it was insolvent at the time of the transfer of its equity interests in Eau Galle and Grande Pointe. The transfer is therefore not avoidable under 11 U.S.C. § 544(b) and Wis. Stat. § 242.05(2).

## IV.    <u>PREFERENCE CLAIMS</u>

### A.    <u>RWE's payment of $175,000 to Berutti Energy is not avoidable as a preference because it is within the ordinary course exception.</u>

RWE seeks to avoid a $175,000 payment it made to Berutti Energy to repay a short-term loan. Adv. No. 23-2078, Cause of Action No. 6. Berutti Energy does not dispute that this payment was a preference, but it argues that RWE cannot avoid the payment because the loan was incurred in the ordinary course of business or financial affairs of the parties and the repayment was also made in the ordinary course of business or financial affairs of the parties.

As part of the loan agreement with Zero6, the Debtors were required to hold $173,000 in the "Flambeau Hydro Interest Reserve" account at the end of each month. Trial Ex. 404; Trial Tr. 268-70 (April 17, 2024). Mr. Berutti asked Zero6 to have the covenant removed in May of 2022, but Mr. Norrbom, the president of Zero6, said no. *Id.* at 270. According to Mr. Berutti, Mr. Norrbom said to "just keep putting the money in there any way you can." *Id*.

In September 2022, the Debtors were unable to comply with the loan covenant in the Zero6 loan agreement. *Id.* at 268. Starting that month and continuing through January 2023, Mr. Berutti agreed to have Berutti Energy loan $175,000 at the end of each month so that RWE could

97

meet the loan covenant. *Id.* at 268-69. RWE would then pay Berutti Energy back at the beginning of the next month. *Id*. Mr. Berutti testified that:

> Since September of 2022, RWE was unable to fund its loan covenant requirement of having [an] interest reserve account at the end of each month in the amount of 173,000. And since September, and every month thereafter, I - - Berutti Energy has loaned on September, October, November, December, January, $175,000 at the end of the month and took the money back the first day or two in the following month with no interest and no fee so that RWE meet its loan covenant with Juhl.

*Id*. Mr. Harris asked Mr. Berutti to make the same loan in February 2023, but Mr. Berutti refused. *Id*. at 270.

At the end of the month, Cindy Trewartha, HEG's bookkeeper, processed the loan transactions by printing a check from Berutti Energy made payable to RWE for Mr. Berutti's signature. Trial Tr. 186 (April 22, 2024). The check was then deposited into RWE's account at SNBT, and the $175,000 was transferred electronically to the Flambeau Hydro Interest Reserve Account. *Id.* at 188-89. At the beginning of the following month, the funds were transferred back to RWE's main account and Ms. Trewartha printed a check from RWE made payable to Berutti Energy in repayment of the loan. *Id*. at 192-93.

Both Mr. Berutti and Mr. Harris knew that Ms. Trewartha was performing both sides of the transaction – making the short-term loan from Berutti Energy to RWE and then having RWE repay the short-term loan to Berutti Energy. Trial Tr. 196 (April 22, 2024); *see also* audio transcript at 3:31:23. The exhibits admitted at trial also showed that Mr. Harris explicitly directed Ms. Trewartha and/or Mr. Berutti via email to proceed with the loan transaction in September 2022, November 2022, and December 2022. Trial Exs. 218, 219, 221.

RWE seeks to avoid repayment of the January 2023 loan as a preference. Berutti Energy loaned $175,000 to RWE on January 31, 2023. Trial Ex. 64; Trial Tr. 268 (April 17, 2024); Trial Tr. 186 (April 22, 2024). Ms. Trewartha followed the same process for this transaction as for the previous transactions. She deposited the check into RWE's main checking account. Trial Ex. 107 at 10. She then transferred the $175,000 to the Flambeau Hydro Interest Reserve Account. Trial Ex. 107 at 10, 35; Trial Ex. 65 at 3; Trial Tr. 189 (April 22, 2024). On February 1, 2023, Ms. Trewartha then transferred the $175,000 from the Flambeau Hydro Interest Reserve Account back to RWE's main operating account. Trial Ex. 108 at 7, 33; Trial Tr. 191 (April 22, 2024). After the funds were transferred to the main account, Ms. Trewartha issued a check payable to Berutti Energy to repay the loan. Trial Ex. 66; Trial Ex. 108 at 7; Trial Tr. 192 (April 22, 2024). The check would have been deposited into Berutti Energy's account that day or within a day or two. Trial Tr. 193 (April 22, 2024).

Section 547(b) of the Bankruptcy Code sets forth the elements of a preference: (1) a transfer; (2) of an interest of the debtor in property; (3) to or for the benefit of a creditor; (4) for or on account of an antecedent debt; (5) made while the debtor was insolvent; (6) made on or

within 90 days before filing the petition, or between 90 days and one year of the petition's filing if such creditor was an "insider"; and (7) that enables such creditor to receive more than it would otherwise receive in a Chapter 7 liquidation case. RWE, as the plaintiff, has the burden of proving the avoidability of a transfer under § 547(b). 11 U.S.C. § 547(g).

In this case, all of the elements of § 547(b) are satisfied. RWE paid $175,000 from its bank account to Berutti Energy in repayment of a loan. This was (1) a transfer; (2) of an interest of RWE in property; (3) to a creditor; (4) for or on account of an antecedent debt. RWE made the transfer on February 1, 2023, within 90 days of the March 16, 2023 petition date, satisfying element (6). RWE is presumed to have been insolvent during this 90-day period preceding the bankruptcy filing, satisfying element (5). *See* 11 U.S.C. § 547(f). Finally, RWE's liabilities exceeded its assets, so creditors in a Chapter 7 liquidation would receive less than full payment of their claims. The $175,000 payment repaid Berutti Energy's short-term loan in full, enabling Berutti Energy to receive more than it would have in a Chapter 7 liquidation, satisfying element (7).

Because all the § 547(b) elements are satisfied, the $175,000 payment is avoidable as a preference unless it falls within the scope of an exception. Relevant here, the "ordinary course" exception in § 547(c)(2) provides that:

> (c)      The trustee may not avoid under this section a transfer—
>
>       (2)      to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—
>
>             (A)      made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>
>             (B)      made according to ordinary business terms.

This provision requires a creditor to show first that the debt was incurred in the ordinary course of business or financial affairs of the debtor and the creditor. Then, the creditor must prove <u>either</u> that the repayment was made in the ordinary course of business or financial affairs of the debtor and the creditor, <u>or</u> that the repayment was made according to ordinary business terms. Berutti Energy, the defendant, has the burden of proving that an exception in § 547(c) applies such that RWE may not avoid the transfer. *See* 11 U.S.C. § 547(g).

Here, Berutti Energy is proceeding under § 547(c)(2)(A). It asserts that the January $175,000 loan was incurred "in the ordinary course of business or financial affairs of the debtor and the transferee" and the February $175,000 repayment was made "in the ordinary course of business or financial affairs of the debtor and the transferee." To determine whether a debt was incurred or a payment made within the "ordinary course of business or financial affairs of the debtor and the transferee," courts generally use historical transactions to calculate a baseline for the parties' dealings and then compare the challenged transactions to that baseline. *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 642-43 (7th Cir. 2003). This is a fact-intensive inquiry

and in performing the analysis, courts consider factors including "(1) the length of time the parties were engaged in the transaction at issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activity; and (4) whether the creditor took advantage of the debtor's deteriorating financial condition." *Kleven*, 334 F.3d at 642.

In this case, the five months' worth of transactions clearly establishes a pattern of RWE incurring debt to Berutti Energy. RWE borrowed $175,000 from Berutti Energy at the end of the month in September, October, November, and December. The terms of these loans were all the same. They were all short-term loans for a period of a few days, and Berutti Energy did not charge any interest or fees. Ms. Trewartha processed all of these loan transactions in the same way.

RWE incurred the debt to Berutti Energy in January 2023 in this same ordinary course. RWE borrowed $175,000 from Berutti Energy at the end of January in the same way it had at the end of September, October, November, and December. The terms of the January loan were the same as in the previous months. Ms. Trewartha processed the loan transaction in the same way in January as she had on the other occasions. The January loan was incurred "in the ordinary course of business or financial affairs of the debtor and the transferee."

The five months' worth of transactions also clearly establishes a pattern of repayment. RWE repaid the loans at the beginning of the month in October, November, December, and January. Ms. Trewartha processed the repayment transactions in the same way in each of those months.

RWE made the February 2023 repayment in this same ordinary course. RWE repaid the loan on February 1, 2023, which was in the first few days of the month just like the previous loans. Ms. Trewartha processed the February repayment in the same manner and under the same circumstances as she processed the repayments in October, November and December. There was no evidence that the amount or the form of the tender differed from past practices. There was no evidence that RWE engaged in any unusual payment activity or that Berutti Energy engaged in any unusual collection activity. There was no evidence that Berutti Energy took advantage of RWE's deteriorating financial condition. The February repayment was made "in the ordinary course of business or financial affairs of the debtor and the transferee."

RWE argues that there is an extra-statutory or equitable "exception to the ordinary course exception" in § 547(c)(2)(A) if a pattern of transactions between parties involves fraudulent conduct. RWE suggests that taking short-term loans to give the appearance that it was complying with Zero6's loan covenant was fraudulent conduct and thus the debt was not incurred "in the ordinary course of business or financial affairs of the debtor and the transferee." However, the evidence showed otherwise. Mr. Berutti had asked Zero6 about removing the covenant and Mr. Norrbom, the president of Zero6, said to "just keep putting the money in there any way you can." That is what RWE did. It was not defrauding Zero6 by taking the short-term loans from Berutti Energy and transferring funds in and out of the Flambeau Hydro Interest Reserve Account.

100

Because the January 2023 loan was incurred "in the ordinary course of business or financial affairs of the debtor and the transferee" and the February repayment was made "in the ordinary course of business or financial affairs of the debtor and the transferee," the $175,000 payment from RWE to Berutti Energy on February 1, 2023 is not avoidable as a preference.

**B.**     **HEG's grant of a security interest in its membership interest in LCO Hydro is avoided as a preference.**

HEG also seeks to avoid as a preference the security interest in its LCO Hydro, LLC membership interest that it granted to Berutti Energy.  Adv. No. 23-2078, Cause of Action No. 7. HEG is the sole member of LCO Hydro.  As security for the loan to fund Sugarloaf Hydro's hydro plant purchase, HEG granted Berutti Energy a security interest in its LCO Hydro membership interest.  HEG executed a Financing and Security Agreement granting the security interest on or about September 20, 2022.  Trial Ex. 49.  Berutti Energy filed a UCC-1 financing statement perfecting that security interest on March 3, 2023.  Trial Ex. 67.  HEG filed its bankruptcy petition on March 16, 2023.

To establish that the granting of the security interest was a preference, HEG must show that it was (1) a transfer; (2) of an interest of the debtor in property; (3) to or for the benefit of a creditor; (4) for or on account of an antecedent debt; (5) made while the debtor was insolvent; (6) made on or within 90 days before filing the petition, or between 90 days and one year of the petition's filing if such creditor was an "insider"; and (7) that enables such creditor to receive more than it would otherwise receive in a Chapter 7 liquidation case.

The granting of the security interest was a transfer of an interest in HEG's property to a creditor, Berutti Energy, satisfying elements (1) through (4).  *See also* Adv. No. 23-2078, Docket No. 18 ¶¶ 126-27 (answer admitting that the transfer was to or for the benefit of a creditor and for or on account of an antecedent debt).  HEG is presumed to have been insolvent during the 90-day period preceding the bankruptcy filing, satisfying element (5).  *See* 11 U.S.C. § 547(f).

The transfer is deemed to have occurred on March 3, 2023, during the 90-day period preceding the bankruptcy filing, satisfying element (6).  The Bankruptcy Code provides that for the purposes of the section addressing preferences, a transfer is made "at the time such transfer is perfected, if such transfer is perfected after such 30 days."  11 U.S.C. § 547(e)(2)(B).  Although HEG granted the security interest on September 20, 2022, Berutti Energy did not file the financing statement to perfect the security interest until March 3, 2023, more than 30 days later. As a result, the transfer is deemed made when it was perfected, on March 3, 2023.  This is within 90 days of the March 16, 2023 bankruptcy petition date.

Finally, the transfer allowed Berutti Energy to receive more than it would otherwise receive in a Chapter 7 liquidation of the HEG bankruptcy estate, satisfying element (7).  Without the security interest, Berutti Energy would be a general unsecured creditor of HEG by virtue of HEG's guarantee of the Sugarloaf Hydro loan.  It would only be entitled to receive a pro rata share of its claim from any property unencumbered by liens.  That pool of unencumbered property available for unsecured creditors would have included HEG's membership interest in LCO Hydro.  When Berutti Energy took the security interest, it became entitled to a greater share

101

of the estate assets because it could look to HEG's membership interest in LCO Hydro to satisfy its claim without having to share that value with unsecured creditors.

All of the elements of § 547(b) are satisfied and Berutti Energy has not argued that any of the exceptions under § 547(c) apply. Accordingly, the granting of the security interest in HEG's membership interest of LCO Hydro, LLC is avoided as a preference.[14]

## V.   EQUITABLE SUBORDINATION OF BERUTTI ENERGY'S CLAIM IS APPROPRIATE, BUT EQUITABLE SUBORDINATION OF MR. BERUTTI'S CLAIM BASED UPON HIS EMPLOYMENT AGREEMENT IS NOT.

The Plaintiffs assert that Mr. Berutti's proof of claim and Berutti Energy's proof of claim "should be equitably subordinated to all other claims in accordance with 11 U.S.C. § 510(c)." Adv. No. 23-2078, Docket No. 1 ¶ 136, Cause of Action No. 8.

Mr. Berutti filed a proof of claim in the amount of $672,206.20 in HEG's bankruptcy case.[15] *See* Case No. 23-21117, Claim No. 1. Mr. Berutti's claim is based upon his 2017 Employment Agreement with HEG. HEG and Mr. Harris filed objections to Mr. Berutti's claim. *See* Case No. 23-21117, Docket Nos. 125, 130. For the reasons stated elsewhere in this opinion, the Court has allowed Mr. Berutti's claim based upon the 2017 Employment Agreement in the amount of $499,902.20, of which $3,086.49 is entitled to priority under § 507(a)(4).

Berutti Energy LLC filed a proof of claim in the amount of $653,349.92 in HEG's bankruptcy case.[16] *See* Case No. 23-21117, Claim No. 2. Berutti Energy's proof of claim is based upon HEG's guarantee of Berutti Energy's loan to Sugarloaf Hydro. *Id.*, Claim No. 2. On September 20, 2022, Berutti Energy loaned $550,000 to Sugarloaf Hydro to acquire certain assets of STS Hydropower, LLC in Colorado.[17] Trial Ex. 49. To secure repayment on the

---

[14] After the completion of briefing, the Court confirmed a plan jointly proposed by some of the Debtors and Zero6 under which LCO Hydro assigned to Zero6 its Lease Agreement with the Lac Courte Oreilles Band of Lake Superior Chippewa Indians, the power purchase agreement with North Central Power Co., Inc. and "all machinery, equipment, and other property used in LCO Hydro's operations." *See* Case No. 23-21117, Docket No. 747 at 11-12 (confirmed plan at § 5.2). The LCO Hydro equity interests were not transferred to Zero6. *Id.* Presumably, though, they no longer have value after the assignment of all LCO Hydro's property.

[15] Mr. Berutti did not file a proof of claim in any of the other Debtors' cases. Debtor RWE Operations, LLC scheduled a $0 claim for the "Guaranty of Harris Energy Group's obligation for potential unemployment," but listed it as contingent, unliquidated, and disputed. Case No. 23-21120, Docket No. 42 at p. 20. In accordance with § 1111(a) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(2), Mr. Berutti was required to file a proof of claim in the RWE Operations, LLC case for Mr. Berutti to have an allowed claim in that case.

[16] Berutti Energy did not file a proof of claim in any of the other Debtors' cases either. Debtor LCO Hydro, LLC scheduled the "Guaranty of Loan to Sugarloaf Hydro, LLC," but listed it as contingent, unliquidated, and disputed. Case No. 23-21129, Docket No. 41 at 14. In accordance with § 1111(a) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(2), Berutti Energy was required to file a proof of claim in the LCO Hydro, LLC case for Berutti Energy to have an allowed claim in that case.

[17] The amount of the loan from Berutti Energy to Sugarloaf Hydro eventually increased to $625,000 in December 2022. Trial Ex. 52.

Berutti Energy loan to Sugarloaf Hydro HEG guaranteed Sugarloaf Hydro's repayment obligation to Berutti Energy. *Id*.

Section 510(c)(1) of the Bankruptcy Code provides that the court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim." Equitable subordination allows the Court "to reprioritize a claim if it determines that the claimant is guilty of misconduct that injures other creditors or confers an unfair advantage on the claimant." *In re Kreisler*, 546 F.3d 863, 866 (7th Cir. 2008). "Equitable subordination generally requires the satisfaction of three conditions: (1) the claimant must have 'engaged in some type of inequitable conduct;' (2) the misconduct must have 'resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant;' and (3) subordination must 'not be inconsistent with the provisions of the Bankruptcy Code.'" *Id*. (quoting *United States v. Noland*, 517 U.S. 535, 538-39 (1996)). The type of conduct that is considered "inequitable" "generally falls within the following categories: (1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) [the] claimant's use of the debtor as a mere instrumentality or alter ego." *Id*. (citing *In re Lifschultz Fast Freight*, 132 F.3d 339, 345 (7th Cir. 1997)).

If the conditions are met, "equitable subordination is applied only to the extent necessary to undo the effect of the misconduct on other creditors." *Id*. The result of equitable subordination "is usually that the claimant receives less money than it otherwise would (or none at all), but that is not the goal. Equitable subordination is remedial, not punitive, and is meant to minimize the effect that the misconduct has on other creditors." *Id*.

Equitable subordination of the proof of claim filed by Mr. Berutti in HEG's bankruptcy case based upon the 2017 Employment Agreement is not appropriate because Mr. Berutti did not "engage in inequitable conduct" related to his employment agreement. For the reasons already discussed in this decision, Mr. Berutti did not breach a fiduciary duty in the negotiation of his 2017 Employment Agreement with HEG. The Court has already analyzed the 2017 Employment Agreement and has held that Mr. Berutti was terminated "without cause" and his claim based upon the 2017 Employment Agreement has been allowed in the amount of $499,902.20. There is no reason to override the terms of the 2017 Employment Agreement and equitably subordinate Mr. Berutti's claim.

Equitable subordination of the proof of claim filed by Berutti Energy in HEG's bankruptcy case based upon HEG's guarantee of the loan to Sugarloaf Hydro is a different story. Berutti Energy engaged in inequitable conduct in obtaining the guarantee. As already discussed, Mr. Berutti breached his fiduciary duty in obtaining HEG's guarantee of the $625,000 loan from Berutti Energy to Sugarloaf Hydro. He used HEG to guarantee a loan that benefitted him as one of the owners of Sugarloaf Hydro (through his Trust), with no benefit to HEG. He also leveraged HEG for the purpose of ensuring that he would be repaid on a loan he made (through Berutti Energy), again, with no benefit to HEG. This misconduct both resulted in an injury to HEG's other creditors and conferred an unfair advantage on Berutti Energy. Based upon the claim that it has filed, Berutti Energy would be entitled to a pro rata share of any distributions to general unsecured creditors. Other general unsecured creditors would receive reduced distributions because of Berutti Energy's claim. Distributions to Berutti Energy would also

confer an unfair advantage on Berutti Energy, resulting in Berutti Energy getting "something for nothing" after HEG guaranteed debt that did not benefit it in any way. Accordingly, Claim No. 2 filed by Berutti Energy will be equitably subordinated to all other claims filed in HEG's bankruptcy case.

In conclusion, and for the foregoing reasons,

IT IS THEREFORE ORDERED: Claim No. 1 filed by Thomas A. Berutti in *In re Harris Energy Group, Inc.*, No. 23-21117-kmp, is allowed as a general unsecured claim in the amount of $499,902.20, of which $3,086.49 is entitled to priority under 11 U.S.C. § 507(a)(4).

IT IS FURTHER ORDERED: Claim No. 2 filed by Berutti Energy, LLC in *In re Harris Energy Group, Inc.*, Case No. 23-21117-kmp, is equitably subordinated to all other claims.

IT IS FURTHER ORDERED: Plaintiff Harris Energy Group, Inc. shall recover from Defendant Thomas A. Berutti the amount of one million dollars ($1,000,000.00) on the First Claim for Relief in *Harris Energy Group, Inc. et al. v. Berutti et al.*, Adv. No. 23-2078, and the Clerk shall enter judgment accordingly.

IT IS FURTHER ORDERED: the security interest that Harris Energy Group, Inc. granted to Berutti Energy, LLC in its membership interest in LCO Hydro, LLC is avoided as a preferential transfer and the Clerk shall enter judgment in favor of the Plaintiff on the Seventh Claim for Relief in *Harris Energy Group, Inc. et al. v. Berutti et al.*, Adv. No. 23-2078.

IT IS FURTHER ORDERED: all other relief requested in the complaints filed as *Harris Energy Group, Inc. et al. v. Berutti et al.*, Adv. No. 23-2078 and *Renewable World Energies, LLC v. Harris et al.*, Adv. No. 23-2080, is denied.

#####

104